# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

STEPHEN G. SAMARAS, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

FIAT CHRYSLER AUTOMOBILES N.V., SERGIO MARCHIONNE, RICHARD K. PALMER, and REID BIGLAND,

Defendants.

Court Action No.

_____

Hon.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Stephen G. Samaras ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon an investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the filings of Fiat Chrysler Automobiles N.V. ("FCA" or the "Company") with the United States Securities and Exchange Commission ("SEC"), Company news releases and conference calls, public statements issued by Defendants, securities analyst reports, and media and industry reports.  Plaintiff believes that substantial additional evidentiary support will exist

for the allegations set forth herein after Plaintiff has had a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of all persons who purchased FCA securities between October 29, 2014, and July 18, 2016, inclusive (the "Class Period"), on a domestic exchange, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      FCA, a Dutch corporation headquartered in London, United Kingdom, is an international automotive group engaged in designing, engineering, manufacturing, distributing, and selling vehicles, components, and production systems.  The Company's vehicles are produced for the mass market under the Abarth, Alfa Romeo, Chrysler, Dodge, Fiat, Fiat Professional, Jeep, Lancia, and Ram brands and the SRT performance vehicle designation.

3.      The Company sells vehicles in the United States through its U.S. subsidiary FCA US LLC ("FCA US"), a Delaware corporation headquartered in Auburn Hills, Michigan.

4.      Throughout the Class Period, Defendants made false and misleading statements and failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants misrepresented the Company's

growth by purposefully inflating FCA's vehicle sales numbers and falsely touting its streak of U.S. monthly vehicle sales growth (on a year-over-year basis).

5.      The truth about FCA's business practices began to surface on January 12, 2016, when an FCA-affiliated dealer filed a lawsuit accusing FCA US of paying dealers to improperly inflate vehicle sales numbers by reporting unsold vehicles as sold and then reversing those fictional sales during the following month.[1]  News outlets reported on the lawsuit on January 13, 2016, and over the following two trading-days, the price of the Company's common shares declined $0.66 per share, or more than 8%, from a close of $8.19 per share on January 12, 2016, to close at $7.53 per share on January 14, 2016.

6.      Additional corrective information surfaced on July 18, 2016, when reports disclosed that FCA was the subject of a government investigation into the Company's reporting of vehicle sales numbers.  That same day, FCA confirmed that it was cooperating with an SEC investigation into FCA's reporting of vehicle sales to "end customers" in the U.S. and that the U.S. Department of Justice ("DOJ") had also made similar inquiries into the issue.  As the market digested this news, the price of the Company's common shares declined $0.19 per share, or nearly 3% over two trading-days, from a close of $6.75 per share on July 15, 2016, to close at $6.56 per share on July 19, 2016.

---

[1] *Napleton's Arlington Heights Motors, Inc. v. FCA US, LLC, et al.*, No. 16-cv-00403 (N.D. Ill.).

7.     On July 26, 2016, the Company announced that it had revised its process for reporting monthly U.S. vehicle sales, revealing that its much publicized 75-month streak of monthly vehicle sales growth (on a year-over-year basis) actually ended at 40 months in September 2013.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business throughout this District, the Company's U.S. subsidiary, FCA US, has its executive offices in this District, and a substantial part of the events giving rise to these claims took place in this District.

11.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff, Stephen G. Samaras, as set forth in the accompanying certification attached as Exhibit A, incorporated by reference herein, purchased FCA common shares at artificially inflated prices during the Class Period and has been damaged thereby.

13.    Defendant FCA is a Dutch corporation headquartered in London, United Kingdom, which designs, engineers, manufactures and sells passenger cars, light commercial vehicles, components, and production systems worldwide.

14.    Defendant Sergio Marchionne ("Marchionne") is and, throughout the Class Period, was the Company's Chief Executive Officer.

15.    Defendant Richard K. Palmer ("Palmer") is and, throughout the Class Period, was the Company's Chief Financial Officer.

16.    Defendant Reid Bigland ("Bigland") is and, throughout the Class Period, was the Company's Head of U.S. Sales.

17.    Defendants Marchionne, Palmer, and Bigland are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

18. FCA was incorporated as a Dutch public limited liability company on April 1, 2014, under the name Fiat Investments N.V. for the purposes of carrying out the reorganization of the Fiat Chrysler Group, including the merger of Fiat S.p.A. ("Fiat") with and into Fiat Investments N.V. (the "Merger"). Upon the completion of the Merger, on October 12, 2014, Fiat Investments N.V. was renamed Fiat Chrysler Automobiles N.V., as the successor entity to Fiat and the holding company of the Fiat Chrysler Group.

19. Throughout the Class Period, FCA placed significant focus on its U.S. vehicle sales growth—in other words, the appearance of increasing retail sales by

dealers to end customers. Among other things, FCA prominently touted consecutive increases of its monthly U.S. vehicle sales (on a year-on-year basis) across its U.S. brands in its monthly press releases reporting U.S. vehicle sales volume. FCA's vehicle sales numbers were also included in its quarterly and annual reports. FCA's vehicle sales figures and its "sales streak" provided the investing public with an important indicator of the underlying health of FCA's business.

**Materially False and Misleading
Statements Issued During the Class Period**

20. The Class Period begins on October 29, 2014, to coincide with the filing of the Company's third-quarter 2014 financial results, filed on Form 6-K with the SEC. The October 29, 2014 Form 6-K reported total sales of 633,000 vehicles in FCA's "NAFTA" region, which includes the U.S., Canada, and Mexico, for the third-quarter 2014, representing an 18% increase from the third-quarter 2013.

21. On December 3, 2014, FCA issued a press release reporting sales of 170,839 vehicles in the U.S. in November 2014, a 20% increase compared with sales of 142,275 vehicles in November 2013. The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 56-consecutive months."

22. On January 6, 2015, FCA issued a press release reporting sales of 193,261 vehicles in the U.S. in December 2014, a 20% increase compared with

sales of 161,007 vehicles in December 2013.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 57-consecutive months."

23.     On January 28, 2015, the Company released its financial results for the fourth-quarter 2014 and full-year 2014 on Form 6-K filed with the SEC.  The January 28, 2015 Form 6-K reported total sales of 2,459,000 vehicles in FCA's NAFTA region for 2014, which represented a 15% increase from 2013.

24.     On February 3, 2015, FCA issued a press release reporting sales of 145,007 vehicles in the U.S. in January 2015, a 14% increase compared with sales of 127,183 vehicles in January 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 58-consecutive months." Similarly, Defendant Bigland highlighted that the Company "kicked off 2015 with a 14 percent increase in sales and extended [its] year-over-year sales streak to 58-consecutive months."

25.     On March 3, 2015, FCA issued a press release reporting sales of 163,586 vehicles in the U.S. in February 2015, a 6% increase compared with sales of 154,866 vehicles in February 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 59-consecutive months." Similarly, Defendant Bigland highlighted that the Company "extended [its] year-over-year sales streak to 59-consecutive months."

26.   On March 5, 2015, the Company filed its 2014 Annual Report on Form 20-F with the SEC, which reported that the Company had total sales of 2,459,000 vehicles in FCA's NAFTA region for 2014.  The 2014 Annual Report was also accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002 ("SOX"), by Defendants Marchionne and Palmer, who both certified that the 2014 Annual Report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

27.   On April 1, 2015, FCA issued a press release reporting sales of 197,261 vehicles in the U.S. in March 2015, a 2% increase compared with sales of 193,915 vehicles in March 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 60-consecutive months." Similarly, Defendant Bigland highlighted that the Company was "able to extend [its] year-over-year sales streak to an even 60-consecutive months."

28.   On April 29, 2015, the Company released its first-quarter 2015 financial results on Form 6-K filed with the SEC.  The April 29, 2015 Form 6-K reported total sales of 587,000 vehicles in FCA's NAFTA region for the first-quarter 2015, an increase of 6% from first-quarter 2014.

29.   On May 1, 2015, FCA issued a press release reporting sales of 189,027 vehicles in the U.S. in April 2015, a 6% increase compared with sales of

178,652 vehicles in April 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 61-consecutive months." Similarly, Defendant Bigland highlighted that "[FCA] launched the spring selling season with nine vehicle sales records and a 6 percent year-over-year increase that extends [FCA's] sales streak to 61-consecutive months of sales gains."

30.    On June 2, 2015, FCA issued a press release reporting sales of 202,227 vehicles in the U.S. in May 2015, a 4% increase compared with sales of 194,421 vehicles in May 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 62-consecutive months." Similarly, Defendant Bigland highlighted that the Company "achieve[ed] [its] 62nd-consecutive month of year-over-year sales increases."

31.    On July 1, 2015, FCA issued a press release reporting sales of 185,035 vehicles in the U.S. in June 2015, an 8% increase compared with sales of 171,086 vehicles in June 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 63-consecutive months." Similarly, Defendant Bigland highlighted that "June represented another strong month for [the] company with sales up 8 percent and [FCA's] 63rd-consecutive month of year-over-year sales increases."

32.    On July 30, 2015, the Company released its second-quarter 2015 financial results on Form 6-K filed with the SEC.  The July 30, 2015 Form 6-K

reported total sales of 682,000 vehicles in FCA's NAFTA region for the second-quarter 2015, an increase of 5% from the second-quarter 2014.

33.     On August 3, 2015, FCA issued a press release reporting sales of 178,027 vehicles in the U.S. in July 2015, a 6% increase compared with sales of 167,667 vehicles in July 2014.   The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 64-consecutive months." Similarly, Defendant Bigland highlighted that the Company was "able to achieve [its] 64th-consecutive month of year-over-year sales increases."

34.     On October 28, 2015, the Company released its third-quarter 2015 financial results on Form 6-K filed with the SEC.   The October 28, 2015 Form 6-K reported total sales of 674,000 vehicles in FCA's NAFTA region for the third-quarter 2015, an increase of 7% from the third-quarter 2014.

35.     On September 1, 2015, FCA issued a press release reporting sales of 201,672 vehicles in the U.S. in August 2015, a 2% increase compared with sales of 198,379 vehicles in August 2014.   The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 65-consecutive months." Similarly, Defendant Bigland highlighted that the Company's "dealer's competitive spirit kicked in and propelled [FCA] to [its] 65th-consecutive month of year-over-year sales increases."

36.     On October 1, 2015, FCA issued a press release reporting sales of 193,019 vehicles in the U.S. in September 2015, a 14% increase compared with sales of 169,890 vehicles in September 2014.  The Company also touted that "[t]he company extended its streak of year-over-year sales gains to 66-consecutive months."  Similarly, Defendant Bigland also highlighted that the Company was "able to achieve … [its] 66th-consecutive month of year-over-year sales growth."

37.     On November 3, 2015, FCA issued a press release reporting sales of 195,545 vehicles in the U.S. in October 2015, a 15% increase compared with sales of 170,480 vehicles in October 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 67 consecutive months."  Similarly, Defendant Bigland highlighted that "October marks [FCA's] 67th-consecutive month of year-over-year sales growth."

38.     On December 1, 2015, FCA issued a press release reporting sales of 175,974 vehicles in the U.S. in November 2015, a 3% increase compared with sales of 170,839 vehicles in November 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 68-consecutive months."  Similarly, Defendant Bigland highlighted that the Company recorded its "68th-consecutive month of year-over-year sales increases."

39.     On January 5, 2016, FCA issued a press release reporting sales of 217,527 vehicles in the U.S. in December 2015, a 13% increase compared with

sales of 193,261 vehicles in December 2014.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 69 consecutive months." Similarly, Defendant Bigland highlighted that the Company's "U.S. sales have now grown annually for the past six years."

40.    On January 27, 2016, the Company released its financial results for the fourth-quarter 2015 and full-year 2015 on Form 6-K filed with the SEC.  The January 27, 2016 Form 6-K reported total sales of 2,624,000 vehicles in FCA's NAFTA region for the year ended December 31, 2015, a 7% increase from 2014.

41.    On February 2, 2016, FCA issued a press release reporting sales of 155,037 vehicles in the U.S. in January 2016, a 7% increase compared with sales of 145,007 vehicles in January 2015.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 70-consecutive months." Similarly, Defendant Bigland highlighted that the Company achieved its "70th-consecutive month of year-over-year sales increases."

42.    On February 29, 2016, the Company filed its 2015 Annual Report on Form 20-F with the SEC, which reported that the Company had total sales of 2,624,000 vehicles in FCA's NAFTA region for 2015.  The 2015 Annual Report was also accompanied by SOX certifications signed by Defendants Marchionne and Palmer that were identical to the certifications contained in ¶26, *supra*.

43.     On March 1, 2016, FCA issued a press release reporting sales of 182,879 vehicles in the U.S. in February 2016, a 12% increase compared with sales of 163,586 vehicles in February 2015.  The Company also touted that "[t]he group extended its streak of year-over-year sales gains to 71-consecutive months." Similarly, Defendant Bigland highlighted that the Company realized its "71st-consecutive month of year-over-year sales increases."

44.     On April 1, 2016, FCA issued a press release reporting sales of 213,187 vehicles in the U.S. in March 2016, an 8% increase compared with sales of 197,261 vehicles in March 2015.  Similarly, Defendant Bigland highlighted that the Company "extended [its] year-over-year monthly sales gains to six full years."

45.     On April 26, 2016, the Company released its financial results for the first-quarter 2016 on Form 6-K filed with the SEC.  The April 26, 2016 Form 6-K reported total sales of 634,000 vehicles in FCA's NAFTA region for the first-quarter 2016, an increase of 8% from the first-quarter 2015.

46.     On May 3, 2016, FCA issued a press release reporting sales of 199,631 vehicles in the U.S. in April 2016, a 6% increase compared with sales of 189,027 vehicles in April 2015.

47.     On June 1, 2016, FCA issued a press release reporting sales of 204,452 vehicles in the U.S. in May 2016, a 1% increase compared with sales of 202,227 vehicles in May 2015.

48.    On July 1, 2016, FCA issued a press release reporting sales of 197,073 vehicles in the U.S. in June 2016, a 7% increase compares with sales of 185,035 vehicles in June 2015.

49.    The statements contained in ¶¶20 to 48 regarding the Company's sales streak, business, and operations were materially false and misleading when made because the Defendants, as detailed in the *Napleton's Arlington Heights* litigation, were artificially manipulating reported vehicle sales figures by offering dealers financials incentives to report fictional vehicle sales.

### The Truth Begins to Emerge

50.    On January 12, 2016, an FCA-affiliated dealer filed a lawsuit accusing FCA US of paying dealers to improperly inflate vehicles sales numbers by reporting unsold vehicles as sold and then reversing those sales during the following month.[2]  Specifically, two dealerships of Napleton Automotive Group, a Chicago-area dealership group affiliated with FCA, alleged civil racketeering claims, among others, and detailed how FCA US had engaged in a scheme to manipulate monthly vehicle sales numbers to perpetuate the Company's highly touted monthly vehicle sales growth streak.  The lawsuit detailed how FCA US offered financial incentives to dealers to report unsold vehicles as sold on the last day of the month and then to reverse or "unwind" those sales the next business day

---

[2] *See Napleton's Arlington Heights Motors, Inc. v. FCA US, LLC, et al.*, No. 16-cv-00403 (N.D. Ill.).

(in the following month).  According to the lawsuit, FCA benefited from this illicit practice because it "results in the inflation of the number of year over year sales which, in turn, create the appearance that FCA's performance is better than, in reality, it actually is."  The media reported on the lawsuit on January 13, 2016.[3] On this news, the price of the Company's common shares declined $0.66 per share, or more than 8% over two trading-days, from a close of $8.19 per share on January 12, 2016, to close at $7.53 per share on January 14, 2016.

51.     On July 18, 2016, several news outlets reported that the DOJ and SEC were investigating the Company's sales practices.  Following these reports, FCA issued a press release on July 18, 2016, confirming that it was cooperating with an SEC investigation into FCA's reporting of vehicle sales to "end customers" in the U.S. and that the DOJ was also investigating FCA for its conduct.  As the market digested this news, the price of the Company's common shares declined $0.19 per share, or nearly 3% over two trading-days, from a close of $6.75 per share on July 15, 2016, to close at $6.56 per share on July 19, 2016.

52.     On July 26, 2016, the Company announced that it had revised the way it reports monthly U.S. vehicle sales, revealing that its much publicized 75-month streak of U.S. monthly vehicle sales growth (on a year-over-year basis) actually ended at 40 months in September 2013.

---

[3] *See, e.g.*, Larry P. Vellequette, *Dealerships accuse Fiat Chrysler of falsifying U.S. sales*, AUTOMOTIVE NEWS, Jan. 13, 2016.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased FCA securities during the Class Period on a domestic exchange (the "Class").  Excluded from the Class are Defendants, directors and officers of FCA, and their families and affiliates.

54.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The Company's shares are likely owned by thousands of persons.

55.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)   Whether Defendants violated the Exchange Act;
>
> (b)   Whether Defendants omitted and/or misrepresented material facts;
>
> (c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of FCA securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

56.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

57.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

58.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

59.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of FCA's securities were artificially inflated throughout the Class Period by Defendants' false and misleading statements, and significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

causing investors' losses.  As a result of their purchases of FCA securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

60.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

61.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded domestically on the New York Stock Exchange ("NYSE"), an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased FCA securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

62.     At all relevant times, the market for FCA securities was efficient for the following reasons, among others: (i) as a regulated issuer, FCA filed periodic public reports with the SEC; (ii) FCA regularly communicated with public investors through established market communication mechanisms, including through regular disseminations of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and (iii) FCA's securities traded domestically on the NYSE, an efficient market.

## NO SAFE HARBOR

63.     Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

64.     Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of FCA who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**FIRST CLAIM**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     During the Class Period, FCA and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FCA securities at artificially inflated prices.  In furtherance of

this unlawful scheme, plan and course of conduct, each of these Defendants, took the actions set forth herein.

67.    FCA and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FCA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

68.    Defendants Class Period statements were issued with actual knowledge of their falsity or were issued with extreme recklessness.

69.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of the Exchange Act
## Against the Individual Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of FCA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements issued by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, FCA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

74. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)  Awarding damages and equitable relief in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 29, 2016

Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Naumon A. Amjed
Ryan T. Degnan
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com

*Attorneys for Plaintiff Stephen G.
Samaras*