# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

STEPHEN G. SAMARAS, Individually
and On Behalf of All Others Similarly
Situated,

              Plaintiff,

     v.

FIAT CHRYSLER AUTOMOBILES
N.V., SERGIO MARCHIONNE,
RICHARD K. PALMER, and REID
BIGLAND,

              Defendants.

Case No. 4:16-cv-12803-LVP-SDD
Hon. Linda V. Parker

**CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES
LAWS**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................2

II.     JURISDICTION AND VENUE ............................................................7

III.    PARTIES AND RELEVANT NON-PARTIES ....................................8

        A.      Lead Plaintiffs .............................................................................8

        B.      Corporate Defendant ...................................................................9

        C.      Individual Defendants ...............................................................10

        D.      Relevant Non-Parties.................................................................12

                1.      CW-1 .................................................................................12

                2.      CW-2 .................................................................................13

IV.     OVERVIEW OF DEFENDANTS' FRAUD........................................13

        A.      The Fall of One of America's Big Three Automakers........................13

        B.      Marchionne's Vision for Chrysler............................................15

        C.      Marchionne and Bigland Target Sales Growth in the U.S.
                Market..........................................................................................16

        D.      FCA Ramps Up U.S. Sales Targets ...........................................19

        E.      Overview of FCA's U.S. Sales Operations................................22

        F.      Defendants Fraudulently Tout the FCA's Monthly U.S.
                Sales Streak ................................................................................30

        G.      The Company Induces Its Dealers to Falsify Sales in
                Order to Maintain Its Streak................................................37

                1.      Denver Business Center....................................................40

                2.      Southwest Business Center ..............................................45

                3.      Great Lakes Business Center and FCA Canada ................47

                4.      Midwest Business Center and Northeast Business
                        Center ................................................................................49

                5.      Mid-Atlantic Business Center and Southeast
                        Business Center ................................................................50

i

      6.    Defendants' Internal Investigation Reveals Thousands of Undisclosed Fake Sales ...................................... 51

    H.    Defendants' Scheme Is Slowly Revealed ............................. 53

V.    DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..................... 62

VI.    THE TRUTH BEGINS TO EMERGE ....................................... 116

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER ..................... 129

VIII.  LOSS CAUSATION/ECONOMIC LOSS ................................ 146

IX.    CLASS ACTION ALLEGATIONS ............................................ 149

X.    LEAD PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ............................................ 152

XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ....................... 154

XII.    CAUSES OF ACTION ............................................................... 155

XIII.  PRAYER FOR RELIEF ............................................................. 162

XIV.  JURY TRIAL DEMANDED ...................................................... 162

Court-appointed Lead Plaintiffs Carl Palazzolo and Albert Ferrandi, ("Lead Plaintiffs"), by and through their undersigned counsel, file this Consolidated Class Action Complaint for Violations of the Federal Securities Laws asserting claims individually and on behalf of all individuals or entities that purchased or otherwise acquired the publicly traded common stock of Fiat Chrysler Automobiles N.V. ("FCA" or the "Company") between November 3, 2014 and July 26, 2016, inclusive (the "Class Period"), and were damaged thereby, against FCA and FCA's Chief Executive Officer Sergio Marchionne ("Marchionne"), Chief Financial Officer Richard K. Palmer ("Palmer"), and Head of U.S. Sales Reid Bigland ("Bigland") (collectively, the "Individual Defendants"; together with FCA, the "Defendants").  Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.

Lead Plaintiffs' information and belief concerning matters other than themselves and their own acts are based upon, among other things, a review and analysis of:  (i) public filings made by FCA with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements issued by FCA and the Individual Defendants; (iii) securities analysts' reports about FCA; (iv) media and news reports related to FCA; (v) data and other information concerning FCA securities; (vi) pleadings filed in related litigation,

including *Napleton's Arlington Heights Motors, Inc., et al. v. FCA US LLC, et al.*, Case No. 1:16-cv-00403 (N.D. Ill. 2016) (the "Dealer Lawsuit"); (vii) other publicly available information concerning the Company and the Individual Defendants; and (viii) an investigation conducted by and through Lead Plaintiffs' attorneys and their investigators, which included interviews of former employees of FCA. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Defendant FCA is a worldwide automotive designer, manufacturer, and retailer. FCA operates in the United States through its wholly-owned subsidiary—FCA US LLC ("FCA US")—which was formerly known as Chrysler Group LLC ("Chrysler"). Chrysler has long been recognized as one of the "big three" automakers in the United States, along with Ford and General Motors ("G.M.").

2.    Chrysler hit rock bottom financially between 2006 and 2008, losing in excess of $30 billion. Ultimately reorganizing through bankruptcy, and benefitting from a bailout by the federal government, Chrysler sought to regain success and prominence in the auto industry beginning in 2009. Chrysler consolidated with

Fiat S.p.A ("Fiat"), an Italian automaker headed by Defendant Marchionne. Defendant Marchionne took the reins of the consolidated entity in June 2009.

3.     Defendants immediately began focusing on increasing U.S. retail sales as the key to turning around Chrysler.  In a five-year plan created in 2009, Chrysler sought to increase U.S. retail sales by greater than 50% and its U.S. market share from less than 9% in 2009 to greater than 13% by 2014.

4.     Right out of the gate, Chrysler appeared to enjoy success in retail sales under the leadership of Marchionne.  In February 2010, Chrysler reported its first positive monthly U.S. sales results in 26 months.  By the time Chrysler became a wholly owned subsidiary of Defendant FCA in October 2014, Chrysler had reported year-over-year monthly U.S. sales growth for 54 straight months.

5.     FCA common stock began trading on the New York Stock Exchange ("NYSE") on October 13, 2014.  The "streak"—i.e., the year-over-year monthly U.S. sales growth Defendants touted in press releases and other public statements—immediately enabled FCA to raise billions of dollars in capital in December 2014.  Specifically, the Company completed:  (i) a secondary offering of common stock, raising over $1 billion; and (ii) an offering of convertible securities, generating an additional $2.875 billion.

6.     By the start of the Class Period on November 3, 2014, the streak was front and center in the Company's public statements.  For each and every month

3

during the Class Period, Defendants trumpeted that the streak was alive and well, purportedly reaching 75 months by July 2016.

7.    Defendants regularly described the streak as a "source of pride for our entire organization," and attributed the Company's apparent success to its "business plan, our products and our market share," as well as FCA's dealers' "competitive spirit."  Defendant Marchionne boasted, "we've had almost six years of uninterrupted growth in the United States. . . . That's not an inconsequential feat.  I'm proud of what the kids have done.  I think they've done a phenomenal job."  Marchionne added that the Company's streak was proof that FCA was doing something right.

8.    Market praise for the Company and its purported year-over-year monthly U.S. sales growth streak came from all corners:

- On November 4, 2014, an industry analyst commented, "Chrysler is on a streak of growth that's virtually unheard of for American auto manufacturers . . . ."

- In December 3, 2014, *USA Today* reported, "Chrysler Group again was the stunner—registering a hefty 20% sales jump in November, the automaker's 56th consecutive monthly increase."

- On January 5, 2015, *CNNMoney.com* called FCA the "[s]exiest auto stock" and a "well-oiled sales machine," noting that "The company has topped Joe Dimaggio:  It's the 57th consecutive month of year-over-year sales increases."

- On January 17, 2015, the *Toronto Star* noted, "Marchionne's Chrysler posted an astonishing 56 months of consecutive sales

4

gains in the all-important U.S. market. To say this has surprised industry experts is an understatement."

- *USA Today* reported on April 2, 2015, "[f]or Fiat Chrysler . . . March marked the 60th consecutive month of year-over-year monthly sales gains, an astounding five-year streak virtually unheard of in the U.S. auto industry."

- On May 2, 2015, the *New York Times* observed, "Fiat Chrysler continued its winning streak with its 61st consecutive month of sales gains . . . ."

- *USA Today* opined on July 17, 2015, "Chrysler has been the unexpected darling of the company, rebounding quickly after bankruptcy . . . the automaker's sales have risen for 63 consecutive months . . . ."

- *Automotive News* noted on March 14, 2016 that FCA "own[s] the industry's most noteworthy sales streak with 71 months of U.S. gains."

- On July 2, 2016, the *Detroit Free Press* reported, "Fiat Chrysler Automobiles on Friday kept its improbable sales streak alive in June . . . . marking the 75th consecutive month of year-over-year sales gains."

9.     Indeed, the streak even appeared to survive down periods in the auto industry, when the Company's competitors reported adverse results, and continued notwithstanding analyst predictions that it would cease. For instance, in September 2015, the *New York Times* reported that, "Fiat Chrysler posted a 2 percent gain, despite analysts' predictions of a loss, allowing the company to continue a streak of 65 months of year-over-year gains, which many had thought was finally poised to end." *Just-auto* likewise observed that, "[d]espite almost unanimous predictions

that Fiat Chrysler's long streak of year-over-year growth would end, healthy Jeep sales kept things in the black for what is now 65 consecutive months."

10.     In a series of shocking revelations beginning in January 2016, however, the market ultimately learned that FCA's streak was pure fabrication. Indeed, Defendants finally admitted in July 2016 that the streak had actually ended in November 2014—nearly a year before the Class Period began.  Unbeknownst to the Class and the market until the end of the Class Period, FCA's purported streak was grounded in a series of fraudulent and false sales typically executed at the end of the month to merely create the perception of growth.  The sales were reversed internally shortly thereafter, yet not reported to the market.  In order to persuade Company dealers to carry out the false sales, senior FCA officials even bribed the retail dealers within FCA's network of franchises with factory cash bonuses, expense reimbursements, and other incentives.  Internally, the illicit sales policies and procedures were referred to as "unnatural acts," which were overseen by a fictitious group dubbed the "unnatural acts department."

11.     On July 18, 2016, various news outlets reported that FCA was being investigated by the SEC, the Federal Bureau of Investigation ("FBI"), and the U.S. Department of Justice ("DOJ") concerning the Company's reporting of monthly U.S. sales figures.  Those investigations remain ongoing.

12.    Defendants' lies and misrepresentations concerning the streak and FCA's U.S. monthly sales growth caused FCA common stock to be artificially inflated throughout the Class Period.  Through partial revelations of the fraud on or about January 13, 2016, July 18, 2016, and July 26, 2016, the artificial inflation was removed from FCA's common stock, costing the Class hundreds of millions of dollars in damages.  This Action seeks to recoup those losses.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.    The Court has personal jurisdiction over the Defendants because each has purposefully availed itself or himself of the privilege of doing business within the District and maintains continuous and systematic contacts with the District. For example, FCA conducts a substantial amount of business in the District and the Company's U.S. subsidiary, FCA US, has its executive offices in the District. Moreover, a substantial part of the events giving rise to these claims took place in the District, and certain of the acts that constitute the violations of law complained

of herein, including the dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from the District.  In addition to conducting business in the District, Defendants Marchionne and Palmer both maintain residences in the District.

16.     Venue is proper in the District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business throughout the District, the Company's U.S. subsidiary, FCA US, has its executive offices in the District, and a substantial part of the events giving rise to these claims took place in the District.

17.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and facilities of the national securities markets.

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.    Lead Plaintiffs

18.     Lead Plaintiff Carl Palazzolo is an individual who purchased FCA common stock during the Class Period, as reflected in his certification previously filed with the Court (ECF No. 11-2), and suffered damages as a result of the federal securities laws violations alleged herein.  By order dated January 18, 2017, the Court appointed Mr. Palazzolo as a Lead Plaintiff in this action.

19.    Lead Plaintiff Albert Ferrandi is an individual who purchased FCA common stock during the Class Period, as reflected in his certification previously filed with the Court (ECF No. 11-2), and suffered damages as a result of the federal securities laws violations alleged herein.  By order dated January 18, 2017, the Court appointed Mr. Ferrandi as a Lead Plaintiff in this action.

## B.    Corporate Defendant

20.    Defendant FCA is incorporated under the laws of the Netherlands, and maintains its corporate headquarters in London, United Kingdom.  The Company designs, engineers, manufactures, and sells passenger cars, light commercial vehicles, components, and production systems worldwide.

21.    FCA operates in the U.S. through its wholly owned subsidiary, FCA US, which was formerly known as Chrysler.  FCA is the product of the October 12, 2014 merger between Italian automaker Fiat and FCA US.  FCA, as the sole beneficial owner of FCA US's membership interests, controls FCA US's management, operations, and corporate decisions.  FCA also has the power to appoint all of FCA US's directors.  Accordingly, FCA has ultimate authority over FCA US's actions, including its public statements.

22.    FCA's operations are reported through six segments: (i) four regional mass market vehicle segments: North America (or NAFTA),[1] LATAM, APAC and EMEA; (ii) Maserati; and (iii) a global Components segment.  FCA's North America segment, which includes and is driven primarily by its U.S. auto sales, generates roughly 90% of the Company's earnings before income and taxes.

23.    FCA's common stock trades on the NYSE under the ticker "FCAU" and did so throughout the Class Period.

**C.    Individual Defendants**

24.    Defendant Sergio Marchionne is and, throughout the Class Period, was the Chief Executive Officer ("CEO") of both FCA and FCA US. Marchionne also served as Chairman of FCA US's Board of Directors.  Since October 2014, Marchionne has served as Chairman of Ferrari S.p.A. ("Ferrari").  Marchionne leads FCA's Group Executive Council, the Company's highest management body. He has also been Chief Operating Officer of the North America segment since September 2011.  During the Class Period, Marchionne was responsible for the day-to-day management and controlled and directed the business and activities of FCA, including certifying FCA's periodic financial reports filed with the SEC, and

---

[1]    The North America segment is the largest of FCA's four regional mass-market vehicle segments, and includes the United States, Canada, Mexico, and the Caribbean Islands.

speaking on a regular basis with investors and securities analysts regarding the Company.

25.    Defendant Richard K. Palmer is and, throughout the Class Period, was the Company's Chief Financial Officer ("CFO"). Palmer was appointed CFO and named a member of the Group Executive Council in September 2011. Palmer has also been CFO of FCA US since June 2009, and is responsible for all FCA US finance activities including corporate controlling, treasury, and tax. Palmer also sits on the Board of Directors of FCA US. Palmer joined FCA US from FCA Italy, where he held the position of CFO since December 2006. He joined Fiat in 2003 as CFO of Comau and in 2005 moved to Iveco in the same role. Palmer is a Chartered Accountant and member of the Institute of Chartered Accountants in England and Wales. During the Class Period, Palmer certified FCA's periodic financial reports filed with the SEC and spoke on a regular basis with investors and securities analysts regarding the Company. Palmer also signed all but one of the materially misleading Class Period monthly press releases touting the Company's U.S. sales growth streak, which were filed with the SEC on Form 6-K.

26.    Defendant Reid Bigland is and, throughout the Class Period, was the Company's Head of U.S. Sales, a position he has held since June 2011. In that role, he reports directly to Marchionne, and has full responsibility for sales strategy, dealer relations and operations, order facilitation, incentives and field

operations. Bigland was named a member of the Group Executive Council in September 2011. Bigland is also the Chairman, President, and CEO of FCA Canada and the Head of the Alfa Romeo and Maserati vehicle brands, roles he assumed in July 2006 and May 2016, respectively. Prior to these roles, Bigland was the President and CEO of the Ram Truck brand and President and CEO of the Dodge brand. During the Class Period, Bigland spoke on a regular basis with investors and securities analysts regarding the Company.

### D.    Relevant Non-Parties

27.    Lead Plaintiffs' allegations are based, in part, upon information provided by confidential witnesses ("CWs") who are former employees of FCA.

#### 1.    CW-1

28.    CW-1 worked for FCA and its predecessors in various managerial positions from over ten years prior to the Class Period to late-2016. During the Class Period, CW-1 was a managerial-level employee with accounting and finance responsibilities in the Denver Business Center, and reported to that Business Center's Director, Steven Yandura ("Yandura"), who reported directly to Defendant Bigland and Jeffrey Kommor ("Kommor"), FCA's Vice President of U.S. Sales Operations. In her[2] Class Period-role, CW-1's job responsibilities included processing and maintaining records of all payment activity to dealers

---

[2]    To preserve anonymity, all CWs are referred to herein using feminine pronouns.

operating within the Denver Business Center, including marketing related expenses.

### 2.    CW-2

29.    CW-2 worked for FCA and its predecessors in various positions from over ten years prior to the Class Period to late-2015.  During the Class Period, CW-2 was an Area Sales Manager in the Southwest Business Center.  CW-2 reported to Southwest Business Center Director Mike Dragojevic ("Dragojevic") beginning in January 2015, and former Director Shannon T. Carr prior to January 2015.  Both Dragojevic, and Carr before him, reported directly to Defendant Bigland and Vice President Kommor.  In her role as an Area Sales Manager, CW-2 interacted with the dealerships in her area, was tasked with increasing their sales, made certain they ordered the vehicles FCA wanted them to order, and assisted them in achieving their Volume Growth Program targets.

## IV.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    The Fall of One of America's Big Three Automakers

30.    Chrysler, now known as FCA US, has long been known as one of the big three automakers in the United States.  Along with its larger American siblings, G.M. and Ford, the big three dominated the lucrative U.S. auto market for decades.  Yet, despite its seemingly ingrained status as an industry stalwart, Chrysler was hit particularly hard by the Great Recession.  From 2006 to 2008, Chrysler lost $30 billion.

31.    As the *New York Times* later reported, Chrysler's "quality was abysmal.  Every model in the company's Chrysler, Dodge and Jeep brands ranked in the bottom 25 percent in the J. D. Power & Associates survey of customer satisfaction."  Further, the Company had fallen behind Toyota in total U.S. sales, and was close to being overtaken by Honda for fourth best in the U.S. sales market.

32.    By mid-2008, the White House's auto industry task force had concluded flatly that Chrysler was "not viable as a stand-alone company."

33.    At the same time Chrysler was struggling to stay afloat, Italian automaker Fiat was actively pursuing a consolidation strategy aimed at capitalizing on economies of scale.

34.    In January of 2009, Chrysler received an "initial" $4 billion bailout from the U.S. government to stave off an impeding collapse.  Less than four months later, in a deal brokered by President Obama, Chrysler filed for Chapter 11 bankruptcy so it could pursue a "lifesaving" alliance with Fiat.  The government-negotiated plan allowed Fiat to take a 20% equity stake in the company, with the option of increasing it to 35%.  The remaining 55% equity stake in Chrysler went to the United Automobile Workers ("UAW"), through their retirement plan.  The United States and Canadian governments also took junior equity stakes in the company of 8% and 2%, respectively.

14

35.     At the time, President Obama called Chrysler a "pillar" of the industrial economy and announced that the government would lend an additional $8 billion to the troubled auto maker, bringing the government's total investment in Chrysler to $12 billion.

**B.     Marchionne's Vision for Chrysler**

36.     Marchionne, then Chairman and CEO of Fiat, took over Chrysler in June 2009.

37.     Marchionne's management style represented a dramatic shift from Chrysler's inefficient, if not outright ineffective, past.  As *Fortune* reported in August of 2010, instead of Chrysler's "old-school org chart with its chains of command," Marchionne instituted "a flat organization with him at the top."  In a November 2014 report, Morgan Stanley similarly explained that, "[f]or all its size, FCA is a notably flat organizational structure with all key nerve systems running directly to Mr. Marchionne."

38.     As *The Detroit News* reported, "[a]t the heart of it [FCA] is a management matrix—a complex, cross-functional, cross-business anomaly that assigns two or more roles to nearly all top-ranking executives.  Marchionne is its epicenter."  The July 2, 2015 article, entitled, "FCA's complex structure bucks conventions," further explained that "[e]veryone is directly or indirectly connected

to Marchionne, who has 38 executives reporting directly to him as CEO and chief operating officer of North America (not including his role as Ferrari chairman)."

39.    To ensure that "decisions are made quickly and nothing is overlooked," Marchionne supervises each of these executives individually and, as he explained to *Fortune*, "[t]hey have access to me 24/7."    According to *The Detroit News*, "[t]he automaker's dependence on one strong executive at the center has helped it push ahead."

### C.    Marchionne and Bigland Target Sales Growth in the U.S. Market

40.    In November 2009, less than six months after it emerged from bankruptcy, Marchionne, Bigland, and other Chrysler executives laid out an ambitious five-year plan for the Company (the "2009 Plan").    At the time of its unveiling, C. Robert Kidder, Chairman of the Board of Chrysler, told investors that the goal of the 2009 Plan was to make Chrysler "a great public company once again and to repay the loans entrusted to us by the U.S. and Canadian governments with all deliberate speed."

41.    In order to achieve this goal, the 2009 Plan called for Chrysler to more than double U.S. retail sales—Chrysler's key market segment—from approximately 700,000 vehicles in 2009 to approximately 1.6 million vehicles in 2014. U.S. retail sales alone would account for approximately 57% of the Company's projected total sales.    The 2009 Plan also called for the Company to

16

increase its U.S. market share from less than 9% in 2009, to more than 13% in 2014.

42.    Analysts and market commentators were unconvinced.  The *Grand Rapid Press* reported that, "Chief Executive Officer Sergio Marchionne and his troops laid out a five-year plan last week that called for Chrysler's global sales to more than double, from 1.3 million cars and trucks this year to 2.8 million by 2014 . . . . But many experts are skeptical that Chrysler can reach its goal . . . . 'In my mind, a win for Chrysler is stop losing money and stay in business.  Anything beyond that is gravy,' said Brad Coulter, of O'Keefe & Associates, a Bloomfield Hills corporate turnaround firm."  The *Wall Street Journal* likewise reported that Marchionne's plan faced "considerable skepticism."

43.    *The Detroit News* in a November 6, 2009 article entitled "Chrysler plan doubted," explained that, "Chrysler Group LLC's now-public five-year plan hinges on some targets that analysts say are unrealistic.  The plan, unveiled Wednesday during an eight-hour session in Auburn Hills, may be a fair representation of what Chrysler needs to do to thrive and repay its loans, but some of the benchmarks, such as the projection of a 4 percent market share increase, are stopping many cold.  'Is the plan outlandish or merely wildly ambitious?' said analyst Michelle Krebs of Edmunds.com, who described the overall tone as one of 'aggressive optimism.'"

17

44.    Indeed, the 2009 Plan came on the heels of a nearly two-year downward spiral in Chrysler's sales.  As *Automotive News* explained, Chrysler was also "less than a year removed from a tumultuous bankruptcy that had culled nearly 800 dealerships from its U.S. ranks," leaving it with scarce resources to sustain the rapid growth for which the 2009 Plan called.

45.    Nevertheless, in February 2010, Fiat posted its first year-over-year U.S. monthly sales growth in 26 months.  Two months later, in April 2010, it began to report a streak of monthly year-over-year sales growth.  As discussed below, thereafter, Fiat and later FCA reported year-over-year growth in its U.S. sales for every single month from April 2010 until July 2016, when FCA was forced to restate its U.S. sales.

46.    By May 2011, the Fiat announced that it had paid back approximately $7.6 billion worth of bailout loans received in the years following the Great Recession—six years ahead of schedule.  At the time, Marchionne was quoted as saying, "We are changing both the image and substance of our group and are regaining the faith of the public at large."  The following month, Fiat purchased the remaining 6% equity stake in Chrysler owned by the U.S. government for $500 million, leaving it in control of Chrysler with a 52% equity stake.

### D.    FCA Ramps Up U.S. Sales Targets

47.    In January 2014, Fiat announced that it would acquire the remaining portion of Chrysler for a reported $4.35 billion, and that it was targeting a NYSE debut for the combined Fiat Chrysler company in October 2014.

48.    By April 2014, Fiat had reported four straight years of monthly year-over-year U.S. sales growth.  That month, Defendant Bigland boasted that Fiat had defied critics: "you're absolutely right a lot of skepticism back on November 4th of 2009 when we then laid out that 5 year plan and when we had 10 consecutive months you know then twenty then 30 then 40.  I'm getting it less and less.  Now it's a little bit more of how long can this continue."

49.    By May 2014, with Fiat's October 2014 NYSE debut fast approaching, Marchionne announced that it had created a new five-year growth plan (the "2014 Plan").  *The Detroit News*, in a May 5, 2014 article entitled "Chrysler, Fiat rev up next part of global plan," reported that, "The newly created Fiat Chrysler Automobiles NV on Tuesday will debut the sequel to its ambitious, five-year business plan revealed in [November] 2009.  This time, the script will be flipped.  Chrysler Group LLC, which emerged from bankruptcy that same year, is on solid ground here in the United States, reporting 49 consecutive months of year-over-year sales gains."  The article further noted that the 2014 Plan, "is being

unveiled at a critical time: The company now being called by the acronym FCA is aiming for its New York Stock Exchange listing to debut in October."

50.    The next day, at a presentation attended by some 400 analysts, media and other attendees, Marchionne laid out his even more ambitious 2014 Plan that called for Fiat's North America sales, buoyed largely by U.S. sales, to increase by approximately 67% from 2.1 million vehicles sold in 2013 to 3.1 million vehicles by the end of 2018.  Fiat also told investors that it planned to increase its U.S. market share from 11.4% in 2013 to nearly 16% by the end of 2018.  In order to achieve this objective, Fiat projected that its sales would need to grow by roughly 8% annually.

51.    Despite the Fiat's apparent sales success, analysts were once again skeptical of the Company's ambitious new targets, with the *Wall Street Journal* calling the Company's projected pace of growth for auto sales "bullish."  The *Chicago Tribune*, in an article entitled "Carmaker unveils 'aggressive' vision," reported that, "[a]nalysts were skeptical that the automaker could achieve all its goals.  'They have set some pretty aggressive sales and market share targets,' said Stephanie Brinley, an IHS Automotive analyst who attended the automaker's briefing in Auburn Hills."

52.    Market reaction in the European stock market was even more skeptical, downright negative.  As the *Wall Street Journal Online* explained,

"[i]nvestors registered a vote of no confidence in Fiat Chrysler Automobiles NV's new five-year plan Wednesday, dumping shares so vigorously that trading was suspended for excessive losses and the Italian auto maker's market value was slashed by nearly 12%." Defendants, however, were determined to silence their critics.

53.     As Marchionne told the *Detroit News* in August 2014, "We almost went bankrupt in 2004 as Fiat and Chrysler did go bankrupt in 2009 . . . . Sinners have to bear the burden on proving themselves. We are willing to pay the price."

54.     In September 2014, a month before its NYSE debut, Fiat reported that its upward trajectory had not slowed. In a September 4, 2014 article entitled, "Chrysler leads gains in best U.S. auto-sales month since 2006," *Bloomberg* reported that, "Chrysler . . . is on an unprecedented winning streak that now stretches to almost 4 1/2 years." A senior analyst for *Autotrader.com* added that "Chrysler just continues to surprise us with the strength they have . . . . The prospects weren't good for Chrysler coming out of bankruptcy, but Marchionne had a vision for where Chrysler could go and he continually pushed the company."

55.     On October 12, 2014, Fiat merged all of its businesses into holding group FCA. The exchange ratio for the merger was one FCA common share for one Fiat share. On Monday, October 13, 2014, shares of FCA began trading on the NYSE.

56.    Although the Company did not sell any new stock at the time of the merger, its intentions were no secret.  FCA wished to gain access to a deeper pool of investors to help fund its lofty objectives, which included, among other things, increasing global sales by 60% over the next five years.

57.    And indeed, with its stock artificially inflated by Defendants' fraud, the Company completed several Class Period offerings of common stock and debt, raising nearly $7,000,000,000 of capital.  For example, on December 16, 2014, the Company completed a secondary offering of common shares and mandatory convertible securities for total net proceeds, before expenses, of approximately $3,887,000,000 (the "Secondary Public Offering").  After the Secondary Public Offering, Marchionne stated, "The completion of these offerings marks another crucial step in establishing FCA as a global automaker with the capitalization to compete effectively with the world's largest automakers," and, "[w]e look forward to continuing to execute our 2014-2018 Business Plan."

## E.    Overview of FCA's U.S. Sales Operations

58.    Prior to and throughout the Class Period, FCA and its predecessors placed particular emphasis on the appearance of ever-increasing sales volume growth in the U.S. market.  As Defendant Bigland told the *Automotive News* in March 2015, "[i]t is by no means for the faint of heart, but I'm looking to continue to grow . . . . Growth is nonnegotiable from my perspective."  Bigland added "I

believe in alignment . . . . My boss expects me to grow.  I expect to grow.  I expect my people to grow, and I expect the dealers to grow.  That's just a fundamental expectation I have every single month—hence the streak."

59.    FCA derives most of its profits from the sale of new motor vehicles in the U.S.  These sales flow from the Company's network of independent franchised dealers, which purchase new motor vehicles from FCA and resell them to the public.  When a dealer purchases a vehicle from FCA, it pays FCA an invoice price for the vehicle that is the same as the invoice price that FCA charges to every other dealer for a vehicle of like grade and quality.  FCA recognizes revenue from the sale of a vehicle when that vehicle is shipped to a dealer.

60.    The retail sales of those vehicles to consumers by dealers then provide the investing public, creditors, and partners in potential acquisitions with an important indicator of the underlying health of FCA's business.  As *Bloomberg* explained, "Investors [] weigh monthly sales reports closely for signs of how auto companies are faring."  The *Daily News* similarly reported during the Class Period that, "[a] lot of eyes are on auto sales . . . . They tend to be out in front of things as it relates to overall health of the economy, of the U.S. consumer."  Thus, maintaining and growing sales volume was of paramount concern to FCA, as Defendants' public statements and contemporaneous market commentary make clear.

61.    To manage its U.S. franchise dealership network, FCA established a framework of nine regional territories within the U.S. ("Business Centers").  The Business Centers include the:  (i) California Business Center, located in Newport Beach, CA; (ii) West Business Center, located in Phoenix, AZ; (iii) Denver Business Center, located in Greenwood Village, CO; (iv) Southwest Business Center, located in Addison, TX; (v) Midwest Business Center, located in Lisle, IL; (vi) Great Lakes Business Center, located in Detroit, MI; (vii) Mid-Atlantic Business Center, located in Columbia, MD; (viii) Northeast Business Center, located in Tappan, NY; and (ix) Southeast Business Center, located in Orlando, FL.

62.    Each Business Center is comprised of multiple districts and is headed by a Business Center Director.  During the Class Period, each Business Center Director reported directly to Defendant Bigland and FCA Vice President of U.S. Sales Operations Kommor.  The districts are, in turn, the responsibility of District Managers, who report directly to the Business Center Director.  Under each Business Center Director, there is also a Sales Manager and several Area Sales Managers and Area Service Managers.  The compensation of Business Center Directors and other Business Center management employees was often tied to the sales numbers and growth within their territory.

63.    To maintain full visibility into dealer sales during the Class Period and to provide that important information to the market, FCA collected retail sales data from the dealers through New Vehicle Delivery Reports ("NVDRs").    A dealer who submitted an NVDR for a new sale could also cancel that transaction and return the vehicle to the dealer's unsold inventory.

64.    Data regarding NVDRs was available to members of senior management though a variety of  internal reporting systems, including Business Objects, Highland Park Information Management System ("HPIMS"), Dealer Connect, "Field Connect," Cinon, and Ess Base.    FCA executives and senior management were thus able to access real-time data regarding NVDRs.

65.    For example, CW-2 explained that FCA's senior management, and employees at the Business Center level utilized a system called Field Connect, which provided detailed sales volume at every dealership at any point in time. According to CW-2, Field Connect displayed a spreadsheet or field that would show NVDRs for the month and the day, and sometimes the daily total would show a negative number reflecting an "unwind" (i.e., a reversed NVDR). According to CW-2, Field Connect enabled Defendant Bigland, Vice President Kommor and others to see granular detail at the dealership level at any point in time.

66.    CW-1 explained that, during the Class Period, FCA's executives could run an "NVDR Unwind Report" from those same internal reporting systems to determine how many NVDRs had been "unwound." Because dealers have up to ten days to unwind a sale without permanently triggering the warranty, CW-1 explained that an NVDR Unwind Report run from the Company's systems ten days after a monthly close would inform executives of how many sales booked at month-end were being unwound the following month. CW-1 believes that NVDR Unwind Reports were regularly run by Sales Operations Managers and Area Sales Managers. She also expects that someone in Bigland and Kommor's group in Auburn Hill ran the NVDR Unwind Report as well. However, unwound transactions were not disclosed or reflected in the Company's monthly U.S. sales report during the Class Period.

67.    According to CW2, Bigland and Kommor were hands-on managers who tracked NVDRs through in-house systems on a daily basis—sometimes several times a day. CW-2 explained that the HPIMS systems would reflect a negative number for a sale that was unwound. CW-2 corroborated that the HPIMS could generate a report listing the vehicles unwound in a given period, and recalled seeing one such report while employed by FCA.

68.    To keep pressure on its franchise dealers, FCA imposed minimum sales requirements, including the Minimum Sales Responsibility metric, or MSR.

26

The methodology to determine the MSR metric was not defined by contract (i.e., the franchise agreement between each dealer and FCA). Instead, FCA retained complete discretion to set and calculate MSR targets using whatever methodology FCA saw fit. Failure to meet an MSR could result in various consequences for the franchise dealer, the most severe of which was the termination of that dealer's franchise, again at the full discretion of FCA.

69.    FCA also utilized incentive programs to encourage dealers to achieve the sales-growth figures that FCA desired. For instance, FCA utilized a "turn and earn" policy of allocating vehicles, in which dealers who sell greater numbers of high-demand models are granted priority for those same models over other competitors.

70.    FCA also employed an incentive-based approach known as a "stair-step" plan. At its most basic level, under a stair-step plan, as dealer sales increase, the incentives (monetary or otherwise) provided to the dealer for each unit sold increase as well. For example, a dealer may earn $1,000 per unit if it sells 50 units. On the other hand, if the dealer misses its target—even by one unit—it may forfeit all incentives under the program.

71.    As *Bloomberg* explained in September 2016:

Interviews with dealers around the country show how such tactics work. With a few days left in June, Jackson, Michigan, dealer Wes Lutz's Extreme Chrysler-Dodge-Jeep dealership needed to move 10 more cars to hit headquarters' goal that month of 78 sales. He was

27

highly motivated by the lure of receiving $900 from the automaker for each sale.  But if he missed the target in the so-called stair-step program by even one car, he would forfeit his entire $70,200 payout.

72.    During the Class Period, FCA's stair-step plan was known as the Volume Growth Program.  Under FCA's Volume Growth Program, if a dealer unwound its sales, the dealer would also lose any incentives it received from the sale.

73.    Generally, dealers who received Volume Growth Program incentives had broad discretion to use those monies as they saw fit, including as a subsidy on new vehicle sales that allowed a dealer to reduce the price of a vehicle below that of competitor dealers (who did not meet the Volume Growth Program target).

74.    In each relevant market, the retail price at which a dealer is able to sell a vehicle is a substantial factor in most retail purchasers' decisions regarding from which dealer they will purchase a vehicle.  Thus, there is considerable price competition between competing dealers, and the receipt of incentive payments enables the dealer to more competitively price a vehicle and ultimately sell more vehicles.

75.    According to the Dealer Lawsuit, FCA also utilized its Volume Growth Program to punish dealers who did not achieve the sales targets set by FCA.  For example, FCA penalized dealers who did not meet Volume Growth Program requirements for a particular month by increasing the Volume Growth

Program target for following months, making it more difficult for them to earn valuable incentives and to compete with other dealers on vehicle pricing.

76.     Through these and other tactics during the Class Period, FCA put considerable pressure on its dealers to meet monthly sales targets.  In an article published in August 2016, FCA dealers told the *Automotive News* that the Volume Growth Program target number was "always a struggle," explaining that "We [the dealers] start each month always saying, 'Is this number going to be an easy hit?' And the answer is always no . . . . We push every single day, and rarely do we hit the number prior to the last day of the month.  We manage to hit it more than we don't, but that's the nature of the goal."  In a March 2015 article, another dealer said about the pressure from FCA that "[w]e're being asked to just sell more in less time.  At some point, you have to decide when to jump off the merry-go-round before you do something stupid."

77.     For these reasons, stair-step plans are not without critics.  As the *Windsor Star* Reported in February 2016, the "practice can lead to unequal treatment of dealers based on volumes; pressuring dealers to slash prices to hit their targets and encouraging dealers to buy new car inventory on their own account, go through the vehicle registration process and convert the new cars into used inventory in an attempt to reach their numbers for the month."  Indeed, as FCA admitted on July 26, 2016, "[i]t is admittedly also possible that a dealer may

register the sale in an effort to meet a volume objective (without a specific customer supporting the transaction)."

78.    Defendant Bigland was throughout the Class Period the mouthpiece for FCA's defense of its stair-step program—employed both in FCA's U.S and Canadian markets—and the pressure it put on dealers to hit sales targets, telling the *Windsor Star* "it just makes sense to reward those (dealerships) that are performing . . . and those that don't perform generally don't get rewarded."   According to Bigland, "If you want to grow, you're going to have to engage, and have a pay-for-performance scheme.   If you don't want to grow, then you'll just eventually whither off."

### F.    Defendants Fraudulently Tout the FCA's Monthly U.S. Sales Streak

79.    In order to give the impression that the Company was on track to achieve its aggressive 2014 Plan, throughout the Class Period, Defendants publicly and repeatedly touted FCA's streak of consecutive monthly year-over-year U.S. sales growth.   For instance, in the Company's monthly press releases filed with the SEC on Form 6-K, which were signed by Defendant Palmer, Bigland consistently trumpeted the Company's U.S. monthly sales growth streak.   *Forbes* likewise observed that "Marchionne made a regular practice of underscoring the significance of the sales streak."

80.    This closely-watched metric purported to provide the investing public with an important indicator of the underlying health of FCA's business.  Indeed, investors and analysts frequently cited FCA's monthly year-over-year U.S. sales streak as concrete evidence that the Company had turned the corner and was flourishing.

81.    For instance, on November 4, 2014, less than a month after FCA's NYSE debut, *USA Today* reported that, "***Chrysler is on a streak of growth that's virtually unheard of*** for American auto manufacturers."

82.    The following month, the *Detroit Free Press* praised FCA's "***jaw-dropping***" streak, noting that when the Company "emerged from bankruptcy in 2009 as a weak automaker with few new cars and trucks in its pipeline," many:

> [D]oubt[ed] whether the company could survive—let alone boost sales and gain market share.  But for nearly five years the automaker, which has been renamed FCA US, has done just that.  ***Every month, for the past 56 months, FCA US has sold more new cars and trucks than for the comparable month from the prior year***."

The article further noted that some analysts remained skeptical of the Company's growth, particularly given how far Chrysler's sales had fallen during the recession.  But Bigland maintained that the sheer length of the streak proved that it was not simply the result of "easy comparisons": "when you have gone almost five years, it silences a lot of people who have alleged you have easy comparisons."  In truth, however, the streak had ended over a year earlier.

31

83.    FCA's purported growth streak also earned the Individual Defendants industry accolades.  For instance, On December 1, 2014, in an article entitled "2014 Automotive News All Stars; Sales," *Automotive News* named Bigland one the years' "All Stars," explaining that, "Reid Bigland, 47, the burly Canadian with the easy-going manner, has Chrysler Group on a roll. . . . Barring an unexpected dip, Chrysler Group's string of month-over-month U.S. sales gains will reach five consecutive years next March."    That same day, *Automotive News* named Defendant Marchionne the "Industry Leader of the Year," dubbing him a "miracle worker" and noting that, "Chrysler Group's run of consecutive monthly year-on-year sales gains is approaching five years."

84.    In January 2015, media outlets further trumpeted the Company's "***astonishing 57 consecutive post-bankruptcy months of sales increases***," explaining that, "[t]o say this has surprised industry experts is an understatement" because "[b]ack in the summer of 2009 . . .  a lot of people had Fiat Chrysler completely written off."

85.    *CNNMoney.com* noted the positive impact of the streak on the Company's share price, explaining that "[s]hares of Fiat Chrysler have gained more than 30% since they started trading on the New York Stock Exchange in mid-October.  That's well ahead of the gains for GM, Ford and Toyota over the same time frame . . . . ***For Wall Street, it's all about sales growth***."  It reported

that "well-oiled sales machine" FCA "has topped Joe DiMaggio: It's the 57th consecutive month of year-over-year sales increases."

86.    That same month, commentators reported that for 2014, "one of the year's biggest stories was the continuing success of Fiat Chrysler, which defied the odds to keep its 57-month streak of year-over-year sales gains intact."

87.    Market watchers cautioned, however, that the Company would have a difficult time continuing its streak in 2015. For instance, the *Detroit Free Press* cautioned that the Company faced a tougher road ahead due to an expected auto market slowdown and a lack of new models in the pipeline for FCA.

88.    The Company's quest to maintain its streak would be further complicated by the fact that comparisons for 2015 would be to 2014 peak-market sales. As *USA Today* explained, FCA's "2015 comparisons will be to a strong 2014, so it'll be tough to keep up the string" because "last year will be hard to beat."

89.    When the Company reported January 2015 sales, however, Bigland announced that Company had "extended our year-over-year sales streak to 58-consecutive months" and expressed confidence that the streak would continue in 2015: "In spite of some tough 2015 comparisons, we remain confident in our ability to post year-over-year sales increases on the back of strong retail demand for our products."

90.    In February 2015, the country was battered by severe winter storms, resulting in a poor showing for the auto industry.  In a March 3, 2015 press release, however, Defendant Bigland boasted that, "[i]n spite of snow and bitter cold that slowed auto sales in many regions of the country, FCA US still turned in a 6 percent sales increase and extended our year-over-year sales streak to 59-consecutive months."   Further, "[e]ven with tougher year-over-year sales comparisons in 2015, our vehicle lineup continues to produce record sales results."

91.    The following month, the Company again overcame tough comparisons to announce its fifth straight year of consecutive monthly U.S. sales growth.  On April 1, 2015, Bigland reported, "March was a tough month, yet we were able to extend our year-over-year sales streak to an even 60-consecutive months."  He further explained that the length of the streak reflected well on the Company: "Five years of consecutive monthly year-over-year sales increases is a great symbol of FCA's commitment to continuous improvement and a tremendous source of pride for our entire organization."

92.    The following day, *USA Today* reported that "March marked the 60th consecutive month of year-over-year monthly sales gains, an ***astounding five-year streak virtually unheard of in the U.S. auto industry***."

93.    Throughout the summer of 2015, as the Company continued to report sales growth, its streak kept ticking upwards.  In July 2015, *USA Today* noted that,

"Chrysler has been the unexpected darling of [FCA], rebounding quickly after bankruptcy as Fiat lost money for several years in Europe. In the United States, the automaker's sales have risen for 63 consecutive months . . . ."

94.    As August 2015 approached, bringing particularly challenging comparisons, however, the market began to express doubt that the Company's oft-touted streak would continue. *PR Newswire* explained that, "***This could be the end of Fiat Chrysler Automobile's streak*** of consecutive monthly sales increases, which began in March 2010." The *Detroit Free Press* reported that, "Fiat Chrysler could see its streak of 64 months of sales increases end . . . ." *TheStreet.com*, in a report entitled, "Fiat Chrysler' Sales Streak Will Get Snapped in August," predicted that, "***It looks like Fiat Chrysler's more than five-year sales winning streak has come to a close***."

95.    On September 1, 2015, however, Defendant Bigland announced that, "In spite of a tough 2014 comparison and extreme stock market volatility, our dealer's competitive spirit kicked in and propelled us to our 65th-consecutive month of year-over-year sales increases."

96.    The market expressed shock, with the *New York Times* reporting that unexpected sales gains had allowed "the company to continue a streak of 65 consecutive months of year-over-year gains, which many had thought was finally poised to end." *Just-auto* similarly reported that, "***[d]espite almost unanimous***

35

**predictions that Fiat Chrysler's long streak of year-over-year growth would end,** healthy Jeep sales kept things in the black for what is now **65 consecutive months**."

97.     The Company's extended streak was once again held up as evidence of its turnaround narrative, with the *Daily Herald* reporting that, "Chrysler exited bankruptcy in 2009 with a new leader and sales momentum that hasn't let up for more than five years. . . . 'FCA accomplished something that nobody would have predicted a few years ago—to have five-plus years of sales increases—even in an accelerating market,' [a Kelley Blue Book senior analyst] said. 'It's an impressive feat and reflects very well on Sergio [Marchionne].'"

98.     By January 2016, with the Company's streak still purportedly going strong, Defendant Marchionne himself touted the streak as proof of FCA's strength. As the *Associated Press* reported:

> When questioned this week at the Detroit auto show about FCA's poor performance in quality rankings from J.D. Power and others, CEO Sergio Marchionne emphasized the company's increasing sales as proof that it's doing something right. "***Don't forget one thing. Since 2009, when we came out of bankruptcy, we've had an uninterrupted record of sales growth for 69 months,***" he said. "***That has happened not because of the fact that I've discounted vehicles. Our margins and operations have improved. It's happened because of the fact that there's brand equity and there's value in what we're selling to the customer base.***"

### G.    The Company Induces Its Dealers to Falsify Sales in Order to Maintain Its Streak

99.    Unbeknownst to the market, the Company's highly touted streak was, in fact, the product of Defendants' fraudulent scheme.  More specifically, during the Class Period, in order to maintain the façade of continued growth—and, in particular, its monthly streak—FCA deliberately solicited, encouraged, and outright bribed its dealers to submit fake NVDRs during the last few days of each sales month.  The dealers would then unwind the fictitious sales during the first few days of the following month, before the vehicle warranty was triggered.

100.    By permitting its dealers to unwind the false NVDR sales, FCA ensured that the "sold" vehicles could later be "re-sold" to actual retail customers with the full warranty intact.  CW-1 explained that if the warranty had already began to run, it would be more difficult for the dealer to actually sell the vehicle to a real customer.

101.    According to CW-1, although fake sales that were quickly unwound did not trigger a vehicle warranty, they could trigger Volume Growth Program and other incentive chargebacks.  As a result, during the Class Period, Defendants bribed their dealers to submit fake NVDRs with "advertising payments" or "marketing payments," which would offset any such incentive chargebacks, thereby allowing them to reap incentives for falsified vehicle sales.  As alleged in

37

the Dealer Lawsuit, the payments were disguised in this manner in order to ensure that dealers could evade scrutiny in the event of an audit.

102.  These unearned incentives from fake sales, in turn, allowed dealers to either pocket larger profits for each vehicle sold, or to pass some of the illegal kickbacks on to customers in the form of lower prices, allowing dealers submitting fake sales to outprice other local dealers and thereby further increase their vehicle sales.  CW-2 identified the "Parts Statement" as the mechanism through which FCA funds specific dealer transactions, and stated that she expects that advertising money paid to dealers for fake sales would appear on the Parts Statement.

103.  As part of the scheme, dealers were also encouraged through the turn and earn plan to book fake sales for the Company's best-selling vehicles, including Jeep Wranglers, thereby increasing their own allocations of those vehicles. According to the Dealer Lawsuit, Defendants also structured the Volume Growth Program so that falsely reported NVDRs would not increase subsequent Volume Growth Program targets for participating dealers.

104.  In addition to offering incentives, Defendants utilized fear tactics to coerce dealers to participate in their fraudulent scheme.  As alleged in the Dealer Lawsuit, Defendants threatened to terminate dealers' franchise agreements based upon skewed data and inaccurate assessments of performance against a MSR

baseline set by FCA, which was imposed to, among other reasons, pressure dealers to comply with FCA executives' requests to inflate sales figures.

105.    This practice of inducing dealers to book false sales was directed by FCA's fictitious unnatural acts department.  In a September 1, 2016 article titled, "Fiat Chrysler's Rallying Cry Emerges as Focus in Sales Probe; Federal investigators are trying to determine if messages to dealers are evidence of sales deception," the *Wall Street Journal Online* reported that:

> [R]egional sales managers and U.S. dealers periodically would get calls from company executives, letting them know that the fictitious "unnatural acts department" was open for business.
>
> The motivational phrase, used over several years on conference calls or in one-on-one conversations, was meant to convey the urgency of drumming up last minute vehicle sales, particularly if the auto maker's results were coming up short of monthly objectives . . . .

106.    CW-1 confirmed that unnatural acts refer to conduct such as paying a dealer to enter fictitious sales, or "anything that is unethical, immoral or improper." Likewise, beginning in 2014 or 2015, CW-2 began to hear the term unnatural acts being used by Area Sales Managers in the Southwest Business Center to describe "things like reporting vehicles sold that weren't, and then being paid to do it through advertising money."

107.    The Company's unnatural acts were not limited in scope but, rather, occurred across the Company's entire U.S. (and Canadian) operations over the course of many years.

### 1.    Denver Business Center

108.    According to CW-1, the Denver Business Center "absolutely" paid dealers to record fictitious sales at the direction of its Business Center Director, Yandura.

109.    CW-1 explained that FCA maintained certain standards with respect to the documentation necessary to process dealer expenses, including payments made from the Business Center to dealers for marketing expenses and other bona fide services.  CW-1 explained that immediately after Yandura came to Denver in January 2015, dealer expense documentation became very lax.  According to CW-1, she frequently interacted with dealers, who mostly asked "when will my money show up."  CW-1 typically responded "as soon as your proof shows up."  Yandura, however, regularly pressured CW-1 to release funds without proper supporting documentation (i.e., proof of the legitimacy of the payment).  More specifically, CW-1 recalled that when she rejected some of the marketing expense documentation submitted by dealers during the first six months of 2015, Yandura would override her decision and tell her to pay the dealer and the supporting documentation would come later.

110.    By June 2015, CW-1 believes that Yandura was so upset about not hitting targets that Yandura affirmatively ordered the Denver Business Center to do what other Business Centers had been doing for awhile.

111.  More specifically, on June 30, 2015, Defendant Bigland and Vice President Kommor held a meeting with all of the Business Center Directors where the Directors each had to provide the sales volume number they would hit for the month.  At that meeting, Yandura told Bigland and Kommor that the Denver Business Center's sales volume number would be 10,300.  Bigland and Kommor replied that Yandura had previously committed to 10,800 sales and had to make his target.  Bigland and Kommor instructed Yandura to generate additional sales, and authorized the release of substantial additional marketing funds to allow him to do so.

112.  CW-1 stated that, on the same day, Yandura called a meeting with 30-40 Denver Business Center employees that CW-1 attended.  According to CW-1, at the meeting, Yandura relayed his conversation with Bigland and Kommor.  CW-1 reported that Yandura then told the meeting attendees that they had to get to 10,800 sales and that "National" (i.e., FCA's U.S. headquarters) was going to give them additional advertising funds to allow that to happen.  CW-1 recalled receiving an extra $150,000 to $180,000 on June 30, 2015.  CW-1 explained that the impetus for the extra money was to maintain the sales streak.

113.  In other words, CW-1 explained that the Denver Business Center would pay its dealers to input false sales to meet the sales numbers and then unwind the NVDRs within ten days to avoid triggering the warranty on each

41

vehicle.  CW-1 explained that unwinds could trigger Volume Growth Program and other incentive chargebacks, so the marketing payments made to dealers would potentially offset the loss from any chargebacks.  CW-1 further explained that everyone in the Denver Business Center was expected to participate in the false sales reporting and that, based on Yandura's comments, CW-1 believed that the directive came from National.

114.  CW-1 explained than an e-mail approving additional funds for June 30, 2015, would have come from Kommor or Bigland to all nine Business Center Directors, with a "cc" to the nine marketing managers and finance directors.  CW-1 further detailed that the June 30, 2015 e-mail from FCA's U.S. headquarters broke out a total of $2,000,000 in additional marketing funds to the nine Business Centers.  Based on conversations with Area Sales Managers, CW-1 believes that most of the nine Business Centers engaged in reporting fictitious sales in June 2015.

115.  According to CW-1, the June 30, 2015 meeting "opened a can of worms" with respect to the practice of booking false sales.  Specifically, CW-1 stated that after June 30, 2015, dealer accounts were credited without any proof of expense incurred, on Yandura's authority.  CW-1 explained that the Company's SAP system, called "Penta SAP," recorded credits made to every dealer's account. CW-1 recalled that Yandura, Business Center Marketing Manager Bill Potter, or an

Area Sales Manager would either put a request for dealer credit directly into the Penta SAP system, or would make a verbal request, a phone request, or an e-mail request for authorization. According to CW-1, payments to dealers ranged from $2,000 to more than $50,000. CW-1 stated that, regardless of how the request was made, an electronic log in the Penta SAP system was kept for every payment, and available for those with proper authorization to review.

116. CW-1 recalled that, on June 30, 2015, a total of $400,000 in marketing funds were dispersed at the direction of Yandura. According to CW-1, this $400,000 was "huge" given that the entire yearly budget for advertising and marketing in Denver was $1.8 million, and the previous high dollar expense the Denver Business Center had experienced was likely a $300,000 advertising payment in connection with a concert series or a Denver Broncos event. CW-1 stated that approximately 300 or more NVDRs came out of the Denver Business Center alone as a result of it.

117. CW-1 also stated that she personally labeled all dealer credits paid from the Denver Business Center to dealers in June 2015 and July 2015 as "June Sales Close" and "July Sales Close," respectively, in order to link those payments to the "fake sales" or fabricated NVDRs. CW-1 stated that she wanted to ensure that when the payment showed up on a dealer statement, or in the work of FCA's

Internal Audit team, the purpose of the payment—to facilitate a fake sale in order to meet month-end targets—would be obvious.

118.    After June 30, 2015, CW-1 stated that she sent an e-mail to the field to the effect that marketing funds would not be available in the future.  In response, Denver Business Center Marketing Manager Bill Potter sent an e-mail telling the field to disregard CW-1's e-mail. CW-1 then forwarded both e-mails to John Earnest, who was the Business Center Controller stationed out of FCA's headquarters in Auburn Hills, Michigan.  CW-1 stated that Earnest reports to the Vice President of Finance, who reports to Defendant Palmer.  CW-1 further recalled writing $400,000 on a board in the conference room at her office around July 1, 2015 to remind everyone that they had encouraged the fake sales.  CW-1 also asked Yandura, "You ever hear of Sarbanes Oxley," to which Yandura replied "Don't spout any legal bullshit to me."

119.    CW-2 likewise explained that she had heard from Area Sales Managers in the Denver Business Center that in June 2015, everyone had to participate in unnatural acts.  Specifically, dealers were given advertising money to report fictitious sales, and Wranglers were handed out to dealers to encourage them to report fictitious sales.  CW-2 explained that she heard that June was unique because, while personnel in Denver were probably recognizing fake sales prior to June 2015, that month it was required of all of them.

44

## 2.    Southwest Business Center

120.    According to CW-2, unnatural acts began occurring in the Southwest Business Center around the time Dragojevic took over as Director in January 2015. CW-2 explained that the fraudulent practices were still occurring when she left in November 2015.

121.    CW-2 recalled that in 2015, the Area Sales Managers were "under a lot of pressure" to meet sales goals and to beat the prior year sales number in order to keep the sales streak alive.  Specifically, CW-2 recalled having two or three conference calls per day with Dragojevic and the Southwest Business Center's Sales Manager, Scott Hayes, discussing and tracking daily dealer sales and orders. CW-2 added that Dragojevic was not concerned with how Area Sales Managers met their goals as long as they were met, and "about every day they [Dragojevic and Hayes] threatened to fire us."

122.    Dragojevic told CW-2 that Defendant Bigland and Vice President Kommor were "hands on" concerning vehicle sales, and that they, along with other headquarters personnel, entered into the FCA in-house system on a daily basis, sometimes several times a day, to track NVDRs.  CW-2 explained that the in-house system would update instantaneously with new NVDRs.  CW-2 also learned from Dragojevic that Bigland and Kommor routinely reviewed the sales results of the Southwest Business Center through the HPIMS systems.

123.   According to CW-2, Dragojevic asked Area Sales Managers to forecast what each dealer in their respective zones would sell each month.  CW-2 reported that Defendant Bigland, Vice President Kommor, and Dragojevic would then measure the progress of each dealer against that dealer's Volume Growth Program target.  CW-2 stated that at least three times per week, and two to three times a day during the last week of the month, Dragojevic would send a report to Bigland and Kommor, which contained the forecast and the month end projection of what each dealer could sell by month end.

124.   CW-2 explained that Dragojevic told Area Sales Managers in the Southwest Business Center that when processing a "questionable" deal, Wrangler was the way to go because there were no incentives attached.  CW-2 noted that, as a result, if the deal was reversed, the dealer would not be charged back the incentive.  Typically, once the dealers unwound a sale they lost any incentives received from that sale.  Furthermore, CW-2 reported that Dragojevic informed them that using Wranglers for such deals would increase the dealers' allocation of Wranglers, which was a highly sought after vehicle.  In addition, Dragojevic mentioned to several large volume Area Sales Managers the availability of $50,000 in advertising money for dealers who sold a lot of vehicles through what CW-2 described as the "Wrangler program."

46

125.  CW-2 stated that she specifically discussed Dragojevic's instructions concerning unnatural acts, including the use of false NVDRs, the "Wrangler program," and advertising money to incentivize dealers, with other Area Sales Managers in the region.  According to CW-2, each of them acknowledged having discussed those instructions with Dragojevic.

126.  Based on her experience and conversations with other Area Sales Managers, CW-2 understands that approximately two to four dealerships in Dallas, two to four dealerships in Houston, three dealerships in San Antonio, three dealerships in Austin, and one or two dealerships in New Orleans participated in the scheme to submit false NVDRs.  According to CW-2, these dealerships were generally large, high volume dealerships.

127.  CW-1 also reported hearing that the Southwest Business Center began engaging in fictitious sales after Dragojevic became its Director.

### 3.      Great Lakes Business Center and FCA Canada

128.  Prior to becoming the Director of the Southwest Business Center during the Class Period, Dragojevic served as the Head of FCA Canada's Eastern Business Center in Toronto, Canada between July 2006 to January 2012.  At the time, Dragojevic worked under the direction of Defendant Bigland, who has served as the CEO of FCA Canada since July 2006.  During CW-1's employment, she

heard talk from colleagues that Dragojevic had promoted and engaged in the fake sales tactics in Canada.

129.    Dragojevic was able to parlay his fraudulent tactics, and resulting success, into a promotion to Director of the Great Lakes Business Center ("Great Lakes"), a position that he served in from January 2012 to January 2015.  Indeed, Dragojevic, upon being appointed as Director of the Southwest Business Center, told CW-2 that he had originally been sent to Great Lakes because of his success in Canada, and that he had been successful in Great Lakes.  According to CW-1, she was told that when Dragojevic moved to Great Lakes, he deployed the fake sales tactics there.

130.    According to CW-1, while Dragojevic served as Director at Great Lakes, his "right hand man" was Steve Yandura, who from September 2011 to December 2013 worked as the Senior Manager of Sales Operations in Great Lakes.

131.    In January 2015, Dragojevic was promoted to Director of the Southwest Business Center and his right hand man, Yandura, was promoted to Director of the Denver Business Center, and the fake sales practices spread to those Business Centers.  For example, CW-2 reported that unnatural acts began in the Southwest Business Center after Dragojevic arrived from Great Lakes.  CW-1 similarly explained that when Yandura was promoted to the Director of the Denver Business Center, he brought the fake sales tactics with him.

### 4.    Midwest Business Center and Northeast Business Center

132.    According to the Dealer Lawsuit, FCA's Midwest Business Center, as well as its Director, Phil Scroggin ("Scroggin"), were also heavily embroiled in the fictitious sales scheme.  In particular, the Dealer Lawsuit alleges that:

a.    On June 1, 2015, an FCA District Manager in northern Illinois offered $15,000 to Napleton's River Oaks to falsely report 23 vehicle sales;

b.    An FCA District Manager for northern Illinois confirmed in a conversation with a manager of Napleton's River Oaks on June 1, 2015, that Scroggin, the FCA Business Center Director for the Midwest Region, had asked his District Managers to request that certain dealers in their respective districts submit false NVDRs in return for the payment of incentives by FCA;

c.    On June 30, 2015, Scroggin and an FCA district manager requested that the manager of Napleton's River Oaks submit 40 false NVDRs at Napleton's River Oaks in exchange for the payment of $20,000 in incentives;

d.    According to an executive at Sherman Dodge, an FCA dealer in suburban Chicago, in June 2015, FCA requested that Sherman Dodge submit 85 false NVDRs in exchange for substantial incentives;

e.    In June 2015, a source who is an executive of Northwestern Chrysler Jeep Dodge Ram—another FCA dealership in suburban Chicago—similarly confirmed that FCA had asked it to submit false NVDRs in return for the payment of incentives; and

f.    An FCA Business Center Director placed a telephone call the owner of the Napleton Dealership Group to directly offer him $20,000 and extra allocations of high-demand vehicles in exchange for falsely reporting 40 new vehicle sales at Napleton's River Oaks.  The FCA Business Center Director indicated that these monies would reach the accounts of

49

Napleton's River Oaks as a credit under the guise of being co-op payments or advertising support monies. FCA's Business Center Director told the Napleton owner that there would be "no harm, no foul" with regard to this scheme because FCA would later back the sales out before they triggered the warranties on these vehicles. FCA's Business Center Director confirmed that FCA would not provide these monies or extra vehicles to Napleton's River Oaks unless Napleton's River Oaks falsely reported the sales.

133. Scroggin previously served as the Director of FCA's Northeast Business Center, where he supervised FCA's Class Period Vice President of U.S. Sales Operations Kommor. Indeed, Kommor served as a Sales Operation Manager in Northeast Business Center from January 2008 to January 2010, before climbing the ladder to become Director of the Northeast Business Center from January 2013 to January 2014.

134. According to CW-1, in addition to the Great Lakes and Southwest Business Centers, CW-1 also was told that the Northeast Business Center was engaged in submitting fake sales. The Dealer Lawsuit further corroborates that dealers in the Northeast Business Center participated in Defendants' scheme.

### 5.    Mid-Atlantic Business Center and Southeast Business Center

135. The Dealer Lawsuit, which brings claims on behalf of FCA dealers located in Illinois, Florida, Missouri, and Pennsylvania, further alleges that dealers in both the Southeast and Mid-Atlantic Business Centers participated in Defendants' fraud, including the following examples:

50

a.    Around November 30, 2015, an FCA sales manager for Orlando, Florida asked a manager of various FCA dealerships affiliated with Plaintiffs located in Florida, Georgia, and Pennsylvania, to submit false NVDRs in exchange for co-op money or an allocation of vehicles high in demand by consumers; and

b.    On approximately November 30, 2015, an FCA sales representative from the Mid-Atlantic Business Center called the general manager of Napleton's Ellwood City. On the call, the FCA representative stated FCA was short on sales of units that month and that it had been handed down that "everyone needed to do their part." The FCA representative requested that Napleton's Ellwood City report three or four new vehicles as sold, and then back these sales out a day or two later, offering to help Ellwood City with the backing out process. When the dealership refused, the FCA representative called a second time that night to repeat the request.

136.   Likewise, on July 27, 2016, in an article entitled "FCA's long sales streak hit the skids during '13," the *Detroit Free Press* reported that, "'There certainly have been games played where dealers would get extra inventories of hot models that other dealers wouldn't get,' said Carl Galeana, owner of Van Dyke Dodge and other Chrysler-related stores in Columbia, S.C., and Ft. Myers, Fla. . . . 'I've heard that other dealers have been asked to take extra vehicles and then unwind them, but I don't do that,' Galeana said.'"

### 6.    Defendants' Internal Investigation Reveals Thousands of Undisclosed Fake Sales

137.   As alleged in the Dealer Lawsuit, in 2015, after an FCA Business Director propositioned the Napleton owner to submit false sales in exchange for incentive payments, the Napleton owner admonished FCA to refrain from its

illegal practices in the future.  Indeed, the Dealer Lawsuit alleged that "Plaintiffs have repeatedly demanded that FCA's fraudulent practices come to an end.  FCA's practice of soliciting false reports, however, continued unabated."

138.  CW-1 likewise explained that employees in the Denver Business Center were so upset by the June 30, 2015 mandate to submit false sales that they began anonymously making reports to FCA's ethics hotline.  Other Denver Business Center employees flat-out quit and informed Human Resources in exit interviews about what was going on.

139.  At the end of the Class Period, *Automotive News* disclosed that, around mid-2015, "dealer complaints about the practice [] reached CEO Sergio Marchionne[.]"  Thus, by mid-2015, the internal backlash at FCA had grown so loud that Defendants could no longer ignore it.  As a result, Defendants ordered an "internal investigation" into the Company-wide submission of fake NVDRs.

140.  As *Automotive News* explained on July 25, 2016, in an article entitled, "FCA found sales were inflated; Pressure to keep streak alive cited,"

> An internal review ordered in mid-2015 by top Fiat Chrysler executives uncovered thousands of vehicle sales reported by FCA brands for which there were no actual buyers, according to two company sources . . . .  The insiders told Automotive News that following the inquiry, U.S. sales head Reid Bigland put a stop to the practice, which had resulted in FCA US reporting more sales than it actually made . . . .  They said the sales numbers were inflated in part under pressure to preserve FCA's streak of U.S. monthly year-over-year sales increases, which now stands at 75 months.  One source cited dealer complaints about the practice that reached CEO Sergio

Marchionne before Bigland sought to end it.  But he added that overstating of sales has crept back into play this year as competitive pressures on FCA's field staff have increased.

141.  CW-1 explained that, at a new vehicle announcement show in Las Vegas in August 2015, Defendant Bigland announced that he was aware that unnatural acts had occurred and that they had to stop.  According to CW-1, however, Bigland was aware of the fake sales before then.  Moreover, according to various sources, including CW-2, the Dealer Lawsuit, and *Automotive News*, the fake sales scheme continued after August 2015.

142.  Nevertheless, as detailed herein, when the Dealer Lawsuit was filed in January 2016, Defendants staunchly denied that the fake sales practices had occurred, deeming the allegations "completely false" and "baseless."  At the same time, they continued to emphasize the Company's monthly U.S. sales streak and year-over-year sales growth throughout the Class Period, relenting only after the FBI and DOJ raided all nine of FCA's Business Centers in July 2016.

### H.    Defendants' Scheme Is Slowly Revealed

143.  On January 12, 2016, FCA's fraudulent practices began to leak to the market when FCA dealers spanning multiple Business Centers filed a lawsuit in federal court accusing FCA of numerous Civil RICO and antitrust violations.  In particular, the complaint—which has since been sustained by an Illinois federal judge—alleged that FCA induced dealers to book fraudulent sales in NVDRs in

return for lucrative payments or benefits in the form of advertising money and other competitive advantages. As alleged above, the dealers were instructed to later reverse or unwind such sales after FCA had publicly reported sales figures.

144. The Company issued two separate press releases dated January 14, 2016, denying the allegations in the Dealer Lawsuit. The first press release stated, "[t]he company is confident in the integrity of its business processes and dealer arrangements and intends to defend this action vigorously." The second press release was less circumspect. Titled "FCA Strongly Rejects Allegations by Two US Dealers," it stated that FCA had *been aware of the allegations for some time*, as it had "*carried out an investigation of the facts*, and [] *determined that these allegations are baseless* and plaintiffs were notified of this fact before they filed suit." In other words, Defendants told the market that they had investigated whether sales had been falsely booked, thereby inflating publicly disclosed sales figures, and determined they had not.

145. Multiple media outlets and analysts reported on the Dealer Lawsuit. *USA Today*, for instance, reported that, "[t]he lawsuit comes after Fiat Chrysler recently posted its 69th consecutive month of gains in U.S. sales, which have been hailed as the *pillar of the company's global operations*."

146. *The Detroit News* similarly explained that "FCA US has recorded 69 consecutive months of year-over-year sales gains—the current *longest-running*

*streak in the industry*.  The sales streak has been touted as recently as this week at the Detroit auto show as a *resounding achievement of the company's plans*."

147.   In response to this news, the Company's share price fell 4.2%, from closing price of $7.86 on January 13, 2016 to a closing price of $7.53 on January 14, 2016.

148.   As the *Chicago Tribune* later explained in an article titled "Fiat Chrysler suit rattles industry investors," "Fiat Chrysler Automobiles investors reacted dramatically to the latest concerns about automotive industry scruples after two dealerships accused the company's U.S. unit of offering money to falsify sales . . . . Fiat Chrysler trading was halted in Europe after shares fell as much as 11 percent.  The company's credit default swaps, used as insurance against defaults on debt, surged."

149.   Incredibly, the Company continued to tout its monthly U.S. sales streak for three more months, in press releases issued in February, March, and April 2016.  For instance, on February 2, 2016, Defendant Bigland boasted that, "FCA US achieved its best January sales in nine years and *our 70th-consecutive month of year-over-year sales increases*."

150.   Likewise, an April 1, 2016 press release quoted Defendant Bigland, who said, "Strong Jeep and Ram brand sales gave us a fast start to the important

spring selling season and ***extended our year-over-year monthly sales gains to six full years***."

151.   Defendants also continued to deny the allegations in the Dealer Lawsuit.   For example, on February 16, 2016, in an article entitled "Bigland defends controversial stair-step dealer bonus plan," the *Windsor Star* reported that, "Bigland dismissed the lawsuit as 'false accusations' levelled by a 'disgruntled' dealer," calling them "***completely false***."

152.   By the time the Company reported its U.S. vehicle sales for April 2016, on May 3, 2016, all overt references to the sales streak had been suspiciously removed.   Still, the Company continued to report its aggregate U.S. sales numbers—which included vehicle sales that the Company would later admit should have been reversed or did not qualify as sales—through June 2016.   Thus, investors continued to believe that the streak was still alive and well.

153.   Moreover, these monthly U.S. sales figures and, implicit therein, the year-over-year streak, remained key metrics for the market, as numerous analysts and media outlets continued to reference the streak in reports issued during this time.   Indeed, after the Company reported U.S. sales growth for May 2015, despite a lackluster showing by the rest of the auto industry, multiple media outlets reported that the streak was alive and well.   For example, *CNN Wire* reported that, "[m]ost major car makers reported lousy sales in May.   Sales fell at GM, Ford,

Toyota and Honda . . . . *Fiat Chrysler was the only major auto company to buck the trend, extending the company's impressive sales growth streak to 74 consecutive months*." The *Detroit Free Press* similarly explained that, "*FCA managed to keep its nearly unprecedented streak of 74 consecutive months of year-over-year sales gains going*, thanks to Jeep, where sales rose 14% for the SUV brand."

154.    As Erik Gordon, a professor at University of Michigan Ross School of Business, stated in a *Washington Post* article titled, "Justice Department, SEC investigating Fiat Chrysler over allegations of false sales numbers," "[i]t would be very difficult to convince a jury that it's not reasonable to consider sales number material.  After all, it was important enough to push the vehicles through the channel.  FCA must have thought [sales numbers] were important."

155.    On July 11, 2016, unbeknownst to investors, federal investigators raided all nine FCA Business Centers and its headquarters, as well as the homes of current and former employees.

156.    On July 18, 2016, news surfaced that the Company's questionable sales tactics had given rise to a criminal investigation by the DOJ and a civil investigation by the SEC.  Later that day, the Company issued a press release confirming both the SEC and the DOJ investigations into its policies for reporting

new vehicle sales, but again denying all accusations and allegations against the Company.

157.   The same day, the *New York Times* reported that:

Fiat Chrysler Automobiles has been on a hot streak for more than six years, reporting growth in new car sales in the United States for 75 consecutive months, a ***feat rarely seen in the auto industry*** . . . . But now the federal government is asking whether those numbers are too good to be true . . . . The Securities and Exchange Commission is investigating whether the company has been improperly inflating its monthly sales totals, and whether those reports have misled investors.

158.   The *Wall Street Journal* explained that, "[t]he Fiat Chrysler investigations ***cast a shadow over the company's 75-month-long streak*** of year-over-year sales increases" and "Fiat Chrysler until recently ***aggressively promoted its monthly sales winning streak***, which dates back to shortly after the company emerged from a government-brokered bankruptcy restructuring."

159.   As *Bloomberg* later explained, "***Investors [] weigh monthly sales reports closely for signs of how auto companies are faring***.  But now the government is questioning whether Fiat Chrysler's tactics have gone too far . . . . The news was ***a blow to investors*** because Fiat Chrysler has impressed over the years with its steadily rising sales."

160.   In response to this news, the Company's stock fell 2.53%, from a closing price of $6.73 on July 18, 2016 to a closing price of $6.56 on July 19, 2016.

161.  As analyst ICBPI noted on July 20, 2016, "Yesterday, the stock reacted very negatively to the news of the SEC and FBI investigations on the FCA sales data in the US[.]"

162.  On July 25, 2016, Peter Henning, a former SEC lawyer and a professor at Wayne State University Law School in Detroit, told the *Automotive News*, in an article entitled "FCA found sales were inflated; Pressure to keep streak alive cited,"

> What the SEC focuses on is disclosure to investors and to the market, so they're not going to buy a claim that "We don't technically engage in sales.  The dealers do."  This is all of a piece, which is: How do you measure how any auto company is doing? Sales.  That's the bottom line, and that's what the SEC is going to be looking at[.]

Henning further stated that the involvement of the DOJ was another clue about the investigation, explaining "Typically, the Justice Department will steer clear of a case until it gets indications of wrongdoing . . . . Normally, it will defer to the SEC. Just the disclosure that they're on the scene means that there's at least smoke, and maybe a fire."

163.  The following day, July 26, 2016, FCA restated its monthly U.S. sales figures for 2011, 2012, 2013, 2014, 2015, and through June of 2016 (the "Restatement").  The Restatement uncovered that the Company's streak of consecutive monthly year-over-year U.S. sales growth had in fact ended more than ***three years earlier***—in September 2013, at month 40.

164.   In the Restatement, the Company further admitted that its dealers could, in fact, book fake sales and then unwind them:  "It is possible for a dealer to 'unwind' a transaction recorded in the NVDR system and return the vehicle to the dealer's unsold inventory," and that it is "also possible that a dealer may register the sale in an effort to meet a volume objective (without a specific customer supporting the transaction)."  ***Moreover, FCA confirmed that it did not subtract these unwound sales from its monthly reported U.S. sales (thereby inflating them): "FCA US has not historically reflected either unwinds or the subsequent sales of these vehicles in its sales reporting."***

165.   The *Detroit Free Press* called FCA's Restatement "eye-popping," while the *Wall Street Journal* noted that "***the growth streak has been routinely touted as an important milestone by Sergio Marchionne***, Fiat Chrysler's chief executive, who has been working to find a buyer for the company since at least 2014."

166.   Similarly, in a story entitled, "Sales Not Hot as Thought, Fiat Chrysler Revises Data," the *New York Times* reported, "***[f]or the last few years, Fiat Chrysler has been acclaiming a long run of rising new-car sales***.  At last count, it had higher vehicle sales 75 months in a row.  Turns out, ***the hot streak actually ended three years ago***, at Month 40."

60

167.   *Forbes*, in an article entitled, "Big Revision: Fiat Chrysler's Monthly Sales Streak Ended Nearly Years Ago," wrote:

> FCA CEO Sergio ***Marchionne made a regular practice of underscoring the significance of the sales streak***.  And, to be sure, the streak highlighted the fact that Fiat Chrysler has been closing in on Toyota's No. 3 sales position in the U.S. market . . . . Now ***the 'record' has been bared as mythological, and that revelation certainly won't help Chrysler as U.S. auto sales flatten out[.]***

168.   In response to this news, the Company's share price fell 4.29%, from a closing price of $7.00 on July 26, 2016 to a closing price of $6.70 on July 27, 2016.

169.   Since the Restatement, multiple news outlets have reported that both the DOJ and the SEC have centered their investigations directly on Bigland.  For instance, in a September 8, 2016 article entitled "Suspect Sales at Fiat Chrysler Could Be Bad News for its Rising Star," *Bloomberg* explained that:

> This should've been Reid Bigland's year.  Under his leadership, Fiat Chrysler Automobiles outsold its competitors in Canada for the first time in the carmaker's history while enjoying an unprecedented streak of rising sales in the U.S.  The success earned Bigland a promotion to head Fiat Chrysler's Alfa Romeo and Maserati brands, making him one of Chairman Sergio Marchionne's most trusted deputies.  Now, Bigland, the 49-year-old head of U.S. sales and chief executive officer of Fiat Chrysler Canada, is at the center of U.S. criminal and regulatory investigations into whether the company fraudulently hyped its monthly sales numbers, according to people familiar with the matter.

170.   On September 12, 2016, in an article entitled "Bigland may face charges in sales probe, report says," *Automotive News* reported that:

In July, federal investigators raided all nine FCA regional business centers and its headquarters as well as the homes of current and former employees. FCA says that it is cooperating with investigators, and on July 26 took the unusual step of restating its monthly sales since 2011. As a result of the restatement, FCA's oft-touted six-plus year streak of year-over-year monthly sales gains was found to have actually ended in September 2013. A federal grand jury in Detroit has been impaneled to investigate the issue and has issued subpoenas to dealers.

## V.    DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

171.   In February 2010, less than a year after it emerged from bankruptcy, and under the new leadership of Defendant Marchionne, Fiat reported its first month of year-over-year monthly U.S. sales growth in over two years. Just two months later, in April 2010, it began reporting a streak of such growth. As *Automotive News* explained:

> When its string of consecutive monthly year-over-year sales gains began in April 2010, what is now Fiat Chrysler was, literally, a different company. Then called Chrysler Group, the company was less than a year removed from a tumultuous bankruptcy that had culled nearly 800 dealerships from its U.S. ranks . . . . But that April, the streak started. And it didn't stop—even as the automaker stopped making some vehicles, such as the Jeep Liberty, and even as it revamped 16 models.

172.   By September 2014, the month before the FCA began trading on the NYSE, Fiat had extended its growth streak to 54 months. As *Bloomberg* reported on September 3, 2014, in an article entitled, "Chrysler leads gains in best U.S. auto-sales month since 2006,"

> Chrysler . . . is on an unprecedented winning streak that now stretches to almost 4 1/2 years . . . . 'Chrysler just continues to surprise us with the strength they have,' said Michelle Krebs, senior analyst for researcher Autotrader.com. 'The prospects weren't good for Chrysler coming out of bankruptcy, but Marchionne had a vision for where Chrysler could go and he continually pushed the company.'

Edmunds.com senior analyst Jessica Caldwell concurred, explaining that: "This is an impressive streak for a company that was all but left for dead five years ago."

173.  Unbeknownst to investors, however, the Fiat's streak had actually ended at least a year earlier, in September 2013, and was being sustained on the back of Defendants' fraudulent fake sales scheme.  Nevertheless, throughout the Class Period, Defendants continued to tout the streak as evidence that the Company had fully recovered, and was on track to meet its ambitious growth targets.

174.  The Class Period begins on November 3, 2014.  On that date, the Company issued a press release announcing its U.S. retail sales for October 2014, which was filed with the SEC on Form 6-K ("November 3, 2014 Press Release"). In the November 3, 2014 Press Release, the Company stated, "***Chrysler Group LLC today reported U.S. sales of 170,480 units, a 22 percent increase compared with sales in October 2013*** (140,083 units), and the group's best October sales since 2001."[3]  In the same press release, the Company stated that the "***group***

---

[3]      Each of Defendants' statements in Section V that is alleged to be false and misleading is highlighted in ***bold and italics***.

*extended its streak of year-over-year sales gains to 55-consecutive months*.” The press release also quoted Defendant Bigland, who said, “***Chrysler Group sales increased 22 percent in October***, our eighth month of double-digit growth this year and our ***55th-consecutive month of year-over-year sales gains***.” Defendant Bigland added that “Chrysler Group is the industry's fastest-growing automaker driven in part by sales of our all-new Jeep Cherokee and Chrysler 200 mid-size sedan, and by the strong consumer demand for our award-winning Ram pickup trucks.” Defendant Palmer signed the November 3, 2014 Press Release.

175.    Each of Defendants' Class Period statements set forth in ¶174 was materially false or misleading when made, or omitted material facts, because throughout the Class Period:

  a.    As the Company later admitted in the Restatement, FCA did not have 75 consecutive months of growth; rather, the Company's streak ended at least 3 years earlier (and before the Class Period began), at month 40, in September 2013.

  b.    As detailed in §IV.G., *supra*, throughout the Class Period, FCA routinely instructed and/or induced its dealers to book fake sales in NVDRs that would later be reversed following the reporting of such sales, and, in exchange for their complicity, FCA made lucrative payments to dealers, or provided other valuable incentives.

  c.    As detailed in §IV.G., *supra*, the Company, through the use of the code phrase "unnatural acts," directed fraudulent and illegal actions to keep up the appearance of sustained U.S. monthly sales growth and to falsely assure the market of its financial health.

d. As the Company has admitted in the Restatement, dealers could, in fact, book fake sales and then unwind them, and FCA did not subtract these unwound sales from its monthly reported U.S. sales, nor did it report them. FCA dealers did engage in these false sales throughout the Class Period, making it appear that the streak was alive and well.

176. In response to the November 3, 2014 Press Release, numerous media outlets reported on the continuation of the Company's "virtually unheard of" growth streak. For example, on November 3, 2014, *RTT News*, in an article entitled, "Chrysler October U.S. Sales Rise 22% Amid Strong Jeep Brand Sales," reported that:

> Automaker Chrysler Group LLC reported Monday a 22 percent increase in total U.S. sales for the month of October, **marking the 55th consecutive month of year-over-year sales gains**, reflecting sales growth in four of its five brands. The company also recorded the best October sales since 2001, and the eight month of double-digit sales growth this year.

177. On November 4, 2014, *The Dallas Morning News* noted that, **"October's results marked 55 consecutive months of sales increases at Chrysler,"** and *IHS Global Insight* reported that, **"Chrysler reported its 55th consecutive month of y/y sales gains** at 21.7%."

178. On December 2, 2014, the Company issued a press release announcing its U.S. retail sales for November 2014, which was filed with the SEC on Form 6-K ("December 2, 2014 Press Release"). In the December 2, 2014 Press Release, the Company stated, **"Chrysler Group LLC today reported U.S. sales of**

*170,839 units, a 20 percent increase compared with sales in November 2013*
(142,275 units), and the group's best November sales since 2001." In the same
press release, the Company further stated that the "*group extended its streak of
year-over-year sales gains to 56-consecutive months*." In the December 2, 2014
Press Release, Defendant Bigland was quoted as saying, "Sales of our all-new
Chrysler 200 sedan were up a strong 155 percent in November, *helping Chrysler
Group to achieve its 56th-consecutive month of year-over-year sales gains*."
Defendant Bigland added that "[i]n total we had 11 vehicles last month that set
new sales records. Calendar year to date, Chrysler Group remains the fastest
growing automaker in the country." Defendant Palmer signed the December 2,
2014 Press Release.

179. On December 5, 2014, the Company published a video touting its
November U.S. sales performance as part of a weekly video series titled "FCA
Replay." The Company describes FCA Replay as a "weekly recap of some of the
major stories at Fiat Chrysler Automobiles." In a video titled "FCA: Replay:
December 5, 2014," the Company stated that:

> [T]he Ram Truck brand posted a 31% sales increase for the month of
> November and that's the brand's best November sales since 2003,
> helping *Chrysler Group achieve its 56th consecutive month of year-
> over-year sales gains. Chrysler Group LLC reported U.S. sales of
> 170,839 units, a 20% increase compared to last year* and the Group's
> best November sales since 2001.

66

180.   Each of Defendants' Class Period statements set forth in ¶¶178-79 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶175.

181.   In response, on December 2, 2014, in an article entitled "Chrysler November U.S. Sales Rise 20% Amid Growth Across Brands," *RTT News* reported that, "Automaker Chrysler Group LLC reported Tuesday a 20 percent increase in total U.S. sales for the month of November, ***marking the 56th consecutive month of year-over-year sales gains***, reflecting sales growth across its five brands."  *USA Today* similarly reported on December 3, 2014 that "***Chrysler Group again was the stunner— registering a hefty 20% sales jump in November, the automaker's 56th consecutive monthly increase.***"

182.   That same day, the *Financial Post*, in an article entitled "Trucks help drive sales for automakers; Chrysler at top," noted that, "Fiat Chrysler sales jumped 20% to 170,839 for ***a 56th straight monthly increase*** amid gains in deliveries of Jeep sport-utility vehicles, Ram pickups and the Chrysler 200 sedan." *The Detroit News* similarly reported that day that "Led by its Ram Truck brand increasing 30.7 percent in November compared to a year ago, Chrysler Group LLC led all major automakers with sales up 20.1 percent—***marking the automaker's 56th consecutive monthly year-over-year sales gain*** and its best November since 2001."

183.   The *Detroit Free Press*, in a December 21, 2014 article entitled,

"***Chrysler's jaw-dropping, 56-month U.S. sales streak***," reported that:

> Chrysler emerged from bankruptcy in 2009 as a weak automaker with few new cars and trucks in its pipeline, leaving many to doubt whether the company could survive—let alone boost sales and gain market share.
>
> But for nearly five years the automaker, which has been renamed FCA US, has done just that.
>
> ***Every month, for the past 56 months, FCA US has sold more new cars and trucks than for the comparable month from the prior year. It's a record the Auburn Hills automaker is proud of***.
>
> "Back in the summer of 2009, when we emerged from bankruptcy and going into 2010 . . . a lot of people had Fiat Chrysler completely written off," said Reid Bigland, head of U.S. sales.   "And yet we continued to keep our head down."
>
> At the time, many analysts and competitors dismissed the automaker's gains as somewhat expected given how far the company's sales fell during the recession.
>
> Others said the sales gains were driven by big incentives.   Another often cited factor was FCA US' dependence on fleet sales.
>
> And while there was some truth to each of those points, those explanations also don't tell the full story.
>
> "I think the conversation is really now starting to shift to our product," Bigland said.   "Because ... ***when you have gone almost five years, it silences a lot of people who have alleged you have easy comparisons***."

184.   Likewise, the *Toronto Star*, in an article entitled "Successful auto

CEOs know it's important to bridge cultural gaps," reported that:

> ***Marchionne's Chrysler posted an astonishing 56 months of consecutive sales gains in the all-important U.S. market.***

*To say this has surprised industry experts is an understatement.*

"Back in the summer of 2009," Reid Bigland, head of Chrysler's U.S. sales, recently told the Detroit Free Press, "a lot of people had Fiat Chrysler completely written off."

Instead, Chrysler has increased its U.S. market share since the time of Marchionne's arrival from 8.9 percent to 12.6 percent, a remarkable surge in the world's most-competitive market.

185.    On January 5, 2015, the Company issued a press release announcing its U.S. retail sales for December 2014, which was filed with the SEC on Form 6-K ("January 5, 2015 Press Release").    In the January 5, 2015 Press Release, the Company stated, "*FCA US LLC today reported U.S. sales of 193,261 units, a 20 percent increase compared with sales in December 2013* (161,007 units), and the group's best December sales since 2004."

186.    In the January 5, 2015 Press Release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 57-consecutive months*."    The January 5, 2015 Press Release also quoted Defendant Bigland, who said, "Our best December sales in a decade pushed our full-year sales over the 2-million unit threshold for our best annual sales since 2006."    Defendant Bigland was also quoted as saying, "This year marked our fifth-consecutive year of annual sales growth in the U.S., and once again, we were the fastest-growing automaker in the country."    Defendant Palmer signed the January 5, 2015 Press Release.

187.    On January 9, 2015, the Company published a video titled "FCA: Replay: January 9, 2015" touting that the *"sale streak continues"* as one of the

"top stories worldwide this week at FCA."  In the video, the Company stated that:

"*FCA U.S. closed out 2014 extending its streak of year-over-year sales gains to 57 consecutive months.*"

188.   Each of Defendants' Class Period statements set forth in ¶¶183, 185-87 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶175.

189.   Analysts and investors reacted positively to the news.  In a report published on January 7, 2015, ICBPI explained that, "Chrysler sales in the month of Dec-14 increased by 20% to 161,007 vehicles, the best December since 2004, the *57th consecutive month of increase*," remarking that the "the very positive data on Chrysler sales in the US confirms the health of the US brands and the NAFTA market."  ICBPI also noted that the "performance in North America confirms the US market to be a key area for the group, and supports a 2014 characterized by a modest recovery in Europe, and a difficult Brazilian market."

190.   Moreover, myriad news publications repeated the Company's claims that its sales growth streak remained unbroken.  For instance, on January 5, 2015, in an article entitled "*Fiat Chrysler: Sexiest auto stock*," *CNNMoney.com* reported that, "[s]hares of Fiat Chrysler have gained more than 30% since they started trading on the New York Stock Exchange in mid-October.  That's well ahead of the gains for GM, Ford and Toyota over the same time frame . . . . *For Wall Street,*

*it's all about sales growth*." Calling the Company a "well-oiled sales machine," the article explained that, "Fiat Chrysler announced Monday that its U.S. sales in December rose 20% from a year ago. ***The company has topped Joe DiMaggio: It's the 57th consecutive month of year-over-year sales increases***."

191. On January 6, 2015, *USA Today*, in an article entitled "A 'blockbuster' auto month; Dec. sales were hot, capping a stellar year," reported that, "Chrysler Group reported a 20% sales jump in December, and a 16% increase for the full year—an ***astonishing 57 consecutive post-bankruptcy months of sales increases***. The 2015 comparisons will be to a strong 2014, so it'll be tough to keep up the string."

192. That same day, in an article entitled "December caps off solid '14 for auto sales; Toledo-built Jeeps fuel success for Fiat," *The Blade* explained that, "For [Autotrader.com analyst Michelle Krebs], one of the year's biggest stories was the continuing success of Fiat Chrysler, which ***defied the odds to keep its 57-month streak of year-over-year sales gains intact***."

193. Likewise, *The Detroit News*, in an article entitled, "Auto sales best since 2006," reported that, "FCA US LLC—the Fiat and Chrysler tieup—continued its impressive streak in 2014, ***finishing the year with 57-consecutive months of year-over-year sales gains***."

194.   On February 3, 2015, the Company issued a press release announcing its U.S. retail sales for January 2015, which was filed with the SEC on Form 6-K ("February 3, 2015 Press Release").  In the February 3, 2015 Press Release, the Company stated, "*FCA US LLC today reported U.S. sales of 145,007 units, a 14 percent increase compared with sales in January 2014* (127,183 units), and the group's best January sales since 2007."  In the February 3, 2015 Press Release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 58-consecutive months*."  The February 3, 2015 Press Release also quoted Defendant Bigland, who said, "[w]e kicked off 2015 with a 14 percent increase in sales and *extended our year-over-year sales streak to 58-consecutive months*."  Defendant Bigland was also quoted as saying, "[i]n spite of some tough 2015 comparisons, we remain confident in our ability to post year-over-year sales increases on the back of strong retail demand for our products."  Defendant Palmer signed the February 3, 2015 Press Release.

195.   In addition to the reasons set forth in ¶175, each of Defendants' Class Period statements set forth in ¶194 was materially false or misleading when made, or omitted material facts, because, as detailed in §IV.G., *supra*, by January 2015, Dragojevic took over as Director of the Southwest Business Center and Yandura took over as Director of the Denver Business Center, bringing with them the fake

sales reporting scheme that had garnered so much success in Canada and Great Lakes.

196.    Analyst reaction was once again positive, with ICBPI reporting on February 4, 2015 that, "US sales for the month of Jan-15 rose 14% to 145,007 units, the best January since 2007, ***the 58th consecutive month of increase***." According to ICBPI, "[t]he very positive data on FCA sales in the US confirms the health of US brands and the NAFTA market," and "[t]he result in North America confirms that US market as a key area for the group."

197.    Market commentators repeated Defendants' misleading claims.  On February 3, 2015, in an article entitled "Automakers Report Strong January U.S. Vehicle Sales," *RTT News* reported that, "FCA US LLC, which changed its name from Chrysler Group LLC in mid-December, said its U.S. vehicle sales for January rose 14% to 145,007 units from 127,183 units in January last year, ***marking the 58th consecutive month of year-over-year sales gains***."

198.    *USA Today*, in a February 4, 2015 article entitled, "2015 already a scorcher for auto sales; White-hot trucks give January a big boost over 2014," reported that:

> ***It was a 58th consecutive month of FCA US sales gains, meaning monthly comparisons with last year will be hard to beat.***  Still, Reid Bigland, U.S. sales chief, said, "We remain confident in our ability to post year-over-year sales increases on the back of strong retail demand for our products."

199.  That same day, the *Daily News*, in an article entitled "Driving to a big gain," noted that, "***It was Fiat Chrysler's 58th straight month of rising sales***." Likewise, on February 5, 2015, in an article entitled "US: FCA sales up 14% to 145,007 units in January," *Just-auto* explained that FCA "***extended its streak of year over year sales gains to 58-consecutive months***."

200.  On February 6, 2015, the Company published a video titled "FCA Replay: February 6, 2015," again highlighting the ***"fifty-eight straight"*** months of U.S. sales growth as one of the "top stories worldwide this week at FCA."  In the video, the Company stated:

> ***FCA US LLC reported U.S. sales of 145,007 units in January 2015***, ***which is a 14% increase from a year ago***.  Ten FCA US vehicles set January sales records, including the Jeep Cherokee, Chrysler 200, and the Dodge Challenger, whose sales are up 87%.  All in all, ***this continues the company's unprecedented sales streak as January 2015 was the 58th consecutive month of year-over-year sales gains***.

201.  Each of Defendants' Class Period statements set forth in ¶200 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195.

202.  Then, on March 3, 2015, the Company issued a press release announcing its U.S. retail sales for February 2015, which was filed with the SEC on Form 6-K ("March 3, 2015 Press Release").  In the March 3, 2015 Press Release, the Company stated, "***FCA US LLC today reported U.S. sales of 163,586 units, a 6 percent increase compared with sales in February 2014*** (154,866

units), and the group's best February sales since 2007."  In the March 3, 2015 Press Release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 59-consecutive months*."  The March 3, 2015 Press Release also quoted Defendant Bigland, who said, "*In spite of snow and bitter cold that slowed auto sales in many regions of the country, FCA US still turned in a 6 percent sales increase and extended our year-over-year sales streak to 59-consecutive months*."  Defendant Bigland was also quoted as saying, "Even with tougher year-over-year sales comparisons in 2015, our vehicle lineup continues to produce record sales results."  Defendant Palmer signed the March 3, 2015 Press Release.

203.  Each of Defendants' Class Period statements set forth in ¶202 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195.

204.  In response, numerous news articles touted the Company's continued streak, despite tough February conditions.  On March 3, 2015, in an article entitled "U.S. Vehicle Sales Slow In February," *RTT News* reported that, "FCA US LLC, which changed its name from Chrysler Group LLC in mid-December, said its U.S. vehicle sales for February rose 6% to 163,586 units from 154,866 units in February last year, *marking the 59th consecutive month of year-over-year sales gains*."

75

205.   On March 4, 2015, the *Detroit Free Press*, in an article entitled, "Ford F-150 is hero and goat: Feb. sales dip may just be blip," explained that, "Fiat Chrysler Automobiles (formerly Chrysler) also is narrowing the gap with sales of 163,586 after ***recording its 59th consecutive year-over-year increase***."

206.   The same day, the *Naples Daily News*, in an article entitled "February's frigid weather put a chill on U.S. auto sales," noted that, "***FCA managed to continue its streak of 59 consecutive months of year-over-year sales increases[.]***"  In a same-day article entitled, "US February light-vehicle sales up 5.3%, lowest SAAR since April 2014 on weather," *IHS Global Insight* reported that, "***FCA US reported its 59th consecutive month of year-on-year (y/y) sales gains[.]***"

207.   On March 5, 2015, the Company filed its Annual Report for fiscal year 2014.  In his "Letter from the Chief Executive Officer," Marchionne wrote that, "[i]n the U.S., ***we closed the year posting our 57th consecutive month of year-over-year sales gains*** and our best annual sales since 2006."

208.   On March 6, 2015, in a video titled "FCA Replay: March 06, 2015," recapping the "top stories" of the week at FCA, the Company boasted that "overall ***FCA US LLC posted its 59th consecutive month of year-over-year sales gains, up 6% over February 2014.***"

209.    Each of Defendants' Class Period statements set forth in ¶207-08 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195.

210.    Societe Generale later issued an analyst report explained that:

> In its 2014 annual report, FCA describes itself as a leading player in the global automotive landscape with unique, world-class capabilities, and a vision built on the historic foundations and strengths inherited from Fiat and Chrysler . . . . It completed the full merger with Chrysler ahead of schedule, and *Chrysler has been reporting yoy sales gains in the US for 61 consecutive months*.

211.    On April 1, 2015, the Company issued a press release announcing its U.S. retail sales for March 2015, which was filed with the SEC on Form 6-K ("April 1, 2015 Press Release").  In the April 1, 2015 Press Release, the Company stated, "*FCA US LLC today reported U.S. sales of 197,261 units, a 2 percent increase compared with sales in March 2014* (193,915 units), and the group's best March sales since 2007."  In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 60-consecutive months*."  The April 1, 2015 Press Release also quoted Defendant Bigland, who said, "*March was a tough month, yet we were able to extend our year-over-year sales streak to an even 60-consecutive months*."  Defendant Bigland was also quoted as saying, "*Five years of consecutive monthly year-over-year sales increases is a great symbol of FCA's commitment to continuous improvement*

77

*and a tremendous source of pride for our entire organization*." Defendant Palmer signed the April 1, 2015 Press Release.

212. In a video published on April 2, 2015 titled "FCA Replay: April 3, 2015," the Company included "FCA's 60-month sales increase streak" or "five year string" as one of the week's top stories. In the same video, the Company stated that **"FCA recorded its 60th straight monthly year-over-year sales boost, a 2% bump over March 2014."**

213. Each of Defendants' Class Period statements set forth in ¶¶211-12 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195.

214. In the days the followed, various media outlets trumpeted FCA's achievement of a five-year streak, notwithstanding decreases by competitors Ford and General Motors. For example, on April 2, 2015, the *New York Times*, in an article entitled, "U.S. Auto Sales Were Flat in March, After Months of Growth," reported that, "Not all automakers finished March in negative territory. Fiat Chrysler posted a 1.7 percent gain in March, *extending its streak of monthly gains to 60 months in a row*."

215. *The Detroit News*, in a same-day report entitled, "Big 3 post mixed sales in March," wrote, "Detroit's automakers posted mixed sales results. Fiat Chrysler Automobiles reported a 1.7 percent sales gain—*its 60th consecutive*

*month of year-over-year gains*—while sales at Ford Motor Co. and General Motors Co. both fell." *The Daily Telegraph*, in an article entitled "High five for Fiat Chrysler," likewise reported that, "Fiat Chrysler said vehicle sales in the US in March rose 1.7pc, *extending its streak of monthly gains to five years amid an expanding American car industry, even as General Motors and Ford posted declines*."

216. The following day, *U.S. News & World Report*, in its recap of "5 Things to Know About the Economy This Week," reported that, *"Fiat Chrysler saw its 60th consecutive month of year-over-year sales gains,* though Ford, Honda, Nissan, General Motors and Volkswagen underwhelmed." On April 4, 2015, *Just-auto*, in an article entitled, "US: Short month trims March light vehicle sales," explained that:

> *Fiat Chrysler reached its 60th consecutive month of year over year sales improvements* as the Chrysler 200 posted all time record sales of nearly 20,000. The margin was slim but the achievement is noteworthy in that FCA overcame big holes left by the now discontinued Dodge Avenger and a 58% drop in minivan sales due to the Windsor (Canada) plant being shut down to retool for the next generation Chrysler minivan.

217. On April 29, 2015, the Company announced its results for the first quarter of 2015. In a presentation distributed to investors and analysts that same day, the Company reiterated that "*March was the 60th consecutive month of y-o-y sales gains*."

79

218.   On May 1, 2015, the Company issued a press release announcing its U.S. retail sales for April 2015, which was filed with the SEC on Form 6-K ("May 1, 2015 Press Release").  In the May 1, 2015 Press Release, the Company stated, "*FCA US LLC today reported U.S. sales of 189,027 units, a 6 percent increase compared with sales in April 2014* (178,652 units), and the group's best April sales since 2007."  In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 61-consecutive months*."  The May 1, 2015 Press Release also quoted Defendant Bigland, who said, "We launched the spring selling season with nine vehicle sales records and a *6 percent year-over-year increase that extends our sales streak to 61-consecutive months of sales gains*."  Defendant Bigland was also quoted as saying, "Our all-new Jeep Renegade small SUV is off to an exceptional start with more than 4,200 units sold in its first full month in the market helping to propel our Jeep brand to its best monthly sales ever."  Defendant Palmer signed the May 1, 2015 Press Release.

219.  On the same day, the Company published a video titled "FCA Replay[:] May 1, 2015" which included the "*61 and counting*" monthly year-over-year U.S. sales streak as one of FCA's top stories.  In the video, the Company stated that "*overall FCA US vehicle sales last month were 6% higher than April*

**2014.  *That makes it 61 straight months of sales gains*** and the best April since

2007."

220.   Each of Defendants' Class Period statements set forth in ¶¶217-19

was materially false or misleading when made, or omitted material facts, for the

reasons set forth in ¶¶175, 195.

221.   Once again, news articles touted the Company's streak.  On May 2,

2015, the *New York Times*, in an article entitled "Behind Rising U.S. Sales, Buyers

Who Like S.U.V.s and Trucks," reported that, "***Fiat Chrysler continued its***

***winning streak with its 61st consecutive month of sales gains***, up 6 percent in

April compared with last year."

222.   That same day, *The Houston Chronicle* wrote that, "***Fiat Chrysler had***

***its 61st consecutive month of sales gains,*** up 6 percent."   Myriad local

publications across the country likewise touted the Company's continued streak,

reporting that, "***FCA reported its 61st consecutive month of year-over-year***

***increases***."   On May 4, 2015, *Automotive News*, in an article entitled, "Beat goes

on for Subaru, Audi, FCA," explained that, "***It was the group's 61st consecutive***

***month of year-over-year sales gains***."

223.   On June 2, 2015, the Company issued a press release announcing its

U.S. retail sales for May 2015, which was filed with the SEC on Form 6-K ("June

2, 2015 Press Release").  In the June 2, 2015 Press Release, the Company stated,

"*FCA US LLC today reported U.S. sales of 202,227 units, a 4 percent increase compared with sales in May 2014* (194,421 units), and the group's best May sales since 2005." In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 62-consecutive months*." The June 2, 2015 Press Release also quoted Defendant Bigland, who said, "Our Jeep brand continues to set records with its best monthly sales ever in May, *helping us to achieve our 62nd-consecutive month of year-over-year sales increases*." Defendant Bigland was also quoted as saying, "Despite one less industry selling day this May versus a year ago, *we posted a 4 percent sales gain* and exceeded the 200,000-unit threshold for the first time since March 2007." Defendant Palmer signed the June 2, 2015 Press Release.

224. On June 5, 2015, the Company echoed these statements in a video titled "FCA Replay: June 5, 2015," recapping the "major stories" at FCA. In the video, the Company stated "*For those keeping score, May was the 63rd consecutive month of year-over-year sales increases for FCA US.*"

225. Each of Defendants' Class Period statements set forth in ¶¶223-24 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195.

226. In response to Defendants' misleading statements, on June 2, 2015, *RTT News*, in an article entitled "Automakers Report Mixed U.S. Sales For May,"

reported that, "FCA US, LLC, which changed its name from Chrysler Group LLC in mid-December, said its U.S. vehicle sales for May rose 4% to 202,227 units from 194,421 units in May last year, *marking the 62nd consecutive month of year-over-year sales gains*. The company also recorded its best May sales since 2005."

227. The following day, the *Detroit Free Press*, in an article entitled, "Picking up the pace," wrote that "Fiat Chrysler Automobiles sales rose 4% from a year earlier . . . . *Trucks and crossovers also helped Fiat Chrysler continue its winning sales streak of 62 consecutive months of improved sales from the prior year*." In a same-day report entitled "Detroit's Big 3 speed past May sales expectations," *The Detroit News* likewise wrote that "*FCA continued its sales gain streak for the 62nd straight month*, reporting its best May sales month since 2005 and sold more than 200,000 vehicles for the first time in a month since March 2007."

228. On June 5, 2015, in an article entitled US: May light vehicle sales set all-time record," *Just-auto* echoed that "*FCA hit 62 months of continuous growth[.]*"

229. On July 1, 2015, the Company issued a press release announcing its U.S. retail sales for June 2015, which was filed with the SEC on Form 6-K ("July 1, 2015 Press Release"). In the July 1, 2015 Press Release, the Company stated,

"*FCA US LLC today reported U.S. sales of 185,035 units, an 8 percent increase compared with sales in June 2014* (171,086 units), and the group's best June sales since 2006." In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 63-consecutive months*." The July 1, 2015 Press Release also quoted Defendant Bigland, who said, "June represented another strong month for our company with *sales up 8 percent and our 63rd-consecutive month of year-over-year sales increases*." Defendant Palmer signed the July 1, 2015 Press Release.

230.   In addition to the reasons set forth in ¶¶175, 195, each of Defendants' Class Period statements set forth in ¶229 was materially false or misleading when made, or omitted material facts, because:

  a.   As set forth in §IV.G., just one day earlier, on June 30, 2015, National had approved and distributed at least $2,000,000 across the nine Business Centers to, at least in part, bribe dealers to participate in the fake sales scheme to meet their month-end sales goals.

  b.   Also on June 30, 2015, Director Yandura instructed the Denver Business Center team to offer dealers illicit funds disguised as advertising payments in exchange for the dealers' agreement to book and submit false NVDRs, as set forth in §IV.G.

  c.   As set forth in §IV.G., by mid-2015, and continuing throughout the Class Period, numerous employees and dealers had been approached by managers at FCA to engage in the fake sales scheme.

  d.   As reported by the *Automotive News* on July 25, 2016, according to FCA sources, an internal review ordered in mid-2015 by top FCA executives uncovered thousands of vehicle

sales reported by FCA brands for which there were no actual buyers.

231.   Market commentators continued to tout the Company's purported sales streak.  For instance, on July 2, 2015, in an article entitled, "US car sales lift in June," *Business Spectator* explained that, "Fiat Chrysler, which has now posted **63 consecutive months of year-over-year sales gains**, said it sold 185,035 units in June, up from 171,086 a year ago."  Similarly, *USA Today*, in an article entitled "GM down in June, but Ford, Chrysler sales rise," reported that the Company "**surged to its 63rd consecutive month of sales increases in the U.S.**"

232.   In a same-day article entitled "Car sales on best pace in decade in the U.S.[,]" *The Detroit News* wrote that, "FCA sales jumped 8 percent for the Auburn Hills company's best June since 2006, **pushing its consecutive monthly sales gain streak to 63**."

233.   In a July 2, 2015 article entitled "Auto sales on fast track to strong finish; Gains in June portend even better 2nd half," the *Chicago Tribune*, reported that, "Fiat Chrysler said U.S. sales rose 8.2 percent in June as its Jeep sport utility vehicles and Ram Trucks won buyers, **maintaining a streak of gains that spans more than five years**."  On July 4, 2015, in an article entitled "US: FCA's total sales increase 8% to 185,035 units in June," *Just-auto* reported that FCA "**extended its streak of year over year sales gains to 63-consecutive months**."

234.   As the Company moved into labor negotiations with the United Auto Workers, it continued to misleadingly tout its U.S. monthly year-over-year sales growth streak as evidence of its turnaround story.  On July 15, 2015, in an article entitled "Marchionne: Two-tier wages must end," the *Detroit Free Press* reported that "Glenn Shagena, vice president of employee relations for FCA North America, ***said the company is in a much stronger position today than it was in 2011 during the last round of contract talks . . . . The automaker has reported 63 consecutive months of year-over-year sales gains and is profitable again***."

235.   On July 17, 2015, in an article entitled "US: UAW collective bargaining talks start with FCA," *Just-auto* explained that, "***In June, the company extended its US sales streak of year over year sales gains to 63 consecutive months***."

236.   On July 30, 2015, the Company announced its results for the second quarter of 2015.  In a presentation distributed to investors and analysts that same day, the Company reiterated that, "***June was the 63rd consecutive month of y-o-y sales gains***."

237.   On August 3, 2015, the Company issued a press release announcing its U.S. retail sales for July 2015, which was filed with the SEC on Form 6-K ("August 3, 2015 Press Release").  In the August 3, 2015 Press Release, the Company stated, "***FCA US LLC today reported U.S. sales of 178,027 units, a 6***

*percent increase compared with sales in July 2014* (167,667 units), and the group's best July sales since 2005." In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 64-consecutive months*." The August 3, 2015 Press Release also quoted Defendant Bigland, who said, "Last week FCA announced a 69 percent increase in second quarter profits and now we post our best July U.S. sales since 2005." Defendant Bigland was also quoted as saying, "With Jeep sales up 23 percent, *we were also able to achieve our 64th-consecutive month of year-over-year sales increases*." Defendant Palmer signed the August 3, 2015 Press Release.

238. On August 7, 2015, the Company published a video titled "FCA Replay: August 7, 2015," reporting that, among its "top stories" for the week, "*July sales spiked 6% compared with July 2014.* The Jeep brand's sales were up 23%, its best July ever, thus helping FCA reach its *64th consecutive month of year-over-year sales gains*."

239. Each of Defendants' Class Period statements set forth in ¶¶234, 236-38 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230.

240. Once again, the market repeated Defendants' false statements and emphasized the streak. For example, on August 3, 2015, *US News & World Report*, in an article entitled "GM, Ford, Fiat Chrysler Sales Explode in July,"

reported that, "Fiat Chrysler, which includes Jeep and Ram truck brands, saw sales inflate 6 percent year over year for the *64th consecutive month of annual gains*."

241.   That same day, in an article entitled "Automakers Report Strong July U.S. Sale," *RTT News* explained that, "FCA US, LLC, which changed its name from Chrysler Group LLC in mid-December, said its U.S. vehicle sales for July rose 6% to 178,027 units from 167,667 units in the same month last year, *marking the 64th consecutive month of year-over-year sales gains*."

242.   On August 4, 2015, in an article entitled "Big vehicles fly off lots as gas prices stay low," *USA Today* reported that, "Fiat Chrysler Automobiles also recorded a 6% increase in July, *marking its 64th consecutive month of U.S. sales gains*."

243.   In a same-day report entitled "Auto sales climb on backs of pickups, SUVs," *The Detroit News* reported, "Fiat Chrysler Automobiles last month posted a 6.2 percent increase thanks to its Jeep SUV brand—*marking 64 consecutive months of year-over-year U.S. sales gains* and the automaker's best July since 2005." That same day, *Automotive News*, in an article entitled "Healthy outlook for N.A. output; Strong U.S. sales, export plans drive volume," echoed that, "Fiat Chrysler *extended its streak of monthly sales gains to 64*."

244.   On August 9, 2015, in an article entitled "Millennials join confident consumers snapping up autos in US," the *Chicago Daily Herald* reported that,

"***The North American unit of Fiat Chrysler Automobiles NV has grown now for 64 straight months***, delivering 178,027 vehicles in the U.S. last month.  Its 6.2 percent gain exceeded the 4.8 percent average estimate . . . . ***Fiat Chrysler's sales-gain streak dates to the 2009 exit from bankruptcy of the automaker formerly known as Chrysler***."

245.   Leading up to FCA's release of its August monthly U.S. sales results, numerous media outlets predicted that the Company's much-touted streak would come to an end.  For instance, on August 26, 2015, *PR Newswire*, in a report entitled, "New-Car Sales To Drop 4 Percent In August 2015, According To Kelley Blue Book; 2015 Labor Day Timing to Impact Results; Fiat Chrysler Sales Streak to End," explained that, "***This could be the end of Fiat Chrysler Automobile's streak of consecutive monthly sales increases***, which began in March 2010, as Kelley Blue Book projects a 3.2 percent decline in volume[.]"

246.   The following day, *Detroit Free Press*, in an article entitled, "Aug. car sales may fall from year ago," reported that, "***Fiat Chrysler could see its streak of 64 months of sales increases end***."  Similarly, on August 31, 2015, *TheStreet.com*, in a report entitled, "***Fiat Chrysler' Sales Streak Will Get Snapped in August***," predicted that, "***It looks like Fiat Chrysler's more than five-year sales winning streak has come to a close.  The automaker's sales are projected to fall by 3.2%***

*in August, following 64 consecutive months of year-over-year gains*, according to

*Kelley Blue Book*."

247.    Then, on September 1, 2015, the Company issued a press release

announcing its U.S. retail sales for August 2015, which was filed with the SEC on

Form 6-K ("September 1, 2015 Press Release").  In the September 1, 2015 Press

Release, the Company stated, "*FCA US LLC today reported U.S. sales of 201,672*

*units, a 2 percent increase compared with sales in August 2014* (198,379 units),

and the group's best August sales since 2002."  In the same press release, the

Company also stated that the "*group extended its streak of year-over-year sales*

*gains to 65-consecutive months*."  The September 1, 2015 Press Release also

quoted Defendant Bigland, who said, "*In spite of a tough 2014 comparison and*

*extreme stock market volatility, our dealer's competitive spirit kicked in and*

*propelled us to our 65th-consecutive month of year-over-year sales increases*."

Defendant Palmer signed the September 1, 2015 Press Release.

248.    The Company also touted its "hot August sales" as one of the "top

stories worldwide" at FCA in a video titled "FCA Replay: September 4, 2015"

published on September 4, 2015.    There, the Company stated that "the Jeep

Compass and its brand mates led the way to the best August sales since 2002 last

month, as *FCA US reported an overall 2% bump over August 2014.  That makes*

*it 65 straight months of year-over-year sales gains for the company.*"

249.   Each of Defendants' Class Period statements set forth in ¶¶247-48 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230.

250.   Extensive news coverage expressed surprise at the Company's continued streak.  For example, on September 2, 2015, the *New York Times*, in an article entitled, "Passenger Car Sales Fall, but Truck Market Stays Robust," reported that, "***Fiat Chrysler posted a 2 percent gain, despite analysts' predictions of a loss, allowing the company to continue a streak of 65 consecutive months of year-over-year gains, which many had thought was finally poised to end***."

251.   That same day, the *Detroit Free Press*, in an article entitled, "Best August auto sales since 2003 surprise industry," reported that, "It was record Jeep sales that allowed Fiat Chrysler to ***maintain its impressive year-over-year sales streak for a 65th consecutive increase—a feat some doubted going into the final weekend of the month***."

252.   In a same day article entitled "Sales keep truckin'," *The Detroit News* reported that, "Fiat Chrysler Automobiles ***sales rose 1.7 percent in a month some analysts had predicted would end the automaker's streak of monthly sales gains dating back to March 2010.***"  The *Daily Herald*, in an article entitled, "August sales spur GM to boost U.S. industry outlook," explained that, "Chrysler exited bankruptcy in 2009 with a new leader and ***sales momentum that hasn't let up for***

*more than five years*.  Deliveries of Ram pickups and Jeep sport utility vehicles helped sustain the streak in August, even as Labor Day weekend sales were pushed into September . . . . '***FCA accomplished something that nobody would have predicted a few years ago—to have five-plus years of sales increases—even in an accelerating market,***' [a Kelley Blue Book senior analyst] said.  'It's an impressive feat and reflects very well on Sergio [Marchionne].'"

253.   On September 4, 2015, in an article entitled, "US: Labor Day shift hits light vehicle sales," *Just-auto* reported that "***Despite almost unanimous predictions that Fiat Chrysler's long streak of year-over-year growth would end, healthy Jeep sales kept things in the black for what is now 65 consecutive months.***"

254.   On September 17, 2015, the *Detroit Free Press*, in an article entitled "UAW chief makes bold choice to lead with Marchionne," explained that:

> ***Marchionne needs to maintain his stature as the global auto industry's doer of improbable deeds.  He has led Chrysler to 65 consecutive months of sales gains since taking charge during the auto industry rescue of 2009***—but he currently faces resistance to his push for a merger with GM and calls for major industry consolidation.

255.   On October 1, 2015, the Company issued a press release announcing its U.S. retail sales for September 2015, which was filed with the SEC on Form 6-K ("October 1, 2015 Press Release").  In the October 1, 2015 Press Release, the Company stated, "***FCA US LLC today reported U.S. sales of 193,019 units last***

*month, a 14 percent increase compared with sales in September 2014* (169,890 units), and the company's best September sales since 2000." In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 66-consecutive months*." The October 1, 2015 Press Release also quoted Defendant Bigland, who said, "On the back of a strong sales industry we were able to achieve our best September sales in 15 years and *our 66th-consecutive month of year-over-year sales growth*." Defendant Palmer signed the October 1, 2015 Press Release.

256.  On October 2, 2015, the Company published a video titled "FCA Replay: October 2, 2015" wherein the Company stated that "*overall sales for FCA US were 14% higher last month over September 2014.  That marks the 66th consecutive month of year-over-year sales gains for the company* and its best September since 2000."

257.  Each of Defendants' Class Period statements set forth in ¶¶255-56 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230.

258.  On October 2, 2015, *Business Spectator*, in an article entitled, "US auto sales surge in September," reported that, "Fiat Chrysler sold 193,019 vehicles for September, compared with 169,890 in the same period last year.  That is a 13.6 percent boost, which *extends the company's sales-gains streak to 66 months*."

93

259.   In a same-day article entitled "Big Month for Carmakers, Except for Besieged VW," the *New York Times* explained that, "Fiat Chrysler was up 14 percent, ***continuing its streak of consecutive monthly sales gains to 66 months***." Likewise, *USA Today*, in an article entitled "U.S. auto sales surge as emissions taint Volkswagen," reported that, "Fiat Chrysler extended its sales streak to 66 consecutive months of gains with a 14% rise."

260.   On October 6, 2015, in an article entitled, "US: FCA Group's sales up 14% to 193,019 units in September," *Just-auto* wrote that FCA "***extended its streak of year over year sales gains to 66-consecutive months***."

261.   Two days later, as labor negotiations continued and a midnight strike deadline loomed, media outlets were keenly focused on the impact that a strike could have on the Company's much-vaunted sales streak.  For example, in an October 8, 2015 article entitled, "The waiting game for FCA, UAW," the *Detroit Free Press* provided an update on FCA's labor negotiations, reporting that:

> As the midnight strike deadline approached Wednesday night, UAW negotiations with Fiat Chrysler Automobiles continued behind closed doors as workers across the country waited anxiously to hear if they'd be walking off the job in solidarity.... ***A strike could end FCA's streak of 66 months of consecutive sales increases in the U.S.***

262.   The following day, the *Financial Post*, in an article entitled "Fiat Chrysler said to offer higher wages to workers; Car marker reported offering US$29 hourly to second-tier UAW members," expressed relief that FCA and

UAW had reached "a new tentative agreement which avoided a strike by 40,000 union members," noting that "*[a] strike would have disrupted Fiat Chrysler's production amid the company's streak of 66 consecutive U.S. monthly sales gains*."

263.   On October 28, 2015, the Company announced its results for the third quarter of 2015.  In a presentation distributed to investors and analysts that same day, the Company reiterated that "*September was the 66th consecutive month of y-o-y sales gains*."

264.   On November 3, 2015, the Company issued a press release announcing its U.S. retail sales for October 2015, which was filed with the SEC on Form 6-K ("November 3, 2015 Press Release").  In the November 3, 2015 Press Release, the Company stated, "*FCA US LLC today reported U.S. sales of 195,545 units last month, a 15 percent increase compared with sales in October 2014* (170,480 units), and the company's best October sales since 2001."  In the same press release, FCA also stated that the "*company extended its streak of year-over-year sales gains to 67-consecutive months*."  The November 3, 2015 Press Release also quoted Defendant Bigland, who said, "*October marks our 67th-consecutive month of year-over-year sales growth* and our best October since 2001." Defendant Palmer signed the November 3, 2015 Press Release.

265.  On November 6, 2015, the Company reported its "top stories worldwide" in a video titled "FCA Replay: November 6, 2015," which touted that "sales keep climbing."   In particular, the Company stated that "FCA US LLC recorded its highest October sales since 2001 with a *15% year over year increase . . . . If you're counting, that's 67 consecutive months of year-over-year sales gains for the company.*"

266.  Each of Defendants' Class Period statements set forth in ¶¶263-65 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230.

267.  In response, on November 4, 2015, in an article entitled "US auto sales jump in October," *Business Spectator* reported that, "Fiat Chrysler—which recorded its best sales for the month since 2001—sold 195,545 vehicles, compared with 170,480 for the month last year, *extending the Italian-US company's sales gains streak to 67 months*."

268.  That same day, the *New York Times*, in an article entitled, "Automakers, With Exception of VW, Report Strongest Sales in a Decade," reported that, "Fiat Chrysler Automobiles reported that its sales increased 14.7 percent from last year to 195,500 vehicles.  The company said the results were its best in any October since 2001 and were *the 67th consecutive month of year-over-year sales gains*."

269. The *Detroit Free Press*, in a same-day article entitled "Detroit 3 leading the pack," reported that, "Sales of FCA's Jeep brand, where sales surged 33%, helped ***propel the company to its 67th consecutive month of year-over-year gains***. Sales rose 12% for Dodge, 3% for Ram, 1% for Chrysler and 1% for Fiat." *The Detroit News*, in an article entitled, "'15 auto sales on pace for all-time high," likewise reported that, "***Fiat Chrysler continued its streak of year-over-year sales gains, pushing the number to 67 consecutive months*** with its best October since 2001." Similarly, in an article entitled, "US: October was a treat for automakers," *Just-auto* reported that, "***Fiat Chrysler came in ahead of forecast, racking up its 67th consecutive month of year-over-year gains***."

270. On December 1, 2015, the Company issued a press release announcing its U.S. retail sales for November 2015, which was filed with the SEC on Form 6-K ("December 1, 2015 Press Release"). In the December 1, 2015 Press Release, the Company stated, "***FCA US LLC today reported U.S. sales of 175,974 units, a 3 percent increase compared with sales in November 2014*** (170,839 units), and the group's best November sales since 2000." In the same press release, the Company also stated that the "***group extended its streak of year-over-year sales gains to 68-consecutive months***." The December 1, 2015 Press Release also quoted Defendant Bigland, who said, "***Despite having two less selling days this November, FCA US still recorded its best November sales since 2000 and our***

97

*68th consecutive month of year-over-year sales increases*." Defendant Bigland was also quoted as saying, "The favorable I.O.U. environment of low interest rates, oil prices, and unemployment, coupled with our strongest product line up ever, continues to be a significant driver of FCA sales." Defendant Palmer signed the December 1, 2015 Press Release.

271.   On December 4, 2015, the Company again boasted about the "*68 and counting*" months of year-over-year U.S. sales growth as one of the "top stories" for the week. In a video titled "FCA Replay: December 4, 2015," the Company stated that "*FCA US LLC posted a 3% year-over-year sales gain in November, marking the company's 68th consecutive month of sales gains.*"

272.   Each of Defendants' Class Period statements set forth in ¶¶270-71 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230.

273.   On the basis of Defendants' false and misleading statements, various media outlets touted the Company's streak. For example, on December 2, 2015, *Business Spectator*, in an article entitled "US auto sales rise modestly," reported that, "Fiat Chrysler Automobiles sold 175,974 vehicles—its best November since 2000—compared with 170,839 for the month last year, a 3 percent increase *extending the Italian-US automaker's sales gains streak to 68 months*." That same day, in an article entitled "Manufacturing Falls Most Since June '09 On

98

Overseas Woes But Rest Of Economy Solid ISM report shows signs of prosperity elsewhere, with construction on rise," *Investor's Business Daily* reported that, "Fiat Chrysler U.S. sales gained 3%, ***its 68th consecutive month of year-over-year growth***."

274.   In a same-day article entitled "Automakers driving to best sales year ever," *the Detroit Free Press* echoed that, "***It was the 68th consecutive month the Detroit-area automaker reported a sales increase from the year-earlier month***." *Just-auto*, in an article entitled "Volvo shines in US November sales," similarly explained that, "***Fiat Chrysler chalked up its 68th consecutive month of year on year gains in November*** thanks to Jeep and despite softness in its Chrysler, Dodge and Fiat brands."

275.   On December 14, 2015, FCA US announced a new "Customer First award for Excellence" program in a press release titled "FCA US LLC Launches Customer First Award for Excellence for Dealers and Customers."  In promoting the program, Defendant Bigland once again touted the Company's sales growth streak.  The December 14, 2015 press release quoted Defendant Bigland as stating that: "'Over the past several years, we've taken bold strides to improve our business plan, our products and our market share . . . . ***Those efforts have translated to FCA delivering a streak of 68 consecutive months of year-over-year sales growth***.'"

276.   On January 5, 2016, the Company issued a press release announcing its U.S. retail sales for December 2015, which was filed with the SEC on Form 6-K ("January 5, 2016 Press Release").   In the January 5, 2016 Press Release, the Company stated, "*FCA US LLC today reported U.S. sales of 217,527 units, a 13 percent increase compared with sales in December 2014* (193,261 units), and the group's best December sales ever."   In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 69 consecutive months*."   The January 5, 2016 Press Release also quoted Defendant Bigland, who said, "*FCA US finished 2015 strong with sales up 13 percent* and our best December sales since we started business more than 90 years ago."   Defendant Bigland was also quoted as saying, "For the second straight year, the company has topped 2 million in U.S. sales.   FCA US sales have now grown annually for the past six years."   Defendant Palmer signed the January 5, 2016 Press Release.

277.   On January 8, 2016, in a video titled "FCA Replay: January 8, 2016," the Company stated that "*overall FCA US sales gains of 13% made December the 69th consecutive month of year-over-year sales growth.*"

278.   Each of Defendants' Class Period statements set forth in ¶¶275-77 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230.

279.   News coverage continued to trumpet the Company's "winning" sales streak.  On January 6, 2016, *Investor's Business Daily*, in an article entitled "U.S. Auto Sales Log Record '15, Car Industry Is CES Pacesetter; Ford, BMW Accelerate Tech," reported that, "***Fiat Chrysler Automobile (FCA) US reported its 69th consecutive month of y/y sales gains*** and sixth consecutive year of sales increases[.]"

280.   In a same-day article entitled "Ford, GM sales trail estimates for December," *The Daily Herald* reported that, "Fiat Chrysler's 13 percent increase was its ***69th straight month of gains.***"   *City A.M.* similarly reported that "Fiat Chrysler Automobiles (FCA) posted a 12.6 percent rise in sales to 217,527 for December, ***bringing its winning streak in sales to a whopping 69 months***."

281.   On January 8, 2016, in an article entitled "US industry posts more gains," the *Times Colonist* explained that, "For December, General Motors finished 2015 with a 5.7 percent sales gain, Ford had 8.4 percent and Fiat Chrysler had a 13 percent gain—***its 69th month of consecutive increases***, compared with the same month the year before."

282.   Just one week later, on January 12, 2016 the Dealer Lawsuit was filed, which accused the Company of inducing dealers to book false sales in NVDRs in exchange for monetary benefits.  News outlets picked up on the suit the next day. The *Automotive News*, for instance, published an article on January 13, 2016,

entitled, "Dealerships accuse Fiat Chrysler of falsifying U.S. Sales; Suit claims FCA offered dealers money to inflate monthly volumes."

283.   On January 14, 2016, the Company sought to reassure investors that there was not a problem with the way that it had been reporting its U.S. monthly sales through two separate press releases, which were both filed with the SEC on Form 6-K and signed by Defendant Palmer.   In the first press release, entitled, "Statement Regarding a Claim filed by a US Dealer Against FCA US" ("First January 14, 2016 Press Release"), the Company stated, "[w]hile the lawsuit has not yet been served on FCA US, *the company believes that the claim is without merit*."   In the First January 14, 2016 Press Release, FCA also stated that the "*company is confident in the integrity of its business processes and dealer arrangements* and intends to defend this action vigorously."

284.   Later on January 14, 2016, the Company doubled down on its denial of the allegations in the Dealer Suit in a press release entitled, "*FCA Strongly Rejects Allegations by Two US Dealers*" ("Second January 14, 2016 Press Release").   In the Second January 14, 2016 Press Release, the Company stated, "*FCA US carried out an investigation of the facts, and has determined that these allegations are baseless*."   The Second January 14, 2016 Press Release went on to state that the "*lawsuit is nothing more than the product of two disgruntled dealers*

*who have failed to perform their obligations under the dealer agreements they signed with FCA US*."

285.   In addition to the reasons set forth in ¶¶175, 195, 230, each of Defendants' Class Period statements set forth in ¶¶283-84 was materially false or misleading when made, or omitted material facts, because they reassured the market that, after investigating the matter, FCA had concluded that the Company was not engaged in the false sales reporting alleged in the Dealer Lawsuit when, in reality, its mid-2015 internal investigation had uncovered the opposite—that FCA had recorded thousands of improper sales.

286.   In response to this news, the Company's share price fell 4.2%, from closing price of $7.86 on January 13, 2016 to a closing price of $7.53 on January 14, 2016.

287.   Just before the Dealer Lawsuit was filed, Defendant Marchionne was trumpeting the streak as proof of the Company's strength.  On or about January 11, 2016, in a speech at the 2016 North American International Auto Show, Defendant Marchionne touted the Company's growth streak, stating:

> *[W]e've had almost six years of uninterrupted growth in the United States.  69 months in a row.*  Number one position in Canada in 90 years.  That's not an inconsequential feat.  I'm proud of what the kids have done. I think they've done a phenomenal job.  I think we just got to keep on doing more of the same going forward.

288.   Moreover, as the *Associated Press* reported in a January 14, 2016 article entitled "Fiat Chrysler denies allegations of false sales reporting,"

> When questioned this week at the Detroit auto show about FCA's poor performance in quality rankings from J.D. Power and others, **CEO Sergio Marchionne emphasized the company's increasing sales as proof that it's doing something right . . . . "Don't forget one thing. Since 2009, when we came out of bankruptcy, we've had an uninterrupted record of sales growth for 69 months," he said. "That has happened not because of the fact that I've discounted vehicles. Our margins and operations have improved. It's happened because of the fact that there's brand equity and there's value in what we're selling to the customer base."**

289.   Each of Defendants' Class Period statements set forth in ¶¶287-88 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

290.   Moreover, despite the Dealer Lawsuit, the Company continued to report its growth streak. Indeed, less than three weeks later, it issued yet another monthly press release touting the streak. The Company would continue to report its streak until April 2016, and report false U.S. sales numbers through June 2016.

291.   On February 2, 2016, the Company issued a press release announcing its U.S. retail sales for January 2016, which was filed with the SEC on Form 6-K ("February 2, 2016 Press Release"). In the February 2, 2016 Press Release, the Company stated, "**FCA US LLC today reported U.S. sales of 155,037 units, a 7 percent increase compared with sales in January 2015** (145,007 units), and the group's best January sales in nine years." In the same press release, the Company

also stated that the "*group extended its streak of year-over-year sales gains to 70-consecutive months*."  The February 2, 2016 Press Release also quoted Defendant Bigland, who said, "Overall, FCA US achieved its best January sales in nine years and *our 70th-consecutive month of year-over-year sales increases*."  Defendant Palmer signed the February 2, 2016 Press Release.

292.  On February 5, 2016, in a video titled 'FCA Replay: February 5, 2016, the Company highlighted the "*lucky 70*" months of U.S. sales growth as a top story.  In the video, the Company touted that *"FCA reported its 70th straight month of year-over-year sales gains with an overall 7% increase* . . . . In all, *FCA sold just over a 145,000 units last month in the U.S.*, the company's best January in nine years."

293.  Each of Defendants' Class Period statements set forth in ¶¶291-92 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

294.  On February 2, 2016, the *Detroit Free Press*, in an article entitled, "Companies get mixed results on auto sales," reported that, "[a]t FCA, sales Jeep and Ram pickups *helped the automaker keep a streak alive.  The automaker has seen 70 consecutive months of year-over-year sales increases*."

295.  On February 3, 2016, *Business Spectator*, in an article entitled, "US carmakers report modest sales in January as heavy snow reduces number of selling

days," explained that, "Automakers posted modest US sales in the first month of the year as fewer selling days and heavy snow kept car shoppers from dealerships . . . . Fiat Chrysler posted a 6.9 percent rise to 155,037 vehicles sold in January, *extending the Italian-US automaker's sales gains streak to 70 months*." The same day, in an article entitled, "U.S. auto sales feel chill of January, blizzard Jonas; Volkswagen's slump continues despite heavy incentives," *USA Today* reported that, "Sales of new U.S. cars and trucks cooled in January after a record-setting pace last year but showed promise as low gasoline prices enticed people into making big purchases . . . . *Fiat Chrysler reported its 70th consecutive month of sales growth* with a 6.9% increase."

296.  On February 5, 2016, *Just-auto*, in an article entitled, "Storm Jonas chills US light vehicle sales," reported that, "*FCA was the big mover among the major automakers, reporting its 70th consecutive month of year-over-year improvement*."

297.  Defendants also continued to deny the allegations in the Dealer Lawsuit as fabrications by a "disgruntled" dealer.  For example, on February 16, 2016, in an article entitled "Bigland defends controversial stair-step dealer bonus plan," the *Windsor Star* reported that:

> *Bigland dismissed the lawsuit as 'false accusations' levelled by a 'disgruntled' dealer* . . . . "There was one dealer in Chicago that represents two stores—somebody who we're in termination proceedings with," he said.  "They're disgruntled" . . . . Such

acrimony "comes with the territory" of being the fastest growing automaker, he added. "*I think people generally want to take shots at your growth; it largely comes with the territory but it's completely false*."

298.   Each of Defendants' Class Period statements set forth in ¶297 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

299.   On February 29, 2016, the Company filed its Annual Report for fiscal year 2015.  In a "Letter from the Chairman and the CEO," Marchionne wrote that, "*In the United States, we closed the year posting our 69th consecutive month of year-over-year sales gains* and our best annual sales since 2006."

300.   On March 1, 2016, the Company issued a press release announcing its U.S. retail sales for February 2016, which was filed with the SEC on Form 6-K ("March 1, 2016 Press Release").   In the March 1, 2016 Press Release, the Company stated, "*FCA US LLC today reported U.S. sales of 182,879 units, a 12 percent increase compared with sales in February 2015* (163,586 units), and the group's best February sales in 10 years."  In the same press release, the Company also stated that the "*group extended its streak of year-over-year sales gains to 71-consecutive months*."  The March 1, 2016 Press Release also quoted Defendant Bigland, who said, "Overall, FCA US realized its best February sales in 10 years and *our 71st-consecutive month of year-over-year sales increases*."  Defendant Palmer signed the March 1, 2016 Press Release.

301.   Each of Defendants' Class Period statements set forth in ¶¶299-300 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

302.   In response, on March 1, 2016, in an article entitled "FCA US LLC Feb. U.S. Sales Rise 12% - Quick Facts," *RTT News* reported that the Company "***extended its streak of year-over-year sales gains to 71-consecutive months***."

303.   On the same day, in an article entitled "Auto Makers Largely Up After New Data," *Benziga.com* noted that, "Shares of Fiat Chrysler Automobiles NV (NYSE: FCAU) were also trading higher by nearly 3 percent after the company announced its ***71st consecutive month of year-over-year sales gains*** as total U.S. sales rose 12 percent in February to 163,586 units." In a March 2, 2016 article entitled "US auto sales jump in February," *Business Spectator* explained that, "Fiat Chrysler Automobiles NV posted a 12 percent rise to 182,879 vehicles in February, ***extending the Italian-US automaker's sales-gains streak to 71 months***." The same day, the *Detroit Free Press*, in an article entitled "Ford, FCA soar in Feb.; GM sales slip," wrote that, "***FCA posted its 71st consecutive monthly gain*** from a year earlier as Jeep and Ram brands led the way."

304.   In a March 2, 2016 report, analyst ICBPI similarly explained that, "[y]esterday early afternoon, FCA US announced that Group sales in the US increased by 12% YoY to 183k units in Feb-16, marking the best February since

2006 and **the 71st consecutive month of growth**," and characterizing it as "very positive news flow."

305.   On March 14, 2016, in an article entitled "GM lifts sales to business buyers; Growth streak helps trim gap with Ford," *Automotive News* noted that FCA "**own[s] the industry's most noteworthy sales streak with 71 straight months of U.S. gains**."

306.   On March 24, 2016, the Company moved to dismiss the Dealer Lawsuit.   In their motion, FCA accused the plaintiffs in the Dealer Lawsuit of "publicly smearing FCA with baseless accusations."

307.   On April 1, 2016, the Company issued a press release announcing its U.S. retail sales for March 2016, which was filed with the SEC on Form 6-K ("April 1, 2016 Press Release").  In the April 1, 2016 Press Release, the Company stated, "**FCA US LLC today reported U.S. sales of 213,187 units, a[n] 8 percent increase compared with sales in March 2015** (197,261 units), and the group's best March sales in a decade."  The April 1, 2016 Press Release also quoted Defendant Bigland, who said, "Strong Jeep and Ram brand sales gave us a fast start to the important spring selling season and **extended our year-over-year monthly sales gains to six full years**."  Defendant Palmer signed the April 1, 2016 Press Release.

308.   On the same day, the Company published a video titled "FCA Replay: April 1, 2016" touting its March 2016 U.S. sales as a top story for the week.  In the

video, the Company stated that "Jeep Grand records [its] best march sales ever and helped **FCA US LLC mark its 72nd consecutive month of year over year sales gains**, **which led to overall sales of 213,187 vehicles, up 8% over last year,** according to sales figures released Friday."

309.  Each of Defendants' Class Period statements set forth in ¶¶307-08 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

310.  Once again, the market repeated the Company's false statements about its sales growth streak.  For instance, on April 2, 2016, *Automotive News*, in an article entitled, "Did early Easter put a crimp in sales?" reported that, "FCA US, led by another strong month for Jeep and higher discounts, posted an 8.1 percent rise in March U.S. sales, its **72nd consecutive monthly increase**."

311.  On April 6, 2016, in an article entitled, "March US light-vehicle sales grow 3.1%, delivering SAAR of 16.46 mil. units," *IHS Global Insight* explained that, "**FCA US reported its 72nd consecutive month of y/y sales gains**, up 8.1% y/y."  In a same day article entitled "March sales rise 3.1%, but SAAR falls to 13-month low," *Global Data Point* reported that, "FCA US, led by another strong month for Jeep and higher discounts, posted an 8.1 percent rise in March U.S. sales, **marking the 72nd consecutive month that the company's U.S. deliveries have advanced year over year**."

312.   On April 9, 2016, *Just-auto*, in an article entitled, "March a month of surprises for US light vehicle sales" reported that, "***FCA posted its 72nd consecutive month of sales growth***."

313.   On May 3, 2016, the Company issued a press release announcing its U.S. retail sales for April 2016, which was filed with the SEC on Form 6-K ("May 3, 2016 Press Release").  In the May 3, 2016 Press Release, the Company stated, "***FCA US LLC today reported U.S. sales of 199,631 units, a 6 percent increase compared with sales in April 2015*** (189,027 units), and the group's best April sales in 11 years."  The May 3, 2016 Press Release also quoted Defendant Bigland, who said, "Consumer preference for SUVs and pickup trucks continued unabated in April and helped to propel us to our strongest April sales in 11 years." Defendant Palmer signed the May 3, 2016 Press Release.

314.   On May 6, 2016, the Company published a video titled "FCA Replay: May 6, 2016" discussing its April U.S. sales report as a major story.  In the video, the Company stated that "Jeep brand sales rose 17% in April, making it the best April sales ever for Jeep and helping drive ***FCA US vehicle sales up 6% for the month.  It was the best April for the Company since 2005.***"

315.   Each of Defendants' Class Period statements set forth in ¶¶313-14 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

316. Based on the Defendants' misleading statements, numerous media outlets reported that the streak had continued. For example, on May 3, 2016, the *Daily News*, in an article entitled, "U.S. auto sales approach records as consumers defy global slump," reported that, "Fiat Chrysler Automobiles said Tuesday that its U.S. sales rose 5.6 percent in April, beating analysts' estimates and ***extending its streak of monthly gains to more than six years***—thanks to the popularity of Jeep SUVs and Ram pickups."

317. The next day, *The Detroit News*, in an article entitled "Light trucks keep auto sales rolling," reported that, "***The sales make April Fiat Chrysler's 73rd consecutive month of year-over-year monthly sales gains*** and the company's best April sales since 2005." Similarly, the *Detroit Free Press*, in an article entitled, "FCA Ford up; GM down despite a rise in retail," noted that, "***April also marked the 73rd consecutive month that [FCA] posted monthly sales gains***."

318. On May 25, 2016, *TheStreet.com*, in an article entitled "Don't Gamble on Caesars; Buy Fiat, Bank of America," noted that, "Fiat's U.S. sales rose 5.6% in April, primarily due to the popularity of Jeep SUVs and Ram pickups, beating Wall Street analysts' estimates of 4.3% growth and ***extending its streak of monthly gains to more than six years***."

319. On June 1, 2016, the Company issued a press release announcing its U.S. retail sales for May 2016, which was filed with the SEC on Form 6-K ("June

1, 2016 Press Release"). In the June 1, 2016 Press Release, the Company stated, "**FCA US LLC today reported U.S. sales of 204,452 units**, **a 1 percent increase compared with sales in May 2015** (202,227 units), and the group's best May sales in 11 years." The June 1, 2016 Press Release also quoted Defendant Bigland, who said, "Notwithstanding a challenging calendar, we managed to muscle our way to our strongest May sales in over 10 years." Defendant Palmer signed the June 1, 2016 Press Release.

320. On June 3, 2016, the Company issued a video titled "FCA Replay: June 3, 2016" stating that "the Jeep brand posted its best monthly sales ever in May, helping drive **FCA US sales to a 1% gain for the month**" of May.

321. Each of Defendants' Class Period statements set forth in ¶¶319-20 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

322. Analysts and investors reacted positively to the news, again reporting that the Company's growth streak had continued. In a report published on June 2, 2016, ICBPI remarked that the Company's announcement "mark[ed] the best month of May since 2005 and **the 74th consecutive month of growth**."

323. Numerous news outlets reported the same. For instance, on June 2, 2016, *CNNMoney*, in an article entitled "Tough times for auto stocks as Uber rules the world," reported that:

It appears that big auto companies are no longer immune to the sluggish U.S. economy . . . . ***Most major car makers reported lousy sales in May. Sales fell at GM, Ford, Toyota and Honda . . . . Fiat Chrysler was the only major auto company to buck the trend, extending the company's impressive sales growth streak to 74 consecutive months.*** Still, sales were up only 1.1% though, led mainly by strong demand for its Jeep brand.

324.   In a same-day article entitled "Industry still on track to set record," the *Detroit Free Press* explained that, "***FCA managed to keep its nearly unprecedented streak of 74 consecutive months of year-over-year sales gains going***, thanks to Jeep, where sales rose 14% for the SUV brand."

325.   On June 6, 2016, in an article entitled "In the grips of a 'sedan recession'; Cars plunge to just 41% of U.S. market," *Automotive News* reported that, "FCA US and Subaru both managed 1.1 percent gains, ***narrowly keeping their multiyear growth streaks alive***."

326.   On July 1, 2016, the Company issued a press release announcing its U.S. retail sales for June 2016 ("July 1, 2016 Press Release"), which—unlike previous monthly U.S. sales reports—was not filed with the SEC on Form 6-K.  In the July 1, 2016 Press Release, the Company stated, "***FCA US LLC today reported U.S. sales of 197,073 units, a 7 percent increase compared with sales in June 2015*** (185,035 units), and the group's best June sales in 11 years."  The July 1, 2016 Press Release also quoted Defendant Bigland, who said, "Strong Jeep and Ram Truck brand sales fueled our best June sales in 11 years."  Defendant Bigland

was also quoted as saying, "In spite of some severe stock market volatility in June, the American consumer stayed focus on buying new vehicles and propelled FCA to six vehicle sales records last month."

327.    On the same day, the Company published a video titled "FCA Replay: July 1, 2016," stating that **"FCA reported US sales of 197,073 vehicles, a 7% increase compared with sales in June 2015**, and the group's best June sales in 11 years."

328.    Each of Defendants' Class Period statements set forth in ¶¶326-27 was materially false or misleading when made, or omitted material facts, for the reasons set forth in ¶¶175, 195, 230, 285.

329.    Once again, analysts and investors reacted positively to the news, repeating their false impression that the Company's growth streak was intact.  In a report published on July 4, 2016, ICBPI remarked that the Company's announcement marked its "best month of June since 2005 and the **75th consecutive month of growth**" and the "performance of the Group on the US market has thus confirmed to beat expectations."

330.    Similarly, on July 2, 2016, the *Detroit Free Press*, in an article entitled, "Jeep, Ram, Pacifica Give Fiat Chrysler a boost in June," reported that, "***Fiat Chrysler Automobiles on Friday kept its improbable sales streak alive in***

*June* as sales rose 6.5%," "*marking the 75th consecutive month of year-over-year sales gains*."

331.  Two days later, in an article entitled "Disappointing US light-vehicle SAAR sales below 17 mil. units in June, volume up 2.4% y/y," *IHS Global Insight* reported that, "*Fiat Chrysler Automobiles (FCA) US reported its 75th consecutive month of year-on-year sales gains*, with a strong 6.6% y/y gain in June."

## VI.    THE TRUTH BEGINS TO EMERGE

332.  On January 12, 2016, investors began to learn the truth concerning FCA and its fraudulent retail U.S. sales scheme.

333.  That day, several of FCA's dealers filed a federal lawsuit captioned *Napleton's Arlington Heights Motors, Inc., et al. v. FCA US LLC, et al.*, Case 1:16-cv-00403 (N.D. Ill. 2016), in the United States District Court for the Northern District of Illinois, alleging that the Company was strong-arming its dealers into reporting false monthly sales numbers.  Specifically, the suit alleged that FCA was inducing its dealers to fraudulently book sales on vehicles that had not yet been sold at the end of each month, and then unwind those sales in the following month before the factory warranty on the vehicles could be processed and start to run.

334.  The lawsuit was reported by media outlets the following day.  In particular, on January 13, 2016, *Automotive News*, in an article entitled

116

"Dealerships accuse Fiat Chrysler of falsifying U.S. Sales; Suit claims FCA

offered dealers money to inflate monthly volumes," reported that:

> Two Fiat Chrysler dealerships that are part of a suburban Chicago auto group filed a civil racketeering suit against FCA, alleging the company offered dealers large amounts of money to report unsold vehicles as sold. The federal suit, filed Tuesday in Chicago by two dealerships in the Napleton Automotive Group, alleges, among other claims, that FCA conspired with certain dealers to inflate the automaker's monthly U.S. sales reports. The company has posted 69 consecutive monthly year-over-year gains after recovering from its U.S.-steered bankruptcy. The suit, filed by Kevin Hyde, an assistant general counsel for the dealerships, alleges that dealers were paid to report the false sales on the last day of the sales month and then 'back out' or unwind the sales the following business day 'before the factory warranty on the vehicles could be processed and start to run.'

> \*       \*       \*

> The suit alleges that FCA officials were aware of the false reporting of sales and rewarded local managers for hitting sales targets—even though the company knew the sales goals had only been met via false sales reports. It says FCA directly benefited from the practice 'as it results in the inflation of the number of year-over-year sales which, in turn, create the appearance that FCA's performance is better than, in reality, it actually is.'   FCA officials, including CEO Sergio Marchionne, touted the monthly sales streak at the Detroit auto show this week. . . . Napleton Automotive Group, of Westmont, Ill., ranks No. 32 on *Automotive News'* 2014 list of the 150 top U.S. dealership groups, with new retail sales of 21,550 vehicles.

335.   The next day, January 14, 2016, Defendants issued two separate press

releases denying the allegations.   In the First January 14, 2016 Press Release,

Defendants assured the market that:

> While the lawsuit has not yet been served on FCA US, the company believes that the claim is without merit and was filed by internal counsel to the dealer group as FCA US has concurrently been

discussing with the dealer group the need to meet its obligations under some of its dealer agreements. The company is confident in the integrity of its business processes and dealer arrangements and intends to defend this action vigorously.

336. In the Second January 14, 2016 Press Release, the Company yet again

falsely reassured the market that the allegations were without merit:

[FCA] learned late yesterday of the filing of a lawsuit in an Illinois Federal Court by two U.S. dealers located in Illinois and Florida. The named defendants are FCA US LLC ("FCA US") and FCA Realty LLC. The dealer plaintiffs are two dealerships of the larger Ed Napleton Automotive Group. The lawsuit makes allegations of false sales reporting by FCA US. Notwithstanding numerous requests to provide evidence of this alleged activity, the plaintiffs have refused to substantiate their claims. *FCA US carried out an investigation of the facts, and has determined that these allegations are baseless* and plaintiffs were notified of this fact before they filed suit. *This lawsuit is nothing more than the product of two disgruntled dealers who have failed to perform their obligations under the dealer agreements they signed with FCA US*. They have consistently failed to perform since at least 2012, and have also used the threats of litigation over the last several months in a wrongful attempt to compel FCA US to reserve special treatment for them, including the allocation of additional open points in the US FCA network. FCA US will continue to resist these pressures, safeguarding the relationship of trust and openness which governs its relationship with its dealers. FCA finds it unfortunate and disappointing that reputable media would be willing to be used in questionable litigation practices without a full understanding of the facts.

337. Media coverage of the lawsuit continued that day, with *TheStreet.com*

reporting in an article entitled "Fiat Chrysler (FCAU) Stock Tumbles on Lawsuit,

Allegations of Falsified Sales," that:

Fiat Chrysler (FCAU) stock is falling . . . in early-morning trading on Thursday, as two Fiat Chrysler dealerships sue the automaker for

allegedly bribing dealers to mark unsold vehicles as sold. . . . Company executives were aware of the practice, and directly benefited from it, the lawsuit alleges. Fiat Chrysler has reported 69 consecutive months of year-over-year gains after recovering from bankruptcy during the financial crisis[.]

338. *PBS Finance Wire*, in a same-day article, explained that, "Shares of Fiat Chrysler under pressure after two dealerships accused the automaker of inflating sales numbers. . . . For its part, Fiat Chrysler says the allegations are baseless and strongly rejects the accusations."

339. Also on January 14, 2016, *RTT News*, in an article entitled "Fiat Chrysler Accused Of Faking Its U.S. Sales; Shares Suspended In Milan," reported that,

> [S]hares of Fiat Chrysler Automobiles (FCA) were suspended from trading in Milan on Thursday following Automotive News reported that two Chicago dealerships had filed a lawsuit against FCA, alleging that the company offered dealers large amounts of money to report unsold vehicles as sold. . . . The company has posted 69 consecutive monthly year-over-year gains after recovering from its U.S.-steered bankruptcy. . . . The suit alleges that FCA officials were aware of the false reporting of sales and rewarded local managers for hitting sales targets—even though the company knew the sales goals had only been met via false sales reports.

340. On January 14, 2016, *USA Today*, in an article entitled, "Chrysler accused of inflating sales; 2 dealerships file civil racketeering suit against automaker," noted that, "The lawsuit comes after Fiat Chrysler recently posted its 69th consecutive month of gains in U.S. sales, which have been ***hailed as the pillar of the company's global operations***." The same day, *The Detroit News*, in an

119

article entitled, "2 dealers accuse FCA of offers to falsify sales," reported that, "FCA US has recorded 69 consecutive months of year-over-year sales gains—the current longest-running streak in the industry. ***The sales streak has been touted as recently as this week at the Detroit auto show as a resounding achievement of the company's plans***."

341.   The *Wall Street Journal*, in a January 15, 2016 article entitled, "Fiat Skewed Sales, Suit Says—Illinois dealer accuses auto maker of using 'strong arm' tactics, cash to pad tallies," similarly reported that :

> An Illinois car dealer has filed a lawsuit against Fiat Chrysler Automobiles NV, accusing the fastest growing of the major auto makers of manipulating vehicle sales reports.   [The dealer] . . . accused Fiat Chrysler of financially rewarding dealers for falsifying their vehicle-sales reports as part of the auto maker's growth program. Fiat Chrysler has reported sales increases for 69 consecutive months, aided by a stream of new products and attractive sales incentives.  Fiat Chrysler's growth program used 'strong-arm' tactics to get dealers to falsify sales reports to benefit the auto maker by creating 'the appearance that [Fiat Chrysler's] performance is better than, in reality, it actually is,' the civil suit claims.
>
> *               *               *
>
> Fiat Chrysler was aware of the practice, according to the complaint, and disguised payments to dealers as factory-based incentives to protect them from a sales audit.

342.   In response to this news, and notwithstanding Defendants' denials, the Company's share price fell 4.2%, from closing price of $7.86 on January 13, 2016 to a closing price of $7.53 on January 14, 2016.

343.   Despite this partial disclosure, which removed some of the artificial inflation in FCA's stock price, the Company's stock price remained artificially inflated as a result of Defendants' staunch denials that there was any problem with FCA's reported U.S. monthly sales and their reassurances that an internal investigation had concluded that the allegations in the lawsuit were meritless.

344.   On July 18, 2016, various media outlets reported that the SEC had launched a civil investigation, and the FBI, and DOJ had launched criminal investigations into the Company's fraudulent reporting of monthly U.S. sales figures.  For instance, the *Wall Street Journal*, in an article entitled "Fiat Chrysler Investigated by Regulators Over Sales Reports; Dealer had accused Fiat Chrysler of rewarding stores that manipulated sales reports," reported,

> The U.S. Justice Department and Securities and Exchange Commission are investigating allegations raised earlier this year by an Illinois car dealer who claimed the company manipulated monthly sales data, said people familiar with the matter . . . . Federal Bureau of Investigation agents visited the homes of nine Fiat Chrysler regional managers on July 11, a lawyer for several of the auto maker's dealerships said. . . . ***The Fiat Chrysler investigations cast a shadow over the company's 75-month-long streak of year-over-year sales increases*** aided in part by sales incentives and strong demand for its Jeep sport-utility vehicles. . . . ***Fiat Chrysler until recently aggressively promoted its monthly sales winning streak, which dates back to shortly after the company emerged from a government-brokered bankruptcy restructuring***.  Some dealers say the company is pressuring them to keep the streak going even as new-car demand cools.

121

345.   In a July 18, 2016 article titled "Fiat Chrysler sales reporting practices subject of U.S. probe," *Automotive News* stated that federal staff attorneys also visited the headquarters of FCA US, and that raids or visits were conducted in Orlando, Dallas, and California.

346.   Additionally, on July 18, 2016, the *New York Times*, in an article entitled "US Investigates Fiat Chrysler Over Sales Figures," reported that:

> Fiat Chrysler Automobiles has been on a hot streak for more than six years, reporting growth in new car sales in the United States for 75 consecutive months, a feat rarely seen in the auto industry.  But now the federal government is asking whether those numbers are too good to be true.  The Securities and Exchange Commission is investigating whether the company has been improperly inflating its monthly sales totals, and whether those reports have misled investors.

347.   In another July 18, 2016 article entitled, "Justice Department, SEC investigating Fiat Chrysler over allegations of false sales numbers," the *Washington Post* reported,

> Illinois and Florida dealers filed a civil suit against the manufacturer in January over a scheme the dealers say encouraged them to falsify new vehicle delivery reports to boost corporate sales numbers . . . . [N]ow federal investigators have begun a criminal probe against the automaker for similar allegations . . . . [According to Erik Gordon, a professor at University of Michigan Ross School of Business] 'It would be very difficult to convince a jury that it's not reasonable to consider sales number[s] material.  After all, it was important enough to push the vehicles through the channel.  FCA must have thought [sales numbers] were important.'

348.   The same day, FCA confirmed the government investigations into its reporting on monthly U.S. sales volumes.   In particular, it issued an "FCA Statement in Response to Press Reports" in a press release on Form 6-K, stating:

> In response to press reports today, FCA confirms that it is cooperating with an SEC investigation into the reporting of vehicle unit sales to end customers in the U.S.   In its annual and quarterly financial statements, FCA records revenues based on shipments to dealers and customers and not on reported vehicle unit sales to end customers. Inquiries into similar issues were recently made by the U.S. Department of Justice.   FCA will cooperate fully with these investigations.

349.   On July 19, 2016, *TheStreet.com*, in an article entitled "How Believable Is Fiat Chrysler's Unbelievable Turnaround," reported that:

> The U.S. arm of Fiat Chrysler Automobiles (FCAU), left for dead during the Great Recession, has turned into a stunning success story, churning out monthly sales figures that would have been all but unthinkable just a few years prior.  U.S. regulators are now digging in to see how real those sales figures really are.

350.   The same day, the *Detroit Free Press*, in an article entitled, "Fiat Chrysler confirms U.S. probe of its sales reports," explained that, "Prosecutors are focusing on whether the automaker violated U.S. securities laws, according to Bloomberg, which cited unnamed sources."

351.   In a same-day article entitled "Why the feds are investigating Fiat Chrysler Automobiles' Sales Reports," *The Motley Fool* in a section called "Why would FCA want to pad its monthly sales total?," explained that:

> FCA isn't a healthy company, and investors know it. It's dealing with big problems on many different fronts, from a huge debt load, to shortages of its most popular products, to crucial product development programs that are far behind schedule. CEO Sergio Marchionne has a plan to deal with all of that.

The article further observed that the Company's U.S. sales streak had helped the Company to silence skeptics of its ambitious 2014 Plan:

> Aspects of the plan may seem far-fetched and improbable, but one factor arguing that they're not *too* improbable has been FCA's long streak of sales growth in its most profitable market, the United States: June was the 75th month in a row in which FCA had reported a year-over-year sales increase in the U.S.

352. In response to this news, the Company's stock fell 2.53%, from a closing price of $6.73 on July 18, 2016 to a closing price of $6.56 on July 19, 2016.

353. Then, on July 26, 2016, in a shocking departure from its previous denials of any wrongdoing, FCA US issued a press release admitting that its much touted monthly U.S. sales streak had, in fact, ended nearly three years earlier. In particular, in a press release entitled "FCA US LLC Explanatory Note on Sales Reporting Process," the Company disclosed that its dealers could, in fact, book fake sales and then unwind them: "It is possible for a dealer to 'unwind' a transaction recorded the NVDR system and return the vehicle to the dealer's unsold inventory." Moreover, FCA confirmed that it did not subtract these unwound sales from its monthly reported U.S. sales (thereby inflating them): "FCA

US has not historically reflected either unwinds or the subsequent sales of these vehicles in its sales reporting."

354.    The Company announced that, effective immediately, it would report its monthly U.S. sales under a "revised methodology" that subtracted any unwound sales from monthly totals.  Specifically, it reported that, moving forward, monthly U.S. sales would be calculated based on:

> All sales recorded by dealers during that month net of all unwound transactions recorded to the end of that month (whether the original sale was recorded in the current month or any prior month); plus [a]ll sales of vehicles during that month attributable to past unwinds that had previously been reversed in determining monthly sales (in current or prior months).

355.    The Company also disclosed that it had been maintaining a "reserve" stock of cars that had been shipped to big fleet buyers such as rental car companies but not recorded as sales.  The Company could then move those sales from one month to the next to ensure that it met monthly targets.  The Company announced that, under the new methodology, "Fleet sales will be recorded as sales upon shipment by FCA US of the vehicle to the customer."

356.    According to the Company, "[t]he objective of this new methodology is to provide in FCA US' judgment the best available estimate of the number of FCA US vehicles sold to end users through the end of a particular month applying a consistent and transparent methodology."

357.   The Company also provided restated monthly U.S. sales numbers going back to 2011, utilizing the new approach.  These restated numbers revealed that FCA's highly publicized streak of monthly sales growth had, in fact, ended in September 2013, nearly three years earlier:

> FCA US in March of this year last commented specifically about a 'streak' of year-over-year monthly sales improvements since April of 2010.  Applying this new methodology during the periods presented below, year-over-year monthly sales would have declined in September 2013 (-3%), August 2015 (-1%) and May 2016 (-7%).  The so-called 'sales streak' would have stopped in September 2013[.]

358.   Thus, Defendants effectively admitted that the streak, touted repeatedly after FCA common stock began trading on the NYSE, did not even exist during the Class Period.

359.   That same day, in an article entitled "Federal grand jury probes FCA's U.S. sales," *Automotive News* reported that,

> Some of Fiat Chrysler's U.S. dealers have begun receiving subpoenas to provide documents and or testimony to a federal grand jury in Detroit as part of a probe into the company's sales reporting practices. . . . A dealer source, speaking on condition of anonymity, confirmed that subpoenas had been issued seeking dealer-level sales data and other information.  FCA declined to comment."

The article also noted that,

> The dealer source said FCA US and its employees were issued warrants by federal investigators when they visited all nine of the automaker's regional business centers, as well as its corporate headquarters in Auburn Hills, Mich., beginning on July 11. Investigators also visited current and former employees in their homes, the source said.  On Tuesday, the automaker issued a

126

sweeping restatement of its monthly U.S. sales results going back to 2011 and disclosed that it was changing the methodology under which monthly sales are tallied. As a result of the changes, FCA US' streak of month-over-month sales increases, which had run up to 75 consecutive months through June, actually ended in September 2013.

360. On July 27, 2016, *The Detroit News*, in an article entitled, "As probes swirl, FCA slashes sales report," noted that Edmunds.com senior analyst and Director of Pricing and Industry Analysis Jessica "Caldwell said the revisions are troublesome, especially considering they end the automaker's years-long sales streak."

361. That same day, the *Detroit Free Press*, in an article entitled "FCA's long sales streak hit the skids during '13," wrote that, under the new process, FCA's "impressive sales streak of 75 months of consecutive sales gains actually ended in September 2013" and FCA "is facing scrutiny from the U.S. Securities and Exchange Commission and the U.S. Department of Justice for its sales reporting practices."

362. The *New York* Times, in a story entitled, "Sales Not Hot as Thought, Fiat Chrysler Revises Data," reported that "[f]or the last few years, Fiat Chrysler has been acclaiming a long run of rising new-car sales. At last count, it had higher vehicle sales 75 months in a row. Turns out, the hot streak actually ended three years ago, at Month 40."

363. *Forbes*, in an article entitled, "Ooops!: FCA's Industry-Leading Streak of Monthly Sales Increases Actually Ended Nearly 3 Years Ago," wrote:

> FCA CEO Sergio Marchionne made a regular practice of underscoring the significance of the sales streak. And, to be sure, the streak highlighted the fact that Fiat Chrysler has been closing in on Toyota's No. 3 sales position in the U.S. market. Now *the 'record' has been bared as mythological, and that revelation certainly won't help Chrysler as U.S. auto sales flatten out* and as the company faces long-term challenges in breadth of product, capital resources, huge segments such as small cars, quality comparisons and other areas.

364. The *Washington Post* reported that:

> Fiat Chrysler Automobiles announced changes in the way it reports U.S. vehicle sales on Tuesday amid an investigation by federal authorities into claims of inflated sales figures. . . . In its statement Tuesday, the company, which has reported year-over-year sales gains every month since April 2010, stopped short of admitting wrongdoing. But it said that the streak would have ended nearly three years ago under the reporting methodology it is now adopting.

365. The *Wall Street Journal*, in an article entitled, "Fiat Chrysler's Revised Sales Numbers End a Winning Streak; Company now says streak of monthly U.S. sales increases ended nearly three years ago," noted that

> The growth streak has been routinely touted as an important milestone by Sergio Marchionne, Fiat Chrysler's chief executive, who has been working to find a buyer for the company since at least 2014. The company's sales results have recently indicated the company is closing in on Toyota Motor Corp.'s No. 3 sales position in the U.S., further boosting investor confidence in its recovery from the 2009 bankruptcy filing by Chrysler. Fiat Chrysler's streak had been considered the longest run of monthly sales gains in the auto industry. Fuji Heavy Industries' Subaru brand now holds that crown with 55 consecutive months through June.

366.   In response to this news, the Company's share price fell 4.29%, from a closing price of $7.00 on July 26, 2016 to a closing price of $6.70 on July 27, 2016.

367.   Just a little over a month after changing its sales methodology, in September 2016, FCA US began reporting a streak of consecutive sales *declines* that continues to today.  On January 5, 2017, *IHS Global Insight*, in a story entitled "US light-vehicle sales return seventh consecutive annual sales gain in 2016, with 0.3% increase to 17.54 mil. units," reported that FCA "lost its ability to claim consecutive y/y gains after a change in reporting methodology in July, and closed out 2016 down slightly by 0.4% compared with 2015."

368.   On March 2, 2017, the Company reported a U.S. sales decline of 10% for February 2017, its sixth consecutive monthly year-over-year U.S. sales decline.

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

369.   As described in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that the statements identified above in Section V were materially false and misleading and/or omitted material facts when made.  *See* Section IV.G.  In addition to the specific acts enumerated above, the following facts also support a strong inference of scienter.

370.  *The fraud concerns the core of FCA's U.S. operations, the retail sales of vehicles in the U.S. market*.  FCA's North America segment, which is driven by its U.S. sales, generates roughly 90% of the Company's earnings before income and taxes.  As a result, the Company's U.S. retail vehicle sales is one of its most closely watched and highly touted metrics, and a critical component of the Company's growth strategy—increasing such sales and, by extension, the Company's market-share in the U.S.  Indeed, throughout the Class Period, Defendants regularly focused investors' attention on the Company's streak of consecutive months of year-over-year U.S. sales growth as evidence of FCA's sustained success and growth potential.  Thus, the importance of the U.S. retail sales of vehicles to FCA's business and bottom line raises a strong inference that the Individual Defendants knew, or were reckless in not knowing or disregarding, that their statements about FCA's U.S. retail sales figures and sales streak were false and/or misleading or omitted material facts.

371.  *The Individual Defendants' high-level positions support an inference of scienter*.  As the Company's top executives, Defendants Marchionne, Palmer, and Bigland—the CEO, CFO, and Head of U.S. Sales (where the heart of the misconduct alleged herein took place), respectively—controlled the Company's day-to-day operations and were informed of and responsible for monitoring FCA's U.S. retail vehicle sales and the Company's oft-referenced streak of consecutive

monthly year-over-year growth in U.S. sales. Each Individual Defendant is also a member of FCA's Group Executive Council, which is the highest management-level decision-making body within the FCA organization and is led by Defendant Marchionne.

372. Additionally, Defendants Marchionne, Palmer, and Bigland are members of the team that manages the day-to-day operations of FCA US. In particular, two management committees chaired by Defendant Marchionne meet regularly to consider significant operational matters in order to facilitate collaboration and enhance speed of decision-making. FCA US has stated that this structure fosters cooperation, information sharing and timely decision-making. Defendants Marchionne, Palmer, and Bigland are also each members of the Board of Directors that oversees FCA US.

373. As the Company's CEO, Defendant Marchionne developed Fiat and FCA's ambitious five-year plan, the goal of which was to capture a larger U.S. market share by increasing retail vehicle sales in the U.S., and was described by *The Detroit News* as the "epicenter" of FCA. *See* ¶¶37-39, *supra*. He also certified the Company's financial reporting filed with the SEC, which included all U.S. retail sales figures, and exerted control over FCA's operations by requiring the Company's top 38 executives, including Defendants Bigland and Palmer, to report directly to him. Marchionne was also the Chairman and CEO of FCA US.

In that capacity, Marchionne chaired FCA US's Commercial Committee, which oversees matters related to sales and marketing.

374.    As the Company's Head of U.S. Sales, Defendant Bigland had during the Class Period "full responsibility for sales strategy, dealer relations and operations, order facilitation, incentives and field operations" throughout the United States, and was responsible for reporting quantitative and qualitative information concerning U.S. retail vehicle sales to the market.    Described by Company sources as a "full-blooded sales carnivore," the *Automotive News* reported in May of 2016, Defendant "Marchionne trusts Reid [Bigland] to run the business" and "treats him like the son who may inherit the company[.]"    Bigland is also a member of FCA Group's Executive Council, the Company's highest decision-making body.

375.    As the Company's CFO and the CFO of FCA US, Defendant Palmer was responsible for reviewing and approving all FCA's (and FCA US's) financial reporting, and for signing and approving each of the monthly press releases, each of which disclosed FCA's monthly U.S. retail vehicle sales figures and/or touted the Company's streak, its growth prospects, and overall financial health.    In a January 11, 2015 article, the *Detroit Free Press* called Palmer "the most important executive at Fiat Chrysler Automobiles that most people—outside of the company and Wall Street—never see."    According to the same article, Palmer "played an

integral role in the development of a detailed, five-year strategic plan that lays out annual sales volume projections for all of the company's brands."

376.  ***The Individual Defendants had access to material, adverse, nonpublic information concerning FCA's U.S. retail sales figures, and the unlawful practices discussed here.***  As the Company's CEO, CFO and Head of U.S. Sales (among other titles), the Individual Defendants had access to various sources of information concerning the Company's U.S. retail sales activities, including actual sales figures and volume.  These sources made readily available to Defendants information that was adverse to Defendants' public statements during the Class Period.

377.  For instance, the Individual Defendants had access to:  (i) HPIMS, which tracked sales volume and vehicle reversals and, according to CW-2, could generate reports listing the vehicles unwound in a given period; (ii) the Field Connect system, which provided comprehensive and detailed information on sales volume, including with respect to any dealer at any point in time, and, according to CW-2, reflected NVDRs for the month and the day, including sales unwound; (iii) the Dealer Connect system, which, like the Field Connect system, provided detailed information regarding sales volume; and (iv) the Penta SAP system, which recorded all payment activity—including purported "incentive payments" received for hitting sales targets—between a Business Center and a dealer within that

133

Business Center's respective territory.  The fact that these Defendants had access to this detailed information shows that Defendants knew, or were reckless in not knowing, that the monthly sales figures FCA reported for the U.S. market during the Class Period were false and/or misleading, and that the monthly year-over-year sales streak had, in fact, ended years prior to the Company's *mea culpa* on July 26, 2016.

378. ***The Individual Defendants were made aware by internal investigations in mid-2015 that the Company was reporting thousands of fake sales.***  After dealer complaints forced FCA executives to engage in an "internal investigation" in mid-2015, the Company uncovered thousands of vehicle sales reported by FCA brands for which there were no actual buyers.  Following the inquiry, Defendant Bigland purportedly instructed FCA employees to cease the deceptive and fraudulent practices, which had resulted in FCA US reporting more sales than it actually made.  According to *Automotive News*, at least one FCA source confirmed that the practice had reached Defendant Marchionne before Bigland it was forced to issue his instruction to cease and desist.  Thus, at the very least, Defendants Marchionne and Bigland were aware of the Company's fake sales scheme by mid-2015.  That same source stated that despite Bigland's instruction, the overstating of sales continued.  CW-2 confirmed that the practice was ongoing when she left the Company in November 2015.    Moreover, CW-1

stated that Defendant Bigland was aware of the fraudulent sales recordings before his instruction to cease and desist.

379. ***The Individual Defendants controlled the contents of the Company's public statements during the Class Period***. Because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made to investors, including the quantitative and qualitative statements concerning U.S. retail vehicle sales, were materially false, misleading, and incomplete.

380. As a result, the Individual Defendants were responsible for the accuracy of FCA's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom. FCA knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that Individual Defendants knew and/or recklessly disregarded that the Company's

statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made. Each of these Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

381. Statements made by FCA and the Individual Defendants during the Class Period strongly and plausibly suggest each had access to the disputed information. Indeed, the vast majority of Defendants' material misrepresentations and omissions (*see,* §V), explicitly or implicitly, pertain directly to U.S. retail vehicle sales and the streak, and could not have been made with any reasonable basis in fact, as the Company in large part confirmed in July 2016 when it disclosed that its monthly sales figures for U.S. retail figures had been misstated, and restated those figures.

382. *FCA's Restatement of U.S. retail vehicle sales supports an inference of scienter*. As noted above, in January 2016, FCA had outright denied the allegations of the Dealer Lawsuit, including that the Company had reported false U.S. retail vehicle sales data to, among other reasons, maintain the façade of the FCA's growth (as manifested through the oft-touted monthly U.S. sales streak). Specifically, in the Second January 14, 2016 Press Release signed by Defendant

Palmer, the Company stated that it had "carried out an investigation of the facts, and has determined that these allegations are baseless."

383.   On July 11, 2016, however, federal investigators raided all nine FCA Business Centers and its headquarters, as well as the homes of current and former employees.  The media reported that a federal grand jury had been impaneled in Detroit to investigate the Company's fictitious sales.  Shortly thereafter, the *Wall Street Journal*, *New York Times*, and *Washington Post*, among other publications, reported that the DOJ, FBI and SEC had launched criminal and civil investigations into FCA "over complaints that the company had fudged quarterly sales tallies" and reported "false sales numbers."

384.   On July 26, 2016 almost immediately following the announcement of criminal and civil investigations by the DOJ, FBI and SEC, FCA reversed course, admitting in a press release that the Company's reported U.S. sales figures were inaccurate, as they did not reflect sales that had been unwound (i.e., reversed and not actually sold), and required a restatement.  Specifically, the Company was forced to restate monthly and quarterly sales figures dating back to 2011.  Most alarming, the Company was forced to admit that after restating the false U.S. sales figures FCA had reported during the Class Period, the Company's highly-touted monthly year-over-year sales streak had, in fact, ended ***three years earlier***.

137

385. The Restatement also confirmed that without the now-admitted improprieties and the Company's decision to instruct dealers to falsify NVDRs, FCA would have reported results in various months that were far below market expectations. For example, as reported by *PR Newswire*, the *Detroit Free Press*, and *The Street.com*, during July and August 2015, market commentators expected FCA's unprecedented streak would finally come to an end. But, as reported by the *New York Times*, when FCA reported August U.S. retail sales numbers, the Company unexpectedly beat analyst estimates and predictions, continuing their streak. As it turns out, FCA did, in fact, see a decline in U.S. sales during August 2015, and should have reported a loss but-for the falsified sales figures, which were inflated by fake sales.

386. Notably, the SEC recently expressed particular concern regarding misleading reporting of non-GAAP (Generally Accepted Accounting Principles) measures, like FCA's monthly U.S. retail sales figures. In fact, the day after FCA announced the Restatement, SEC Chair Mary Jo White gave a keynote address via videoconference at the International Corporate Governance Network Annual Conference in San Francisco, California. Among other things, Chair White stated:

> Not surprisingly, our rules governing these communications make clear that the presentation of non-GAAP measures cannot be misleading and require that they be reconciled to the appropriate GAAP measure so that investors and analysts can compare them to the one that is consistently defined under the GAAP requirements. . . . In too many cases, the non-GAAP information, which is meant to

supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation."

Chair White concluded by urging "that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures."

387. Similarly, on September 13, 2016, in an article entitled "Polishing Financial Results Looks Good, but Can Lead to Fraud," the *New York Times* explained that FCA's U.S. sales reporting:

> is typical of the non-GAAP reporting that companies embrace to show how well they are doing because it involves an easily grasped figure for the media to report and analysts to highlight. Everyone loves a winning streak, which means there is enormous pressure to keep it alive as long as possible, perhaps by tinkering with the numbers just enough to maintain the facade another month.

388. ***The sheer scope of Defendants' false sales scheme supports an inference of their scienter***. As set forth herein, the Company's fraudulent practices were not limited to a small subset of employees, but rather permeated their critical U.S. business unit, with the same fraudulent practices occurring across most, if not all, of its nine U.S. Business Centers, as corroborated by CW-1, CW-2, and the Dealer Lawsuit. Since the criminal investigations forced the Company to alter its practices, it has reported U.S. sales declines in six of seven months, and is currently on a streak of six months of consecutive year-over-year U.S. sales ***declines***.

389.  Defendants have also admitted that same improper practices were occurring in the Company's FCA Canada business, which was also spearheaded by Defendant Bigland.  During the Class Period, FCA Canada reported 72 consecutive months of year-over-year sales growth, and for the first time in its 90-year history, was the top-selling automaker.  Indeed, on September 26, 2015, Bigland authored an article in *The Gazette*, the official newspaper of the Government of Canada for the sole purpose of hyping the Company's Canadian sales growth streak.  In the article, entitled, "FCA Canada racks up unprecedented sales growth," Bigland wrote that:

> Keep on Growing is a song by Eric Clapton, recorded first by his group Derek and the Dominos and later covered by Sheryl Crow, amongst others.  Keep on Growing could also be the theme song for FCA Canada (formerly Chrysler Canada), which has posted 69 consecutive months of year-over-year sales growth through August.  This unprecedented streak has made us the country's top-selling automaker in 2015 and has put us on pace for the highest annual sales in the company's 90-year history in Canada.

*390.*  By August 2016, however, when FCA Canada was forced to adopt the new sales methodology accounting for unwound transactions, its sales began to plummet.  On August 4, 2016, the *Financial Post*, in an article entitled "FCA Canada's July sales plunge; 14% drop," reported that, "Fiat Chrysler Automobiles Canada Inc.'s sales plunged 14 percent in July as the company adopted a new way of counting its transactions following a reporting scandal south of the border."  For

the next five months, FCA Canada posted a streak of consecutive year-over-year sales declines, with all but one month declining in the double digits.

391.    Moreover, on September 1, 2016, FCA admitted that its Canadian monthly year-over-year sales streak was also a product of unwound sales.  In a press release entitled "FCA Canada Inc. Explanatory Note on Sales Reporting Process," the Company explained that, "FCA Canada in November 2015 last commented specifically about a 'streak' of year-over-year monthly sales improvements since December of 2009.  Applying this new methodology, during the periods presented below, year-over-year monthly sales would have declined in April 2012 (-6%).  The so-called 'sales streak' would have stopped in April 2012," over three years earlier.

392.    The following day, *The Globe and Mail*, in an article entitled "Auto makers; Counting Cars: New formula alters FCA's sales numbers," explained that:

> The vehicle sales winning streak that Fiat Chrysler Canada proclaimed for more than six years following the 2008-09 recession would have ended in 2012 under a new way of calculating monthly sales.  The Canadian unit of Fiat Chrysler Automobiles NV said Thursday that revised figures using a new methodology show sales would have fallen in April, 2012, December, 2012, and in single months in each of 2013, 2014, 2015 and this year.

The article also noted that FCA Canada had stopped mentioning the streak in November 2015, despite the fact that it continued to report monthly sales growth under the old methodology until June 2016:

The monthly streak of year-over-year sales gains was proclaimed in news releases through most of that period, ending in November, 2015, when Fiat Chrysler Canada declared that sales that month represented its 72nd consecutive monthly increase. That was the last month during which the monthly sales release mentioned the sales streak. Under the old way of calculating monthly sales, that streak continued through June of this year. The company began using the new methodology in reporting its July sales, which fell from July, 2015, levels. August sales plunged 20 percent from a year earlier.

393. ***Defendant Bigland was motivated to commit fraud for his own personal gain, as evidenced by his numerous promotions.*** FCA executives who did not meet targets were in danger of losing their jobs, and compensation was directly linked to performance in this regard. In this intense environment, Defendant Bigland was motivated to ensure FCA's U.S. dealers continued to report increased monthly sales in the U.S. market over which he presided, and was able to parlay that growth into numerous lucrative promotions. Specifically, FCA rewarded him for his conduct by naming him: (i) Head of US Sales; (ii) then, on October 5, 2015, as Head of NAFTA Fleet; and (iii), then, less than a year later, on May 24, 2016, CEO of FCA's Alfa Romeo and Maserati brands. Commenting specifically on U.S. sales, analyst ICBPI explained that "Bigland has an excellent track record in sales and market share for the USA and Canada, and would seem to be the most fitting manager to manage the relaunch of Alfa Romeo and Maserati in the coming years." Likewise, *Bloomberg* reported that:

Under [Bigland's] leadership, [FCA] outsold its competitors in Canada for the first time in the carmaker's history while enjoying an

unprecedented streak of rising sales in the U.S. The success earned Bigland a promotion to head Fiat Chrysler's Alfa Romeo and Maserati brands, making him one of Chairman Sergio Marchionne's most trusted deputies.

394. ***The Individual Defendants were motivated to commit fraud in order to raise capital through public offerings***. Throughout the Class Period, the Individual Defendants were motivated to keep the truth concerning their U.S. retail vehicle sales figures and indicators from the market so that the Company could consummate offerings for mandatory convertible securities, common stock, and debt to achieve Defendants' aggressive goals for the Company. FCA executives—including Marchionne and Bigland—routinely highlighted the streak and the Company's overall U.S. retail vehicle sales growth as evidence that the Company had recovered from its 2009 bankruptcy.

395. According to an April 9, 2015 *Detroit Free Press* article, Defendant Marchionne's ambitious 2014 Plan called for the Company to "invest as much as $60 billion to boost sales and revenue." The article further explained that the "goals include[d] boosting revenue from $110 billion in 2013 to $167 billion in 2018 and vehicle sales from 4.4 million to 7 million annually." On August 30, 2014, the *Wall Street Journal* had commented that in order to "have any chance of winning that race" with regards to car sales against major automakers, Defendant "Marchionne will have to sell new debt, something he has said would happen once the company had access to U.S. capital markets through the New York stock

143

listing." Afterwards, on October 10, 2014, the *Wall Street Journal* further commented that FCA was "aiming to revamp aging factories and product lines to moves sales close to the industry's big three" automakers.

396. On December 16, 2014, while its share price was artificially inflated by Defendants' fraud, FCA completed a secondary offering of common stock and mandatory convertible securities. Specifically, Defendants completed the sale of 100 million common shares at a public offering price of $11.00 per common share for net proceeds before expenses of $1,067,000,000, as well as $2,875,000,000 in aggregate notional amount of its 7.875% mandatory convertible securities due 2016. The mandatory convertible securities were sold to the public at 100% of the notional amount of $100 per mandatory convertible security for total net proceeds, before expenses, of approximately $2,820,000,000. FCA's total net proceeds, before expenses, from both offerings were approximately $3,887,000,000. *Detroit News* explained that the December offering was "part of an elaborate plan by Fiat Chrysler CEO Sergio Marchionne to raise capital to fuel an ambitious five-year growth strategy for the world's seventh-largest automaker through 2018."

397. On April 14, 2015, FCA closed a $3 billion bond offer of unsecured senior notes to investors. In particular, Defendants sold $1.5 billion in bonds at a 4.5% rate due by 2020 and another $1.5 billion at a 5.25% rate due by 2023. *The Detroit News* noted that Defendant Marchionne wanted to pay off the debt of FCA

US as soon as possible to lift restrictions on how the company could allocate its capital. FCA US's debt had ballooned to $12.8 billion by the end of 2014 due to the Company refinancing bonds in order to gain full control of Chrysler from a United Auto Workers union trust fund that owned 41.5% of the automaker as a result of its 2009 bankruptcy. Shortly after announcing the offering, FCA notified bondholders that it intended to pay off bonds due in 2019.

398. ***The Individual Defendants were motivated to capitalize and leverage FCA's purported U.S. monthly year-over-year sales streak and represented U.S. sales growth in order to attract a merger partner.*** As the *TheStreet.com* reported on July 19, 2016, Defendants had been actively campaigning for a merger partner throughout the Class Period: "Worth noting that this alleged sales padding came during a period where Fiat Chrysler CEO Sergio Marchionne was actively trying to sell the company, publicly lobbying for a deal with General Motors among other potential suitors." The article, entitled "How Believable Is Fiat Chrysler's Unbelievable Turnaround," went on to state:

> Though the M&A effort to date has been unsuccessful, it is pretty easy for a company skeptic to make the case that management had ample reason to want to make sure sales momentum looked as strong as possible. No matter what the investigators find, the Chrysler resurgence since 2008 remains one of the more unlikely rebounds in the history of the U.S. auto sector. In the months to come we'll find out just how impressive the turnaround really was.

## VIII.  LOSS CAUSATION/ECONOMIC LOSS

399.  Defendants' alleged unlawful conduct directly caused the losses incurred by Lead Plaintiffs and the Class.  Throughout the Class Period, FCA common stock traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements and/or omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Lead Plaintiffs and other members of the Class purchased or otherwise acquired FCA common stock relying upon the integrity of the market price for FCA's common stock and market information relating to FCA, and have been damaged thereby.

400.  When the true facts became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of FCA common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Lead Plaintiffs and the members of the Class.  The economic loss, i.e., damage, suffered by Lead Plaintiffs and other members of the Class was a direct result of: (i) Defendants' scheme to misrepresent FCA's monthly U.S. sales figures and overall growth; and (ii) the subsequent decline in the value of FCA's stock price as the relevant truth was revealed in a series of partial adverse disclosures.

401.   As detailed in ¶¶143, 282, 332-33, on January 12, 2016, several of FCA's dealers filed a federal lawsuit alleging that the Company was had been inducing its dealers to report false monthly U.S. sales numbers.   The Company immediately issued a denial.   In direct response to this news, the Company's share price fell 4.2%, from closing price of $7.86 on January 13, 2016 to a closing price of $7.53 on January 14, 2016.   In the wake of the January 12, 2016 revelation, market commentators expressed surprise concerning FCA's alleged misconduct related to its unprecedented monthly year-over-year U.S. sales streak and underlying sales figures, which had propelled FCA throughout the Class Period. *See* ¶¶145-46, 148, 334, 337-41.

402.   Despite this partial disclosure, which removed some of the artificial inflation in FCA's stock price, its stock price remained artificially inflated as a result of Defendants' misleading statements that there was no truth to the allegation in the Dealer Lawsuit and that an internal investigation had revealed that the allegations were meritless.   *See* ¶¶144, 151, 283-84, 297, 306, 335-36.

403.   As detailed in ¶¶156-57, 344-47, on July 18, 2016, various media outlets reported that the SEC, FBI, and DOJ had launched criminal investigations into the Company's fraudulent reporting of monthly U.S. sales figures.   The same day, FCA confirmed the government investigations.   *See* ¶¶156, 348.   In response to this news, the Company's stock fell 2.53%, from a closing price of $6.73 on July

18, 2016 to a closing price of $6.56 on July 19, 2016.  Market commentators were once again surprised by these revelations, particularly given FCA's unequivocal denials of any wrongdoing following the announcement of the Dealer Lawsuit. *See* ¶¶156-59, 161-62, 344-47, 349-51.

404.   As detailed in ¶¶163-64, 353-58, on July 26, 2016, FCA US issued a press release admitting that its monthly U.S. sales figures had been improperly inflated by sales that its dealers had "unwound."   As a result, the Company announced that it would restate five years of monthly U.S. sales figures, and that under these restated figures, its much touted monthly year-over-year U.S. sales streak had, in fact, ended nearly three years earlier.  In response to this news, the Company's share price fell 4.29%, from a closing price of $7.00 on July 26, 2016 to a closing price of $6.70 on July 27, 2016.  Following the Company's January 26, 2016 disclosure, market commentators expressed surprise concerning FCA's Restatement and the fact that its monthly year-over-year U.S. sales streak had actually ended three years earlier.  *See* ¶¶165-67, 359-65.

405.   It was foreseeable to FCA and the Individual Defendants that issuing false and misleading statements and/or omissions of material fact concerning the Company's U.S. monthly year-over-year sales growth would artificially inflate the price of FCA common stock during the Class Period.  It was similarly foreseeable that the ultimate disclosure of the concealed information would cause the price of

FCA common stock to drop significantly as the inflation caused by earlier misstatements was removed from the stock by the corrective disclosures and/or materialization of the risk set forth herein. Accordingly, the conduct of these Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act to Lead Plaintiffs and members of the Class.

## IX.    CLASS ACTION ALLEGATIONS

406.  Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded common stock of FCA and were damaged thereby.  Excluded from the Class are:  (i) Defendants; (ii) present and former directors or executive officers of the Company; (iii) any members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iv) any of the foregoing individuals' or entities' legal representatives, heirs, successors, or assigns; and (v) any entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants.

407.  The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the precise number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are

likely hundreds, if not thousands of members, of Class members. At the end of the Class Period, there were approximately 1.29 billion shares of FCA common stock issued, outstanding and actively trading on the NYSE. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The names and addresses of Class members can be ascertained from the books and records maintained by FCA or its transfer agent, and notice of this action can be provided to Class members by a combination of published notice and first-class mail, using the techniques and form of notice similar to that customarily used in class actions arising under the federal securities laws.

408. Common questions of law and fact exist as to all members of the Class, and such common questions predominate over questions solely affecting individual members of the Class. Among the questions of law and fact common to members of the Class are:

    a.     whether Defendants' actions as alleged herein violated the federal securities laws;

    b.     whether Defendants' statements issued during the Class Period were materially false and misleading and/or omitted material facts;

    c.     whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

    d.     whether and to what extent the market prices of FCA common stock were artificially inflated and/or distorted before and/or during the Class Period due to the misrepresentations and/or omissions of material fact alleged herein;

150

e.    Whether Class members' reliance may be presumed pursuant to the fraud-on the-market doctrine or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972); and

f.    whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

409.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and all other Class members' claims and associated damages arise from, and were caused by, purchasing or otherwise acquiring FCA common stock at prices that were artificially inflated by the same materially false and misleading statements and/or omissions of material fact made by or chargeable to Defendants.  Moreover, Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

410.    Lead Plaintiffs do not possess any interests that are antagonistic to the interests of the other members of the Class, and Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intend to prosecute this action vigorously.

411.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by each

individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## X.    LEAD PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

412.    At all relevant times, the market for FCA common stock was open and efficient for the following reasons, among others:

a.    FCA common stock met the requirements for listing, and was listed and actively traded on the NYSE where the Company's common stock trades under the ticker symbol "FCAU."

b.    As a registered and regulated issuer of securities, FCA filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c.    FCA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

d.    FCA was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace.

413.   As a result of the foregoing, the markets for FCA common stock promptly digested current information regarding FCA from all publicly available sources, and the prices of FCA's stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, FCA common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and the other members of the Class purchased FCA common stock relying upon the integrity of the market price of FCA common stock and other market information relating to FCA.

414.   Under these circumstances, all purchasers of FCA common stock during the Class Period suffered similar injuries through their purchases and/or acquisitions of FCA common stock at artificially inflated prices, and a presumption of reliance under the fraud-on-the-market doctrine applies.

415.   Further, at all relevant times, Lead Plaintiffs and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired FCA common stock at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its

business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute*, 406 U.S. at 153-54.

## XI.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

416.   The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

417.   None of the statements complained of herein was a forward-looking statement.   Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

418.   To the extent that any of the materially false and/or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, such statement were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

419.   To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof,

Defendants are liable for any such false or misleading forward-looking statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of FCA who knew that the forward-looking statement was false.

## XII.   CAUSES OF ACTION

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

420.   Lead Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by Lead Plaintiffs on behalf of themselves and all other members of the Class.

421.   During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Lead Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and/or maintain the market price of FCA common stock; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase or otherwise acquire FCA common stock at artificially inflated prices that did not reflect their

true value.  In furtherance of their unlawful scheme, plan or course of conduct, Defendants took the actions alleged herein.

422.  While in possession of material adverse, non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false and misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock, including Lead Plaintiffs and the Class members, in an effort to maintain artificially high market prices for FCA common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are alleged as primary participants in the wrongful conduct alleged herein.

423.  By virtue of their high-level positions at the Company during the Class Period, the Individual Defendants were authorized to make public statements, and made public statements during the Class Period on FCA's behalf. These Defendants were also privy to and participated in the creation, development, and issuance of the materially false and misleading statements and omission of

156

material fact alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

424.   In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports to the investing public, these Defendants had a duty to disclose information required to update and/or correct their prior statements and/or omissions, and to update and/or correct their prior misstatements or omissions that had become false and misleading as a result of intervening events.  Defendants also had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01, *et seq*.) and Regulation S-K (17 C.F.R. Section 229.10, *et seq*.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. The Individual Defendants also had duties under the Sarbanes-Oxley Act of 2002 to ensure that FCA's Forms 6-K and Annual Reports filed with the SEC did not misrepresent or omit any material facts.

425.   Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to

157

ascertain and to disclose such facts, even though such facts were known or readily available to them. Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, for the purpose and effect of concealing the truth with respect to FCA's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

426.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated or maintained artificial inflation already in the market price of FCA common stock during the Class Period. In ignorance of the fact that the market prices of FCA common stock was artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired FCA common stock during the Class Period at artificially inflated prices. As previously misrepresented and/or concealed material facts eventually emerged, the price of FCA common stock substantially declined.

427.   At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the relevant truth with respect to FCA's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired common stock at artificially inflated prices that they paid.

428.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

429.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) by Lead Plaintiffs on behalf of themselves and all other Class members.

430.  During the Class Period, the Individual Defendants were senior executive officers of FCA and were privy to, and monitored, confidential and proprietary information concerning FCA, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

431.  Because of their high-level positions at FCA, the Individual Defendants had regular access to non-public information about its business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

432.  The Individual Defendants acted as in concert and each was a controlling person of FCA within the meaning of § 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination

of the statements Lead Plaintiffs alleged were materially false and misleading and/or omitted material facts.

433.   Each Individual Defendant was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability and ultimate authority to prevent the issuance of the statements or cause the statements to be corrected.

434.   In particular, each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had, or is presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

435.   As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of the Individual Defendants' status as controlling persons, and their respective participation in the underlying violation of Section 10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Lead Plaintiffs as class representatives under Rule 23 and Lead Counsel as Class Counsel;

B.     Awarding Lead Plaintiffs and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: March 17, 2017                          Respectfully submitted,

                                               */s/ E. Powell Miller*
                                               E. Powell Miller (P39487)
                                               Sharon S. Almonrode (P33938)
                                               **THE MILLER LAW FIRM, P.C.**
                                               950 West University Drive, Suite 300
                                               Rochester, MI 48307
                                               Telephone: (248) 841-2200
                                               Facsimile: (248) 652-2852

162

epm@millerlawpc.com
ssa@millerlawpc.com
mya@millerlawpc.com

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Gregory M. Castaldo
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com

-and-

Stacey M. Kaplan
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
skaplan@ktmc.com

*Attorneys for Lead Plaintiffs*

163

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2017, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/ E. Powell Miller*
E. Powell Miller
