## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------x

STEPHEN G. SAMARAS,
Individually and On Behalf of All
Others Similarly Situated,

                  Plaintiff,

      v.

FIAT CHRYSLER AUTOMOBILES
N.V., SERGIO MARCHIONNE,
RICHARD K. PALMER and REID
BIGLAND,

              Defendants.

-----------------------------------------------x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Case No. 16-12803

Honorable Linda V. Parker
District Court Judge

Honorable Stephanie Dawkins Davis
Magistrate Judge

**(Oral Argument Requested)**

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS
## THE CONSOLIDATED CLASS ACTION COMPLAINT

Patrick G. Seyferth (P47575)
Roger P. Meyers (P73255)
BUSH SEYFERTH & PAIGE PLLC
3001 West Big Beaver Road
Troy, Michigan  48084
Telephone: (248) 822-7800
Facsimile: (248) 822-7001
seyferth@bsplaw.com
meyers@bsplaw.com

Robert J. Giuffra, Jr. (N.Y. 2309177)
William B. Monahan (N.Y. 4229027)
Darrell S. Cafasso (N.Y. 4147849)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
giuffrar@sullcrom.com
monahanw@sullcrom.com
cafassod@sullcrom.com

*Counsel for Defendants Fiat Chrysler Automobiles N.V.,*
*Sergio Marchionne and Richard K. Palmer*

Keefe A. Brooks (P31680)
Michael T. Price (P57229)
BROOKS WILKINS SHARKEY
& TURCO, PLLC
401 S. Old Woodward
Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1710
Facsimile: (248) 971-1801
brooks@bwst-law.com
price@bwst-law.com

Paul Shechtman (N.Y. 2300242)
Rachel B. Goldman (N.Y. 2896272)
David A. Shargel (N.Y. 4366365)
BRACEWELL LLP
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 508-6154
Facsimile: (212) 938-3854
paul.shechtman@bracewell.com
rachel.goldman@bracewell.com
david.shargel@bracewelllaw.com

*Counsel for Defendant Reid Bigland*

May 16, 2017

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................................1

BACKGROUND ...............................................................................10

    A.   Defendants...........................................................................10

    B.   Overview of FCA US's Sales Reporting Process ...............10

    C.   FCA US's Sales Reporting Methodologies.........................12

    D.   The Alleged Fraudulent Sales Reporting Scheme ..............16

LEGAL STANDARD ......................................................................19

ARGUMENT ..................................................................................20

I.     PLAINTIFFS DO NOT PLEAD THAT THE CHALLENGED STATEMENTS WERE MATERIALLY FALSE.......................................................................................20

II.    PLAINTIFFS PLEAD NO PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE THAT DEFENDANTS ACTED WITH FRAUDULENT INTENT. ..................24

    A.   The Alleged Scheme To Inflate FCA US's Monthly Sales Numbers Is Implausible and Contrary to the Alleged Facts. .............25

    B.   The Complaint Does Not Allege Facts Showing That Any of the Individual Defendants Had the Requisite Fraudulent Intent...............27

        1.   The Complaint Contains No Adequate Allegations That the Individual Defendants Knew or Should Have Known That the Streak Would Have Stopped in September 2013 and May 2016. .................................28

        2.   Plaintiffs' Scienter Allegations Are Insufficient as a Matter of Law in Any Event.................................31

        3.   The Complaint's "Additional Allegations" Do Not Establish a "Strong Inference" of Scienter. .............................34

C.     The Complaint Does Not Allege Particularized Facts Establishing a Strong Inference of FCA's Corporate Scienter. .................................39

**III.   PLAINTIFFS DO NOT STATE A SECTION 20(a) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS**......................................40

**CONCLUSION**......................................................................................40

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Albert Fadem Trust* v. *Am. Elec. Power Co.*,
    334 F. Supp. 2d 985 (S.D. Ohio 2004) ............................................................30

*Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013).....................................................................................23

*Ashcroft* v. *Iqbal*,
    556 U.S. 662, 678 (2009) .................................................................................19

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007).........................................................................................19

*Berry* v. *U.S. Dep't of Labor*,
    832 F.3d 627 (6th Cir. 2016) ...........................................................................19

*Bondali* v. *Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) ...............................................................36, 39

*Bovee* v. *Coopers & Lybrand C.P.A.*,
    272 F.3d 356 (6th Cir. 2001) ...........................................................................10

*Car Carriers, Inc.* v. *Ford Motor Co.*,
    745 F.2d 1101, 1110 (7th Cir. 1984) ...............................................................26

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Waters Corp.*,
    632 F.3d 751 (1st Cir. 2011)............................................................................38

*City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ...........................................................................20

*Constellation Energy Commodities Grp. Inc.* v. *Transfield ER Cape Ltd.*,
    801 F. Supp. 2d 211 (S.D.N.Y. 2011) .............................................................34

*D.E. & J Ltd. P'ship* v. *Conaway*,
    284 F. Supp. 2d 719 (E.D. Mich. 2003) ..........................................................10

*Dailey* v. *Medlock*,
    551 F. App'x 841 (6th Cir. 2014)....................................................................37

# TABLE OF AUTHORITIES
## (continued)

*In re Diebold Sec. Litig.*,
  No. 5:05 CV 2873, 2008 WL 3927467 (N.D. Ohio Aug. 22, 2008) .................33

*Doshi* v. *Gen. Cable Corp.*,
  823 F.3d 1032 (6th Cir. 2016) .......................................................24, 32

*Dougherty* v. *Esperion Therapeutics, Inc.*,
  No. 16-10089, 2016 WL 7439196 (E.D. Mich. Dec. 27, 2016).........................27

*In re Federal-Mogul Corp. Sec. Litig.*,
  166 F. Supp. 2d 559 (E.D. Mich. 2001) ........................................31, 36

*Fla. Carpenters Reg'l Council Pension Plan* v. *Eaton Corp.*,
  964 F. Supp. 2d 875 (N.D. Ohio 2013) ...............................................25

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) ...................................................5, 20, 22

*Frank* v. *Dana Corp.*,
  547 F.3d 564 (6th Cir. 2008) ...........................................................10

*Geinko* v. *Padda*,
  No. 00 C 5070, 2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ...........................34

*Grossman* v. *Tex. Commerce Bancshares, Inc.*,
  No. 87 Civ. 6295, 1995 WL 552744 (S.D.N.Y. Sept. 15, 1995)......................35

*Helwig* v. *Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ...........................................................38

*Higginbotham* v. *Baxter Int'l Inc.*,
  495 F.3d 753 (7th Cir. 2007) ...........................................................32

*In re Huntington Bancshares Inc. Sec. Litig.*,
  674 F. Supp. 2d 951 (S.D. Ohio 2009) .................................27, 35, 36

*Konkol* v. *Diebold*,
  590 F.3d 390 (6th Cir. 2009) .......................................................33, 37

# TABLE OF AUTHORITIES
## (continued)

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ................................................................26

*Kuyat* v. *BioMimetic Therapeutics, Inc.*,
  747 F.3d 435 (6th Cir. 2014) ..............................................................................29

*Ley* v. *Visteon Corp.*,
  543 F.3d 801 (6th Cir. 2008) ..........................................................31, 32, 33, 37

*Matrixx Initiatives Inc.* v. *Siracusano*,
  563 U.S. 27 (2011)......................................................................................20, 32

*Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*,
  547 U.S. 71 (2006)...............................................................................................20

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) ..............................................................................39

*Oran* v. *Stafford*,
  226 F.3d 275, 282 (3d Cir. 2000) .......................................................................23

*Parnes* v. *Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) ...................................................................6, 21, 23

*PR Diamonds, Inc.* v. *Chandler*,
  364 F.3d 671 (6th Cir. 2004) ....................................................................*passim*

*In re Proquest Sec. Litig.*,
  527 F. Supp. 2d 728 (E.D. Mich. 2007) ............................................................32

*In re SCB Computer Tech., Inc. Sec. Litig.*,
  149 F. Supp. 2d 334 (W.D. Tenn. 2001) ............................................................38

*Slayton* v. *Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ...............................................................................30

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................8, 9, 10, 24

## TABLE OF AUTHORITIES
### (continued)

*USM Holdings Inc.* v. *Simon*,
    No. 15-14251, 2016 WL 4396061 (E.D. Mich. Aug. 18, 2016) ..............6, 21, 23

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...............................................................31

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) ......................................................................... 23-24

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) .............................................................34

*Wilkof* v. *Caraco Pharm. Labs., Ltd.*,
    No. 09-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ........................32

### STATUTES

Private Securities Litigation Reform Act,
    15 U.S.C. § 78u-4 .......................................................................................*passim*

Securities Exchange Act of 1934
    Section 10(b), 15 U.S.C. § 78j........................................................................1, 19
    Section 20(a), 15 U.S.C. § 78t........................................................................1, 40

### RULES

Federal Rules of Civil Procedure
    Rule 9(b) ........................................................................................................1, 20
    Rule 12(b)(6)..................................................................................................1, 19

Securities and Exchange Commission,
    Rule 10b-5, 17 C.F.R. § 240.10b-5................................................................1, 19

## STATEMENT OF ISSUES PRESENTED

1.  Should this Court dismiss Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) ("Section 10(b)") and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) ("Rule 10b-5"), because the challenged statements, even if false, were not material as a matter of law, where those statements at most (1) underrepresented FCA US's vehicle sales of 10,331,420 by only 0.2% (23,346) over a period of five and a half years, and (2) actually overrepresented sales by only 0.04% (1,716 out of 3,929,030 total sales) during the 21-month putative class period?

2.  Should this Court dismiss Plaintiffs' claims under Section 10(b) and Rule 10b-5, because Plaintiffs do not plead particularized facts giving rise to a strong inference that any Defendant acted with scienter, as required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("Reform Act"), where (1) the purported fraudulent scheme is inherently implausible and inconsistent with the facts alleged in the Complaint, and (2) the allegations do not establish that any Defendant made any of the challenged statements with either (a) actual

knowledge that those statements were false, or (b) conscious disregard as to the truth of those statements?

3.   Should this Court dismiss Plaintiffs' claims against the Individual Defendants under Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)) ("Section 20(a)"), because Plaintiffs do not state an underlying securities law violation?

The answer to each of these questions is "yes."

# STATEMENT OF CONTROLLING
# OR MOST APPROPRIATE AUTHORITIES

The controlling or most appropriate authorities for the relief that

Defendants seek includes:

1.   Fed. R. Civ. P. 12(b)(6)

2.   Fed. R. Civ. P. 9(b)

3.   Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4

**Plaintiffs Do Not Plead That the Challenged Statements Were Materially False:**

4.   *In re Ford Motor Co. Sec. Litig. Class Action*, 381 F.3d 563 (6th Cir. 2004)

5.   *USM Holdings Inc.* v. *Simon*, No. 15-14251, 2016 WL 4396061 (E.D. Mich. Aug. 18, 2016)

**Plaintiffs Plead No Particularized Facts Giving Rise to a Strong Inference That Defendants Acted With Fraudulent Intent:**

6.   *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)

7.   *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671 (6th Cir. 2004)

8.   *Doshi* v. *Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016)

9.   *Fla. Carpenters Reg'l Council* v. *Eaton Corp.*, 964 F. Supp. 2d 875 (N.D. Ohio 2013), *aff'd sub nom. In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356 (6th Cir. 2014)

10.  *Ley* v. *Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008)

11.  *Helwig* v. *Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) (en banc)

12.    *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951
       (S.D. Ohio 2009)

13.    *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559
       (E.D. Mich. 2001)

14.    *Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015)

15.    *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014)

**Plaintiffs Do Not State a Section 20(a) Claim Against the Individual
Defendants:**

16.    *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671 (6th Cir. 2004)

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Reform Act, Defendants Fiat Chrysler Automobiles N.V. ("FCA" or the "Company"), Sergio Marchionne, Richard K. Palmer and Reid Bigland (the "Individual Defendants," and together with FCA, "Defendants") hereby move to dismiss with prejudice the Consolidated Class Action Complaint (the "Complaint" or "Compl.") of Lead Plaintiffs Carl Palazzolo and Albert Ferrandi ("Plaintiffs"), which asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

## PRELIMINARY STATEMENT

FCA is a global automotive manufacturer, which operates in the United States through its wholly-owned subsidiary, FCA US LLC ("FCA US"). On July 26, 2016, FCA US announced that, effective for its July 2016 sales period, it was revising its long-standing methodology for compiling and reporting monthly vehicle sales to end users, *i.e.*, primarily sales from independent dealers to their retail customers. (Ex. 1 ("July 2016 Release").) FCA US also published a chart setting out its historical data for monthly sales from January 2011 to June 2016 under both its new and old sales reporting methodologies. (Ex. 1A.) This change had an immaterial effect on FCA US's reported monthly sales from January 2011 through June 2016, as FCA US reported a slight *increase* of 23,346 sales, or 0.2%,

under its new methodology.[1]   Not surprisingly, this change in FCA US's methodology for reporting monthly sales had little impact on FCA's stock price, which actually *increased* by 1.16% on July 26, 2016, from $6.92 to $7.00.  (*See* Ex. 3.)

In their Complaint, Plaintiffs—purported shareholders of FCA, not FCA US, which is a non-public company—claim that FCA US's decision to revise its monthly sales reporting methodology proves that it engaged in securities fraud. Specifically, Plaintiffs allege that Defendants used the old reporting methodology to report that FCA US had a 75-month "streak" of year-over-year monthly increases in sales from April 2010 through June 2016, when under its new methodology FCA US would have reported year-over-year monthly sales increases *in only 73 of those 75 months*.[2]   Simply put, this is not the stuff of a well-pled securities fraud complaint.

---

[1]    On October 3, 2016, FCA US issued a second press release and chart that slightly revised the figures provided in the July 2016 Release.  (Exs. 2 & 2A (the "October 2016 Release").)  Unless otherwise noted, the figures referenced in this memorandum are those that accompanied the October 2016 Release.

[2]    While Plaintiffs allege that application of the new methodology results in year-over-year declines in three months (September 2013, August 2015, and May 2016 (Compl. ¶ 357)), under the corrected numbers in the October 2016 Release FCA US in fact experienced a year-over-year increase in sales in August 2015, meaning that application of the new methodology yields only two months of slight year-over-year declines.  (Ex. 2A.)  Although citing the October 2016 Release for other purposes (Compl. ¶ 367), the Complaint does not account for the correction.

To add a nefarious twist, Plaintiffs conclusorily allege—based on two confidential witnesses, cherry-picked media reports and unproven allegations lifted from a single unverified complaint filed by two disgruntled FCA US dealerships—that FCA US "bribed" dealerships with "factory cash bonuses, expense reimbursements, and other incentives" to report false sales at the end of each month to "create the perception of growth."  (Compl. ¶ 10.)  Then, in Plaintiffs' telling, those dealers would reverse or "unwind" an unspecified number of those sales in some later month.  Plaintiffs contend that this supposed "unwind" scheme was revealed in a series of disclosures in 2016, none of which was followed by a significant drop in FCA's stock price, culminating in FCA US's July 26, 2016 Release, in which it supposedly "admitt[ed]" that its previously reported sales were "inaccurate" and "required a restatement."  (Compl. ¶¶ 353, 384.)  Nothing could be further from the truth.

Neither FCA US, nor its parent, FCA, has restated any financial statement.  Plaintiffs do not challenge the accuracy of any item in any FCA US or FCA financial statement, including reported revenues or the number of vehicles that FCA US sold at wholesale to its dealers every month.  (Compl. ¶ 12.)   As Plaintiffs concede, FCA US recognizes revenues when it sells the vehicles to dealers, not when the dealers in turn sell the vehicles to retail customers.  (Compl. ¶ 59.)

-3-

Thus, lost in Plaintiffs' hyperbole that Defendants committed securities fraud, the Complaint challenges only the manner in which FCA US calculated and reported retail sales by dealers to consumers, focusing on the effect of "unwinds" (*i.e.*, sales that were made and reported by a dealer but later reversed). But Plaintiffs' theory ignores that unwinds did not—and could *not have*—created an inaccurate portrayal of FCA US's overall financial results or even its retail sales results. In fact, under FCA US's old methodology, even if a subsequently unwound sale was reported in one month (and theoretically "overstated" the volume of retail sales reported in that month), the vehicle would not be counted in a future month when the dealer ultimately sold the vehicle to a retail customer—*i.e.*, sales would theoretically be "understated" in such future month. And, even if every single unwind were somehow the product of a "false sale" (a claim not supported by the Complaint's conclusory allegations), the total variation between the two reporting methodologies from unwinds would have been just *0.06%* (4,500) of FCA US's approximately 7.7 million reported retail vehicle sales from January 2011 through June 2016. (Ex 1 at 3.)

Nor do Plaintiffs claim that FCA US falsely represented the manner in which it calculated monthly dealer sales, that it was required to employ a particular methodology to do so, or even that there is any standard methodology in the automotive industry for calculating monthly sales. Instead, Plaintiffs simply latch

-4-

onto FCA US's decision to improve a long-standing methodology to enhance consistency and transparency (Ex. 1 at 2) and baselessly cry fraud.  Recognizing that FCA US's reported vehicle sales actually *increased* under its new methodology, Plaintiffs do not rest their fraud claims on any month-to-month discrepancy in unit sales.  Rather, Plaintiffs contend that the Defendants falsely touted a 75-month "streak" of year-over-year increases in monthly sales, because under FCA US's new methodology, it would have reported year-over-year monthly sales increases in just 73 of those 75 months.  It is on the basis of this supposedly "shocking . . . *mea culpa*," which was not followed by a meaningful drop in FCA's stock price, that Plaintiffs concoct their securities fraud claims.  (Compl. ¶¶ 353, 377.)

Accepting Plaintiffs' allegations as true, their Complaint falls well short of the stringent pleading requirements of the Reform Act and should be dismissed with prejudice, for at least two independent reasons.

**Materiality**.  Plaintiffs allege no facts from which the Court could conclude that the minimal variations to FCA US's historical monthly or yearly sales numbers over a five-and-a-half-year period "significantly altered the total mix of information made available" to investors.  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004).  In fact, contrary to Plaintiffs' theory of fraud, under FCA US's new methodology, it would have reported a small 0.2% sales

*increase* in sales during the five-year comparison period. Even if the Court focused just on the proposed 21-month class period (November 3, 2014 through July 26, 2016 (the "Class Period")), if FCA US had followed its post-July 26, 2016 methodology throughout the Class Period, it would have reported just 1,716 fewer sales—out of a total of about 4 million (a tiny *.04%* difference)—than under the methodology it used in that period. *See USM Holdings Inc.* v. *Simon*, 2016 WL 4396061, at *5 (E.D. Mich. Aug. 18, 2016) (alleged financial misrepresentations totaling less than two percent of defendant's annual net sales "immaterial as a matter of law"); *Parnes* v. *Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (alleged two percent overstatement of assets "immaterial as a matter of law").

| FCA US Vehicle Sales | Old Methodology | New Methodology | Change (%) |
|---|---|---|---|
| **Total Reported Sales** (Jan. 2011 - June 2016) | 10,308,074 | 10,331,420 | ***Increased 0.23%*** |
| **Class Period Reported Sales** (Oct. 2014 - June 2016) | 3,930,746 | 3,929,030 | Decreased ***0.04%*** |

Nor have Plaintiffs alleged facts suggesting that a reasonable investor cared if FCA US reported year-over-year sales improvements in only 73 months versus 75 months, especially when FCA US's reported sales undeniably *increased* over the entire period regardless of the methodology, and there is no allegation that its choice of methodology affected FCA US's (let alone FCA's) financial results.

Equally important, Plaintiffs' handful of allegations about episodic

-6-

instances of supposedly false reporting of sales by individual dealers only confirm that this alleged misconduct had no relevant impact on FCA US's reported monthly sales numbers.  In their 435-paragraph Complaint, Plaintiffs make specific allegations about false reporting of sales by individual dealers in just three months: June, July and November 2015.  (Compl. ¶¶ 110-119, 132, 135.)  Yet, under FCA US's new "corrected" methodology—which Plaintiffs do not challenge in any way—the total reported sales in every one of these three months were *higher* than as reported under the old methodology.  (Ex. 2A.)

| FCA US Vehicle Sales | Old Methodology | New Methodology | Change (%) |
|---|---|---|---|
| **June 2015** | 185,035 | 190,331 | *Increased 2.86%* |
| **July 2015** | 178,027 | 179,855 | *Increased 1.03%* |
| **November 2015** | 175,974 | 187,731 | *Increased 6.68%* |

In other words, the small number of instances of supposedly "false sales" cited by Plaintiffs in three months did not adversely impact FCA US's reported sales numbers or the "streak" of increased sales.

Tellingly, Plaintiffs do not allege any specific instances of false reporting of sales by individual dealers in September 2013 or May 2016—the *only* two months (out of 75) in which FCA US's new methodology would yield slight year-over-year declines in sales.  And, even in those two months, there were too

few unwinds of individual sales to affect the result.  Because these allegedly false "unwinds" had no impact on the only two months in which there would have been even a blip in the streak through application of FCA US's new reporting methodology, those unwinds do nothing to establish a material misstatement, even if one assumes that FCA US's streak of increased sales would otherwise have been material.

**Scienter**.  Plaintiffs also do not plead particularized facts giving rise to the required "strong inference" that any Defendant acted with fraudulent intent. Under *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd*., 551 U.S. 308, 314 (2007), Plaintiffs must plead particularized facts giving rise to a "strong inference of scienter," which "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Plaintiffs cannot do so here, because the alleged scheme to misrepresent FCA's "financial health" (Compl. ¶ 175(c)) is not plausible as a matter of law. Plaintiffs' theory that FCA US "bribed" some individual dealers to report false sales at the end of the month, with the full understanding that those dealers would unwind those same sales a month or two later, did not inflate FCA US's sales growth.  Fatally for Plaintiffs' "fraud" theory, had FCA US followed its new sales reporting methodology from January 2011 through June 2016, it would have reported *more* sales, not fewer.  Thus, this alleged scheme did not "create the

perception of growth" (Compl. ¶ 10) because FCA US's growth was real regardless of whether it followed its old or post-July 26, 2016 methodology for reporting sales.

In any event, Plaintiffs do not allege with the particularity required by the Reform Act that Defendants knew, or consciously disregarded knowing, that FCA US was engaged in some "bribe" scheme with its dealers to cause them to falsely report their monthly sales to retail customers, much less that this scheme was of sufficient magnitude to materially affect FCA US's monthly reported sales. Instead, Plaintiffs rely on conclusory and unsubstantiated assertions about dealer "bribes" that, taken together, do not raise a strong inference of scienter.  In short, the "opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314—that FCA US updated its methodology to provide greater "consistency in application and transparency" to a nonstandard reporting process (Ex. 1 at 2)—is the far more compelling inference than Plaintiff's speculative allegations of "fraud" that supposedly led Defendants to *understate* FCA US's reported monthly sales.

# BACKGROUND[3]

### A.   Defendants

A worldwide automotive manufacturer, Defendant FCA is organized as a Dutch company and headquartered in the United Kingdom.  (Compl. ¶ 1.) FCA's common shares began trading on the New York Stock Exchange on October 13, 2014.  (Compl. ¶ 5.)  FCA operates in the United States through its wholly-owned subsidiary FCA US.

Sergio Marchionne serves as the Chief Executive Officer of FCA and Chairman and CEO of FCA US.  (Compl. ¶ 24.)  Richard K. Palmer is the Chief Financial Officer of FCA and also served as the CFO of FCA US for the relevant period.  (Compl. ¶ 25.)  Reid Bigland is FCA's Head of U.S. Sales.  (Compl. ¶ 26.)

### B.   Overview of FCA US's Sales Reporting Process

FCA US designs and manufactures vehicles and sells them to its direct customers, predominantly independent, franchised dealerships.  (Compl. ¶ 59; Ex. 1 at 1.)  The majority of FCA US's sales consist of sales at wholesale to

---

[3]   On this motion, the Court may consider the following facts from (i) the Complaint; (ii) "documents incorporated into the complaint by reference," *Frank* v. *Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Tellabs*, 551 U.S. at 322); (iii) "the full text of . . . SEC filings . . . analysts' reports and statements integral to the complaint," *Bovee* v. *Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001) (quotation and citations omitted); and (iv) judicially noticeable matters, *D.E. & J Ltd. P'ship* v. *Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005).

its dealerships, which then sell the vehicles to retail customers out of their own inventory.[4]  (Ex. 1 at 1.)  As Plaintiffs admit, FCA US recognizes revenue when it ships vehicles to the dealerships, *not* when the dealerships in turn sell the vehicles to retail customers.  (Compl. ¶ 59.)  Thus, while FCA US follows industry practice in separately publishing monthly retail sales by dealers, those sales do *not* affect FCA US's revenues.  Plaintiffs do not challenge the accuracy of any statements concerning the number of vehicles FCA US sold at wholesale to its dealers, or the revenue FCA US recognized from those sales.  (*See* Compl. ¶ 12.)

Once a licensed dealer sells an FCA US vehicle to a retail customer, the dealer reports that sale to FCA US by submitting a New Vehicle Delivery Report ("NVDR"), which triggers the customer's warranty coverage, and FCA US's obligation to make any applicable incentive payments to the dealer.  (Compl. ¶ 63; Ex. 1 at 1.)  FCA US uses the data collected from these NVDRs to compile and report monthly sales by dealers.  (Compl. ¶ 63; Ex. 1 at 1.)

After a dealer submits an NVDR, the dealer may thereafter "unwind," or reverse, the sale transaction for a number of reasons, including the customer's

---

[4]      FCA US manages its dealers through nine regional business centers, which are themselves comprised of multiple districts.  (Compl. ¶¶ 61-62.)  Each district has a district manager, who reports to the business center director, as well as sales managers, area sales managers, and area service managers.  (Compl. ¶ 62.)  Plaintiffs do not allege that the Individual Defendants, or any other FCA or FCA US executives, had any direct dealings with particular dealers in the network.

inability to obtain financing or simple decision to cancel the purchase, or an inadvertent error in the initial report.  (Ex. 1 at 1.)  The dealer then returns the vehicle to unsold status in its inventory.  (Ex. 1 at 1.)  If a dealer unwinds a sale, then the dealer "lose[s] any incentives it received from the sale."  (Compl. ¶ 72.) Further, "FCA US blocks the vehicle identification number (VIN) in its NVDR files to ensure that a subsequent retail sale of the vehicle does not enter into any tally of reported sales in any future month (*i.e.*, a vehicle cannot be counted twice as a retail sale by the dealer)."  (Ex. 1 at 1.)  There is no dispute that "unwinds," no matter the reason, never resulted in double counting vehicle sales and thus could not alter the overall reported unit sales; at most, an unwind that was not resold until a later month could have caused that sale to be counted earlier than the month in which the dealer ultimately resold the vehicle to an end customer.

### C.    FCA US's Sales Reporting Methodologies

*Pre-July 26, 2016 Methodology*.  For more than thirty years, FCA US reported each retail vehicle as sold only in the month a dealer first reported it as sold, without subtracting unwinds or reporting the subsequent sales of vehicles that were unwound and resold.  (Ex. 1 at 1.)  In other words, if a dealer reported a car as sold in month A, unwound the sale for any reason in month B, and re-sold the car in month C, FCA US reported the sale in month A and did not account for the unwind in month B or the resale in month C.  FCA US followed this approach

because (i) of the impossibility of knowing at the time when monthly sales data is first reported (often hours after the end of the month) how many sales may be unwound in later months; and (ii) a vehicle cannot be counted twice as sold, avoiding the primary risk with which FCA US was concerned, *i.e.*, the risk of double counting.  (Ex. 1 at 1.)

*Post-July 26, 2016 Methodology*.   On July 26, 2016, FCA US announced that it was revising its methodology.  (Compl. ¶ 353.)   The new methodology differs from the prior methodology in a few respects, only one of which—the treatment of unwinds—is relevant to this action.  (Compl. ¶ 353; Ex. 1 at 2.)   Under the new methodology, FCA US reports as retail sales for a given month the sum of all sales recorded by dealers in that month, including vehicles sold in that month that were previously unwound, less any unwinds that occurred in that month.  (Compl. ¶ 354.)   Using the same example as above, if a dealer reported a car as sold in month A, unwound the sale in month B, and re-sold the car in month C, FCA US would report the sale in month A, subtract the sale from its monthly tally in month B, and then report the second sale in month C.  As with the old methodology, no vehicle can count as more than one sale on a net basis. Again, this change had no impact on FCA's reported financial results.  (Compl. ¶ 59.)

***Comparisons in Reported Sales***.  In the July 2016 Release, as slightly revised by the October 2016 Release, FCA US calculated unit sales going back to January 2011 using its new methodology and compared those results to its previously reported sales.  As summarized in the chart below and further detailed in Exhibit 2A, by applying the new methodology, FCA US would have shown *greater* overall sales growth than it had originally shown for the period of January 2011 through June 2016.  On a yearly basis, FCA US's historical comparison showed slightly lower sales for some years and slightly higher sales for others, but never by more than 1.1%.  Similarly, on a monthly basis, sales would have been slightly higher for some months (37 months) and slightly lower for others (29 months), but in no particular pattern.  (*See* Ex. 2A.)  Under the new methodology, the "sales streak" would have had a blip in September 2013 (after 41 months), 14 months before the start of the Class Period.  The sales streak would have restarted in October 2013, and continued for another 31 months through most of the Class Period, until May 2016.  (Ex. 2A.)  FCA US thus still would have reported year-over-year sales increases in 73 of the 75 months that comprised the "sales streak," including in all but one month of the Class Period.

Focusing on just the 21 months of the Class Period (October 2014 to June 2016), FCA US reported 3,930,746 sales, compared with 3,929,030 under the new methodology, a difference of 1,716 sales, or *.04%*.  In fact, in 13 out of the 21

months, the number of reported sales was *higher* under FCA US's new methodology.

| Vehicle Sales | | | | |
|---|---|---|---|---|
| Year | Old Methodology | New Methodology | Change | Months with *Higher* Sales under FCA US's New Methodology |
| **2011** | 1,369,114 | 1,384,399 | + 15,285 (1.12%) | 6 (50%) |
| **2012** | 1,651,787 | 1,643,874 | - 7,913 (0.48%) | 6 (50%) |
| **2013** | 1,800,368 | 1,799,640 | - 728 (0.04%) | 7 (58.3%) |
| **2014** | 2,090,639 | 2,106,347 | + 15,708 (0.75%) | 6 (50%) |
| **2015** | 2,243,907 | 2,252,877 | + 8,970 (0.40%) | 9 (75%) |
| **2016** | 1,152,259 | 1,144,283 | -7,976 (0.69%) | 3 (of 6) (50%) |
| **Total** | **10,308,074** | **10,331,420** | **+ 23,346 (0.23%)** | **37 (of 66) (56.1%)** |
| **Class Period (10/2014–6/2016)** | 3,930,746 | 3,929,030 | - 1,716 (0.04%) | 13 (of 21) (61.9%) |

Finally, the "unwinds" that form the basis of Plaintiffs' claims comprise an even smaller component of the overall changes in previously reported monthly sales data. FCA US reported that variations in the sales figures attributable only to unwinds were "a mix of positive and negative numbers which did not exceed 0.5% of the reported data in any month"; May 2015 was the month

with the largest downward difference, which was only 770 sales or 0.5% of the month's volume. (Ex. 1 at 3.) Critically, as a matter of simple arithmetic, in the only two months that would fall short under the new methodology—September 2013 and May 2016—the maximum number of unwinds (a total of 770 vehicles) could not be responsible for breaking the year-over-year monthly sales streak. For example, FCA US reported 204,452 sales in May 2016 as compared to 202,227 sales in May 2015, a difference of 2,225 sales. (Ex. 2A.) Sales in May 2016 would therefore still be higher than May 2015 even after subtracting the maximum amount of monthly unwinds (770).[5] That is, even if the *de minimis* blip in the streak were material, it is not attributable to the only "fraud" alleged here—unwinds.

### D. The Alleged Fraudulent Sales Reporting Scheme

In their Complaint, Plaintiffs conclusorily allege that FCA US "solicited, encouraged, and outright bribed its dealers to submit fake [sales] during the last few days of each sales month," which sales the dealers would subsequently unwind, and that the Company's "highly touted streak was . . . the product" of this conduct. (Compl. ¶ 99.) Plaintiffs further allege that this scheme was designed to "keep up the appearance of sustained U.S. monthly sales growth and to falsely

---

[5] Similarly, FCA US previously reported 143,017 sales in September 2013, as compared to 142,041 sales in September 2012—a difference of 976 sales. (Ex. 2A.)

assure the market of [FCA's] financial health." (Compl. ¶ 175.)

Tellingly, in claiming that this conduct "occurred across the Company's entire U.S. (and Canadian) operations over the course of many years" (Compl. ¶ 107), Plaintiffs do not allege any instances of false sales reporting practices in specific months other than June, July and November 2015 (Compl. ¶¶ 110-119, 132, 135). Notably, in every one of these three months FCA US would have reported *greater* sales under its new methodology. (Ex. 2A.) Put differently, even accepting Plaintiffs' theory, the alleged scheme led FCA US to *underreport* its sales for those months. Moreover, Plaintiffs' allegations rest entirely on (i) information provided by two confidential witnesses ("CW-1" and "CW-2"), who are not alleged to have had any direct contact or communications with any of the Individual Defendants or other FCA US senior management; (ii) cherry-picked newspaper articles; and (iii) unproven allegations of purported false sales practices that Plaintiffs copy from a complaint filed in January 2016 by two related dealerships ("*Napleton*").[6] Plaintiffs do not cite any alleged false sales practices in September 2013 or May 2016, the only two months in which year-over-year monthly sales would have slightly declined using the new methodology.

On the basis of these allegations, Plaintiffs challenge Defendants'

---

[6]     *Napleton's Arlington Heights Motors, Inc.* v. *FCA US LLC*, No. 16-cv-00403 (N.D. Ill. 2016).

statements referencing FCA US's year-over-year monthly sales gains and the streak in monthly press releases for sales in October 2014 through June 2016 and certain other sources. (Compl. ¶¶ 171-331.) Plaintiffs also allege that Defendants made material misrepresentations in two January 14, 2016 press releases, in which the Company stated that it believed that the *Napleton* claims "are baseless" (Compl. ¶¶ 283-84), and that Mr. Bigland made a false statement on February 16, 2016 when he "dismissed the lawsuit as 'false accusations' levelled by a 'disgruntled' dealer" (Compl. ¶ 297). Plaintiffs do not purport to have personal knowledge about the specific facts alleged by the dealerships.

Plaintiffs next allege that "[t]hrough partial revelations of the fraud on or about January 13, 2016, July 18, 2016, and July 26, 2016, the artificial inflation was removed from FCA's common stock." (Compl. ¶ 12.) Specifically, they allege "corrective disclosures" on:

- January 13, 2016, when the *Napleton* lawsuit was reported by the media. Plaintiffs describe this as a "partial disclosure" of the fraud that failed to fully remove the alleged artificial stock price inflation because Defendants "reassured" the public in their press releases (Compl. ¶¶ 332-43). On January 13, FCA's stock price decreased by only 31 cents from $8.17 to $7.86. (Ex. 3.)

- July 18, 2016, when the media reported, and the Company issued a press release stating, that the SEC and DOJ were investigating its policies and practices concerning sales reporting (Compl ¶¶ 344-52). On July 18, 2016, FCA stock decreased by a mere 2 cents (from $6.75 to $6.73) and fully recovered to trade above $6.75 only two days later on July 20, 2016. (Ex. 3.)

- July 26, 2016, when FCA US announced its decision to adjust its sales reporting methodology, and that under the new methodology FCA US would have reported year-over-year declines in two of the 75 months comprising the sales streak (September 2013 and May 2016) (Compl. ¶¶ 353-66).  On July 26, FCA stock *increased* by 1.16% from $6.92 to $7.00.  (Ex. 3.)

Notably, although Plaintiffs describe the July 2016 Release as a "shocking departure from [FCA's] previous denials of any wrongdoing" (Compl. ¶ 353), that release does not, in fact, acknowledge any wrongdoing, and says nothing at all about the alleged false sales reporting scheme.

## LEGAL STANDARD

Under Rule 12(b)(6), this Court must dismiss a complaint where, as here, it fails to "raise a right to relief above the speculative level" or plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 570 (2007).  The Court is not "constrained to accept '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'"  *Berry* v. *U.S. Dep't of Labor*, 832 F.3d 627, 638 (6th Cir. 2016) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (second alteration in original).

To state a claim under Section 10(b) or SEC Rule 10b-5, a plaintiff must allege: "(1) a misrepresentation or omission; (2) of a material fact that the

defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury." *City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005). The heightened pleading requirements for securities fraud specified in the Reform Act and Rule 9(b) "require[] that the complaint specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671, 681 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives Inc.* v. *Siracusano*, 563 U.S. 27 (2011). The complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006).

## ARGUMENT

## I. PLAINTIFFS DO NOT PLEAD THAT THE CHALLENGED STATEMENTS WERE MATERIALLY FALSE.

A misrepresentation is material "only if there is a substantial likelihood that a reasonable investor would have viewed the misrepresentation . . . as having significantly altered the total mix of information made available." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d at 570 (quotation and citation omitted). Here, the challenged statements were immaterial as a matter of law.

*First*, by applying the new methodology, FCA US would have achieved *greater* sales growth than it originally reported—total sales *increased* by more than 23,000 vehicles—from January 1, 2011 through June 2016.  (Ex. 2A.) Focusing on the 21 months of the Class Period (October 2014 through June 2016), FCA US reported 3,930,746 sales under its old methodology, compared with 3,929,030 under its new methodology, a trifling difference of 1,716 sales, or *.04%*. This is immaterial as a matter of law.  *See USM Holdings Inc.*, 2016 WL 4396061, at * 5; *Parnes*, 122 F.3d at 547.  Viewed on a monthly basis, the "fraud" still makes no sense because it had no meaningful effect on FCA US's sales results:  in 13 out of the 21 months of the Class Period, reported sales were *greater* when counted under the new methodology.  In other words, for more than half of the Class Period, the sales counts under the old "fraudulent" methodology were *lower* than under the new methodology.  In addition, in the only months for which the Complaint identifies specific instances of alleged fraudulent activity—June, July and November 2015 (Compl. ¶¶ 110-119, 132, 135)—FCA US's previously reported sales were *lower* than what they would have been under the new methodology.  (*See* Ex. 2A.)

*Second*, the lynchpin allegation of the Complaint is that FCA US falsely reported an ongoing streak of year-over-year sales gains for 75 months. (Compl. ¶¶ 4-12; 79-98; 145-153; 171-331.)   Even if one were to treat the

-21-

application of the new methodology to historical sales as a "correction," during that same 75-month period FCA US would have reported *73* months of year-over-year sales gains and a *greater* number of total sales.  The Complaint provides no basis to conclude that reasonable investors would care whether the sales streak was 75 continuous months or 73 out of 75 months, much less that this fact would have "*significantly* altered the total mix of information made available," *In re Ford Motor Co. Sec. Litig.*, 381 F.3d at 570 (emphasis added).  This is particularly so because this minor discrepancy had no adverse impact on FCA US's financial results or its overall reported retail sales.[7]

   *Third*, the immateriality of the sales streak being 73 of 75 months under FCA US's new methodology rather than 75 straight months under the old methodology is confirmed by the fact that FCA's stock price *increased* over 1.15%

---

[7]  Reports issued by financial analysts, including those cited by Plaintiffs, confirm the immateriality of Plaintiffs' allegations.  (*See* Ex. 4, Stefan Burgstaller et al., *Commentary: FCA shares down on news of dealer lawsuit re. mis-statement of volumes*, Goldman Sachs Research, Jan. 14, 2016 ("[T]here is no suggestion that FCA's revenues would be mis-stated" and the alleged misrepresentations "would be a zero sum game"); Ex. 5, Brent Snavely and Greg Gardner, *FCA's astounding sales streak actually ended in 2013, after revision*, Detroit Free Press, July 26, 2016 (FCA's sales streak was "meaningless" according to Professor Peter Henning of Wayne State University Law School); Ex. 6, Daily Report, Italian Equity Market, ICBPI, July 20, 2016 (cited at Compl. ¶ 161) (maintaining a "Buy" rating for FCA, and noting that "it is very likely that [the SEC and FBI investigations into FCA's sales reporting practices] will end with no outcome").)  Plaintiffs do not cite a single financial analyst who changed a rating concerning FCA shares based on the July 2016 Release or the alleged "unwind" scheme.

on July 26, 2016, the day that FCA US disclosed the sales data under both methodologies.  (Ex. 3.)  "[I]f a company's disclosure of information has no effect on stock prices, it follows that the information disclosed . . . was immaterial as a matter of law."  *Oran* v. *Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (quotations omitted); *see Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013).    That FCA stock reacted *favorably* to the disclosure of the new methodology makes clear that the market did not view the July 26 press release as having revealed the massive fraud that Plaintiffs assert occurred here.

> *Fourth*, Plaintiffs nowhere attempt to quantify any reported sales unit difference that is confined to the allegedly fraudulent "unwinds" that are the sole basis of their claims, or explain how that supposed inaccuracy was material to FCA investors.  Even looking at all unwinds, and not the unspecified number Plaintiffs contend were fraudulent, these unwinds result in a total adjustment of *0.06%*, and did not affect the sales streak.  There can be no serious argument that investors would care about a change of this trifling magnitude.  Indeed, courts have found changes *fifty times greater* to be immaterial as a matter of law, even in the case of financial statement errors, which are not alleged here.  *See*, *e.g.*, *USM Holdings Inc.*, 2016 WL 4396061 at *5 (two percent sales change).[8]

---

[8]     *See also Parnes*, 122 F.3d at 547 (overstatement of assets by $6.8 million, or two percent of total assets, was "immaterial as a matter of law"); *In re*

## II. PLAINTIFFS PLEAD NO PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE THAT DEFENDANTS ACTED WITH FRAUDULENT INTENT.

The Reform Act requires Plaintiffs to establish that Defendants acted with scienter, *i.e.*, the "intent to deceive, manipulate or defraud." *Tellab*s, 551 U.S. at 319 (citation omitted). To meet this standard, Plaintiffs must plead facts giving rise to a "strong inference of scienter," which "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "In securities fraud claims based on statements of present or historical fact . . . scienter consists of knowledge or recklessness." *PR Diamonds*, 364 F.3d at 681. To meet the Reform Act's heightened pleading standards, the Sixth Circuit has made clear that allegations of "recklessness" must constitute "an extreme departure from the standards of ordinary care" that is "akin to conscious disregard." *Doshi* v. *Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016). Accordingly, "[b]efore drawing an inference of recklessness, courts typically require multiple, obvious red flags, demonstrating an *egregious refusal* to see the obvious, or to investigate the doubtful." *Id.* (quotation and citations omitted).

Here, Plaintiffs allege no particularized facts showing that the

---

*Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (Alito, J.) (1.2% overstatement of assets was immaterial).

Individual Defendants, or anyone else involved in formulating or making the alleged misstatements, knew or consciously disregarded that those statements were false when made. This failure dooms their securities fraud claims.

### A.   The Alleged Scheme To Inflate FCA US's Monthly Sales Numbers Is Implausible and Contrary to the Alleged Facts.

Plaintiffs allege that Defendants engaged in a "fraudulent scheme" to "bribe" dealers to falsely report retail sales, and that FCA US's "highly touted streak was . . . the product" of this conduct and a "pure fabrication." (Compl. ¶¶ 10, 99.) But this alleged scheme "to falsely assure the market of [FCA's] financial health" (Compl. ¶ 175) defies common sense and basic math. *See Fla. Carpenters Reg'l Council Pension Plan* v. *Eaton Corp.*, 964 F. Supp. 2d 875, 889 (N.D. Ohio 2013) ("[C]ourts have found that no inference of scienter exists where plaintiffs' view of the facts defies economic reason."), *aff'd sub nom. In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356 (6th Cir. 2014). As such, this purported scheme cannot support any inference of scienter, let alone a strong one.

*First*, as the July 2016 Release makes clear, FCA US's reporting system, under both the old and new methodologies, prevented any vehicle from being double counted. (Ex. 1 at 1.) Inducing a dealer to submit and then unwind "fake NVDRs" in one month would simply decrease sales in the month in which the unwound vehicles were finally sold, without increasing the net number of reported sales over a given period. In effect, it would become increasingly more

-25-

difficult to sustain the streak over time as the stock of unwound (and subsequently uncountable) vehicles increased. "It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market" would engage in a scheme with little "chance of achieving its putative ends." *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) (quotation omitted). "In considering a motion to dismiss, [a] court is not required to don blinders and to ignore commercial reality." *Car Carriers, Inc.* v. *Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984).

*Second*, although Plaintiffs contend that the July 2016 Release marked "a shocking departure from [FCA's] previous denials of any wrongdoing" because "the Company disclosed that its dealers could, in fact, book fake sales and unwind them . . . thereby inflating" monthly sales (Compl. ¶ 353), the July 2016 Release shows that the prior treatment of unwinds had a miniscule effect on the number of reported sales, and *no effect on the sales streak*. It explained that the monthly variations due to the treatment of unwinds "did not exceed 0.5% of the reported data [or 770 units] in any month." (Ex. 1 at 3.) As demonstrated above, even unrealistically assuming (1) the maximum number of unwinds in September 2013 and May 2016, and (2) that every single unwind was the result of a "false sale," the streak would not have been affected (*i.e.*, the stoppage of the streak is attributable to other methodological changes not relevant here).

*Finally*, the implausibility of the alleged scheme is confirmed by the market's *positive*, rather than negative, reaction following the July 2016 release. As noted above, rather than decrease precipitously, as would be expected following the disclosure of an allegedly massive fraud, FCA shares actually increased, making clear that the market did not perceive the new sales methodology as revealing anything significant to FCA's financial performance.

## B. The Complaint Does Not Allege Facts Showing That Any of the Individual Defendants Had the Requisite Fraudulent Intent.

The Sixth Circuit has made clear that "fraudulent intent cannot be inferred merely from [defendants'] positions in the Company and alleged access to information." *PR Diamonds*, 364 F.3d at 688 (no scienter where plaintiffs did not allege "specific facts or circumstances suggestive of [defendants'] knowledge"). Instead, plaintiffs must allege the *specific information* defendants actually knew or recklessly disregarded when the statements were made.[9]   Plaintiffs' allegations fall well short of this standard.   Even if these allegations were deemed sufficient to

---

[9]   *See Dougherty* v. *Esperion Therapeutics, Inc.*, 2016 WL 7439196, at *6-7 (E.D. Mich. Dec. 27, 2016) ("Plaintiffs have not adequately pled a strong inference of scienter because they have not alleged with particularity facts showing what [defendants] did or did not know on [the date] when the allegedly misleading statements were made."); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 972 (S.D. Ohio 2009) (no scienter where plaintiffs alleged that defendants had "access to spreadsheets and data regarding the [alleged fraud]," but not that they "learned data from these reports which were inconsistent with any [of their] public statements").

show that the Individual Defendants knew of potential false sales reporting at one time or another (they are not), they do not show that the Individual Defendants knew or should have known that their statements about FCA US's monthly unit sales or the streak were false when made.

> **1.      The Complaint Contains No Adequate Allegations That the Individual Defendants Knew or Should Have Known That the Streak Would Have Stopped in September 2013 and May 2016.**

Plaintiffs set forth only four allegations suggesting that any of the Individual Defendants were aware of false sales reporting practices.  Specifically, they allege that:

- after a meeting with Mr. Bigland in June 2015, which CW-1 did not attend, CW-1's supervisor told Denver Business Center employees that they were required to meet a specific sales target and "'National' (*i.e.*, FCA's U.S. headquarters) was going to give them additional advertising funds to allow that to happen," and that, according to CW-1, "everyone in the Denver Business Center was expected to participate in the false sales reporting and . . . based on [her supervisor's] comments, CW-1 believed that the directive came from National" (Compl. ¶¶ 112-13);

- according to an Automotive News article from July 25, 2016, which relied on anonymous sources, in mid-2015 dealer complaints "reached" Mr. Marchionne (Compl. ¶¶ 139-40);

- according to the same Automotive News article, an internal investigation in mid-2015 turned up instances of false sales (Compl. ¶¶ 139-140, 378); and

- according to CW-1, Mr. Bigland stated in August 2015 that he was aware of "unnatural acts" and they had to stop, and, again according to CW-1, that

Mr. Bigland "was aware of the fake sales before then" (Compl. ¶ 141).[10]

As an initial matter, none of these allegations suggests that the Individual Defendants knew or consciously disregarded that the sales streak would have ended in September 2013, because each of them references conduct and events occurring long *after* September 2013.  *See Kuyat* v. *BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 442 (6th Cir. 2014) (facts arising "well after the allegedly misleading statements were made" have "little bearing" on what was known "at the time the allegedly misleading statements were made" and therefore "do[] not support a strong inference of scienter").  In any event, as shown below, even accepting these allegations as true, they do not raise a plausible, let alone strong, inference that the Individual Defendants believed, or had reason to believe, that their statements were not accurate.

Plaintiffs' first allegation is pure speculation.  CW-1 "believed" that "National" directed employees in the Denver Business Center to "participate in the false sales reporting" in a single month, June 2015.  (Compl. ¶¶ 112-13.)  The Court cannot infer from this guesswork about unidentified individuals at "National" (whatever that means) that Messrs. Marchionne, Palmer or Bigland directed this supposed conduct, much less that they therefore knew that their

---

[10]     Plaintiffs do not allege a single fact suggesting that Mr. Palmer had knowledge of the purported false sales reporting scheme. (*See* Compl. ¶¶ 25, 137-42.) This alone requires dismissal of all claims against him.

statements about the sales streak were false. *See Albert Fadem Trust* v. *Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1012 (S.D. Ohio 2004) ("inappropriate to infer Defendants' scienter" based on actions "of an unidentified 'head of the trading desk'" not alleged to be an officer or director). Indeed, as shown above, June 2015—the month of the alleged false sales practices—is one of the months where FCA US would have reported greater sales under the new methodology.

Plaintiffs' remaining allegations—that around mid-2015 unspecified dealer complaints "reached" Mr. Marchionne, Defendants ordered an "internal investigation," and Mr. Bigland "announced that he was aware that unnatural acts had occurred and that they had to stop" (Compl. ¶¶ 139-41)—fare no better. These allegations do not show that Messrs. Marchionne or Bigland knew or should have known from these complaints that FCA US's overall reported volumes were inaccurate, much less materially so. At most, they suggest that Messrs. Marchionne and Bigland were aware of some episodic instances of false sales reporting by dealers at one point in time, and tried to put a stop to it, which weighs *against* a finding of scienter. *See*, *e.g.*, *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (decision to undertake internal investigation weakened inference of scienter).

In sum, Plaintiffs' allegations provide no basis to infer that Messrs. Marchionne or Bigland believed, or consciously ignored, that instances of

potential false sales reporting materially affected FCA US's monthly sales numbers, or the streak.  *See In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 564 (E.D. Mich. 2001) ("Anecdotal evidence of particular problems at particular plants does not create a strong inference that Defendants' general, global statements about the progress of plans were knowing or reckless misrepresentations."); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011) ("the testimony of [confidential witness] could describe the anomalies of a rogue fiefdom rather than company-wide practices that rise to the level of a core operation").  And, as it happens, they did not.  Under the new methodology, FCA US experienced year-over-year growth throughout all of 2015 (Ex. 2A), meaning that whatever conduct Messrs. Marchionne and Bigland are alleged to have been aware of in 2015 demonstrably did *not* impact the streak.

### 2.    Plaintiffs' Scienter Allegations Are Insufficient as a Matter of Law in Any Event.

As shown above, Plaintiffs allege, at most, that Messrs. Marchionne and Bigland knew of some claims of improper sales conduct, not that their statements about FCA US's monthly sales or the streak were false.  But they do not even show that much.

Although confidential witness allegations "are not altogether irrelevant to the scienter analysis," the Sixth Circuit has made clear that such allegations should be discounted when they are "vague and conclusory."  *Ley* v.

-31-

*Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008), *abrogated on other grounds by Matrixx Initiatives, Inc.*, 563 U.S. at 48-50; *see also Higginbotham* v. *Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("allegations from confidential witnesses must be discounted . . . . Usually that discount will be steep" (quotation omitted)). Thus, Plaintiffs must "plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi*, 823 F.3d at 1037 n.2. Further, confidential witness allegations must specify "who at" the company "knew about the[] alleged . . . improprieties and what, when, where, and how they knew." *Ley*, 543 F.3d at 811. Finally, even if this information is sufficiently pled, confidential witness allegations must be corroborated by evidence derived from other disclosed sources. *See In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 739-40 (E.D. Mich. 2007) ("allegations from a confidential source" cannot form "*sole* basis for establishing scienter"); *Wilkof* v. *Caraco Pharm. Labs., Ltd.*, 2010 WL 4184465, at *6 (E.D. Mich. Oct. 21, 2010) (same).

Here, Plaintiffs' "CW" allegations fail on all counts. To start, nowhere in their 435-paragraph Complaint do Plaintiffs allege any direct contact between their two "confidential witnesses" and the Individual Defendants or other senior management. Neither CW had a position that would have involved interaction with senior management. (Compl. ¶ 28 (CW-1 had "accounting and

finance responsibilities" and processed dealer payments); ¶ 29 (CW-2 was "Area Sales Manager" and "interacted" with "dealerships").)

Plaintiffs also do not allege "who at" the Company "knew about the[] alleged . . . improprieties and what, when, where, and how they knew." *Ley*, 543 F.3d at 811. They do not specify who at "National" CW-1 purportedly "believed" directed the reporting of false sales in June 2015 (Compl. ¶¶ 112-13), or who learned what from the purported internal investigation (Compl. ¶¶ 139-140, 378). And although Plaintiffs allege that "dealer complaints about the practice" reached Mr. Marchionne in mid-2015 (Compl. ¶¶ 139-40) and that Mr. Bigland was "aware of the fake sales" (Compl. ¶ 141), they again do not specify what exactly Messrs. Marchionne and Bigland supposedly learned. CW-1's allegation that she "believed" the directive to report false sales came from "National" is unfounded conjecture. *See In re Diebold Sec. Litig.*, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) (confidential witness references to "pressure from corporate" were "nothing more than mere speculation"), *aff'd sub nom. Konkol* v. *Diebold*, 590 F.3d 390 (6th Cir. 2009).

Lastly, Plaintiffs provide no corroboration for these allegations. Instead, they rely on unproven allegations from another lawsuit against FCA US, which also relies on confidential witnesses. (Compl. ¶¶ 132, 135.) As numerous courts have held, unproven and contested allegations taken from other complaints

should be disregarded, particularly where there is no indication that counsel has made any independent effort to verify them.  *See*, *e.g.*, *Constellation Energy Commodities Grp. Inc.* v. *Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) (claim was inadequately pled where "the majority" of the plaintiff's allegations "reference mere unproven allegations" from another lawsuit); *Geinko* v. *Padda*, 2002 WL 276236, at *6 (N.D. Ill. Feb. 27, 2002) (dismissing action where plaintiffs relied on allegations from other actions). Plaintiffs also draw a few allegations from cherry-picked media reports that again rely in large part on unproven claims from anonymous sources, and are also entitled to little or no weight.  (Compl. ¶¶ 139-40; *see also* ¶¶ 105, 136); *see In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." (citation omitted)).

### 3.    The Complaint's "Additional Allegations" Do Not Establish a "Strong Inference" of Scienter.

Plaintiffs also allege various general factors to support an inference of scienter.  (Compl. ¶¶ 369-98.)   These allegations do nothing to bolster their scienter allegations.

- **Allegations that the Individual Defendants were motivated by the desire to save their salaries or jobs do not support an inference of scienter.  (Compl. ¶ 393.)**

Courts in the Sixth Circuit have repeatedly distinguished "motives

common to corporations and executives generally from motives to commit fraud." *PR Diamonds*, 364 F.3d at 690.  "All corporate managers share a desire for their companies to appear successful.  That desire does not comprise a motive for fraud." *Id.*  Plaintiffs' scienter allegations regarding the Individual Defendants— such that FCA executives who missed sales targets were in danger of being terminated (Compl. ¶ 393)—are of this conclusory, generalized nature and are thus insufficient as a matter of law.  *See*, *e.g.*, *PR Diamonds*, 364 F.3d at 690; *Huntington Bancshares*, 674 F. Supp. 2d at 974 (allegations that defendants "had an interest in having [a certain acquisition] deemed successful and in receiving their salaries" were "motives common to all executives").  Nor do allegations that the Individual Defendants wished for the sales streak to continue suffice to plead scienter.  *See Grossman* v. *Tex. Commerce Bancshares, Inc.*, 1995 WL 552744, at *11 (S.D.N.Y. Sept. 15, 1995) (defendant's alleged desire to maintain "the illusion of a continuing earnings streak" was insufficient to show scienter).

- **Allegations that the fraud concerns the core of FCA's U.S. operations do not support an inference of scienter.  (Compl. ¶ 370.)**

Plaintiffs allege that because the alleged fraud concerns FCA US's core operations—U.S. retail sales—Defendants knew, or were reckless in not knowing, that their statements were false or misleading.  Even accepting the premise that U.S. retail sales—which do not affect FCA's recognition of revenue— constitute "core operations," this does not suffice to establish a strong inference of

scienter.  *See Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483, 492 (6th Cir. 2015) (without indication that defendant "knew or should have known" that statements were false or misleading, allegation that statements pertained to "core" business were insufficient as a matter of law); *Fed.-Mogul*, 166 F. Supp. 2d at 564.

- **The Individual Defendants' alleged access to information does not support an inference of scienter.  (Compl. ¶¶ 376-77.)**

Plaintiffs vaguely allege that Defendants "had access to various sources of information concerning the Company's U.S. retail sales activities." (Compl. ¶ 376.)   Such general access to information is plainly insufficient to support an inference of scienter.  *See*, *e.g.*, *Huntington Bancshares*, 674 F. Supp. 2d at 972 ("[G]eneralized allegations of . . . Defendants' access to documents and internal information lack specific facts to establish a strong inference of scienter.").

Moreover, Plaintiffs' allegations that the Individual Defendants had access to specific information derive solely from their confidential witnesses' speculation.  They allege that CW-2 claims she was told "that Defendant Bigland and Vice President Kommor were 'hands on' concerning vehicle sales," "entered into the FCA in-house system on a daily basis, sometimes several times a day, to track NVDRs," and "routinely reviewed the sales results of the Southwest Business Center."  (Compl. ¶ 122.)  Plaintiffs also allege that, according to CW-2, her boss would send periodic reports to Messrs. Bigland and Kommor, "which contained the forecast and the month end projection of what each dealer could sell by month

end," and that "Defendant Bigland, Vice President Kommor, and [her boss] would . . . measure the progress of each dealer against that dealer's Volume Growth Program target."  (Compl. ¶ 123.)  Plaintiffs elsewhere allege that CW-1 "expects" that "someone in Bigland and Kommor's group . . . ran the NVDR Unwind Report."  (Compl. ¶ 66.)  These speculative allegations suggest nothing more than that Mr. Bigland reviewed sales results and projections, hardly an unusual practice for a corporate executive charged with sales responsibility.   Plaintiffs nowhere allege that, assuming Mr. Bigland accessed NVDR data and ran unwind reports, he would or should have known that false sales were being generated, much less that any such false sales could impact the sales streak.  *See Konkol*, 590 F.3d at 398 ("The standard from *Tellabs* requires specific facts that those reports were known to Defendants and reflected the revenue-recognition scheme in such a way that it would have been obvious that Diebold was improperly inflating its revenue.").

- **Allegations that FCA US changed its sales reporting methodology do not support an inference of scienter.  (Compl. ¶¶ 382-87.)**

Plaintiffs next allege that FCA US's decision to revise its sales reporting methodology supports an inference of scienter.  This is not the law.  The Sixth Circuit has squarely rejected as impermissible "fraud-by-hindsight" pleading the notion that a subsequent correction adequately alleges scienter.  *See Dailey* v. *Medlock*, 551 F. App'x 841, 847 (6th Cir. 2014) ("With no facts alleged to support the contention that defendants had prior knowledge that a valuation allowance

-37-

would be taken for the fourth quarter of 2009, plaintiffs make the *ipso facto* assertion that the mere fact that it ultimately was taken demonstrates such knowledge.  It is hard to imagine a clearer example of alleging 'fraud by hindsight.'"); *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 353 (W.D. Tenn. 2001).  *A fortiori*, FCA US's decision to switch to a different methodology, which was not a "restatement" given that no particular methodology is required and no standard methodology exists in the industry, cannot support an inference of scienter.

- **Allegations about the scope of the alleged false sales scheme do not support an inference of scienter.  (Compl. ¶¶ 388-92.)**

As FCA US's July 2016 Release makes clear, the monthly variations to previously reported sales as a result of the changed treatment of unwinds "are a mix of positive and negative numbers which did not exceed 0.5% of the reported data in any month."  (Ex. 1 at 3.)  Thus, even assuming the existence of the alleged scheme, the effects of the alleged fraud on FCA US's reported sales were tiny, weighing against scienter.  *See*, *e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011) (where materiality is "questionable" or "marginal," inference of scienter is "undercut").[11]

---

[11]     In *Helwig* v. *Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001), the Sixth Circuit set forth a list of nine non-exhaustive factors that courts have used to help assess scienter.  The Complaint contains no allegations relating to six of the nine

### C.     The Complaint Does Not Allege Particularized Facts Establishing a Strong Inference of FCA's Corporate Scienter.

The Sixth Circuit has held that the states of mind of the following individuals are probative in assessing a corporation's scienter:  (1) "the individual who uttered or issued the misrepresentation"; (2) any individual who authorized, reviewed or prepared the statement in which the misrepresentation was made; and (3) "[a]ny high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation" after it was made.  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014).  Here, the Complaint does not allege that any FCA employee other than the three named defendants participated in making any of the challenged statements.   Thus, to plead that FCA acted with corporate scienter, Plaintiffs must plead facts showing a strong inference of scienter with regard to Messrs. Marchionne, Palmer or Bigland.  *See Bondali*, 620 F. App'x at 493.  As explained above, Plaintiffs have not done so.

---

factors with respect to the Individual Defendants, and the Complaint's allegations relating to the three factors that might arguably be relevant—"divergence between internal reports and external statements on the same subject," "disregard of the most current factual information before making statements," and "the self-interested motivation of defendants in the form of saving their salaries or jobs"— are wholly insufficient for the reasons discussed above.  While courts also consider as a factor "evidence of bribery by a top company official," *id.*, and the Complaint vaguely pleads that Defendants "bribed" dealerships to submit "fake" sales numbers (Compl. ¶¶ 99, 101), there are no particularized allegations connecting the Individual Defendants to those supposedly improper payments.

## III.   PLAINTIFFS DO NOT STATE A SECTION 20(a) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS.

Because the Complaint does not state an underlying securities law violation by a "controlled person," Plaintiffs' Section 20(a) claims for control person liability must fail as well.  *See PR Diamonds*, 364 F.3d at 696-98 (dismissing Section 20(a) claims where complaint failed to state an underlying securities law violation).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety, with prejudice.

Respectfully submitted,


/s/ Robert J. Giuffra, Jr.

| | |
|---|---|
| Patrick G. Seyferth | Robert J. Giuffra, Jr. |
| Roger P. Meyers | William B. Monahan |
| Jessica Vartanian Currie | Darrell S. Cafasso |
| BUSH SEYFERTH & PAIGE PLLC | SULLIVAN & CROMWELL LLP |

*Counsel for Defendants Fiat Chrysler Automobiles N.V.,*
*Sergio Marchionne and Richard K. Palmer*


/s/ David A. Shargel

| | |
|---|---|
| Keefe A. Brooks | Paul Shechtman |
| Michael T. Price | Rachel B. Goldman |
| BROOKS WILKINS SHARKEY | David A. Shargel |
| & TURCO, PLLC | BRACEWELL LLP |

*Counsel for Defendant Reid Bigland*


May 16, 2017

-40-

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2017, I caused FCA US LLC's Motion to Dismiss the Consolidated Class Action Complaint to be filed with the Clerk of the Court and served upon counsel of record through the Court's ECF filing system.

/s/ Darrell S. Cafasso
Darrell S. Cafasso (N.Y. 4147849)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
cafassod@sullcrom.com