# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

CARL PALAZZOLO, et al.,

                Plaintiffs,

      v.

FIAT CHRYSLER AUTOMOBILES
N.V., SERGIO MARCHIONNE,
RICHARD K. PALMER, and REID
BIGLAND,

                Defendants.

Case No. 4:16−cv−12803−LVP−SDD
Honorable Linda V. Parker
District Court Judge

Honorable Stephanie Dawkins Davis
Magistrate Judge

**CLASS ACTION**
**JURY TRIAL DEMANDED**

## LEAD PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................1

II.   STATEMENT OF FACTS ......................................................6

    A.    Background ...............................................................6

    B.    The Class Period.......................................................8

    C.    Defendants Resort to Fraudulent Practices in Order Maintain the Perception of the Streak ...................................9

    D.    FCA's Own Investigation Reveals Thousands of Secret Fake Sales.......................................................................12

    E.    Investors Finally Learn of Defendants' Fraud ....................13

III.  ARGUMENT..........................................................................15

    A.    The Complaint Sufficiently Pleads Materiality ...................15

        1.    Materiality is Rarely Resolved on a Motion to Dismiss..........15

    B.    The Complaint Sets Forth Adequate Facts Supporting Materiality ...............................................................17

    C.    Defendants' "Mathematical" Immateriality Arguments Fail.............22

    D.    The Complaint Adequately Pleads Scienter..........................24

        1.    The Complaint Pleads that Defendants Possessed Actual Knowledge of the Scheme, Including Dealer Bribes...............26

        2.    The Complaint Alleges Motive...............................30

        3.    The Complaint Pleads Recklessness Under *Helwig* .................32

        4.    The Complaint Pleads Additional Facts Demonstrating Recklessness........................................................36

    E.    Plaintiffs' CW Allegations Support an Inference of Scienter............38

    F.    The Complaint Pleads Corporate Scienter ..........................40

IV.  CONCLUSION.......................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ................................................37

*Basic, Inc. v. Levinson*
485 U.S. 224 (1988)........................................................................................24

*Beach v. Healthways, Inc.*,
2009 WL 650408 (M.D. Tenn. Mar. 9, 2009) ....................................................16

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015)..................................................................35

*In re Braskem S.A. Sec. Litig.*,
2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017)...................................................29

*In re Cardinal Health Inc. Sec. Litigs.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) .................................................................38

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010) .....................................................34, 38

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .......................................................................*passim*

*City of Pontiac Gen. Emps.' Ret. Sys., v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ........................................................20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)........................................................................................15

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004) .............................................................31

*Frank v. Dana Corp. ("Dana I")*,
547 F.3d 564 (6th Cir. 2008) ...........................................................................25

*Frank v. Dana Corp ("Dana II")*,
646 F.3d 954 (6th Cir. 2011) ....................................................................*passim*

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) ........................................................................19, 24

*Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.,*
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ..........................................35, 37

*Goldman v. Belden,*
754 F.2d 1059 (2d Cir. 1985) ..............................................................................22

*Halford v. AtriCure, Inc.,*
2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)....................................................39

Helwig v. Vencor, Inc.,
251 F.3d 540 (6th Cir. 2001) ...........................................................16, 30, 32, 34

*In re Huffy Corp. Sec. Litig.,*
577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................................37

*In re King Pharm., Inc., Sec. Litig.,*
2004 U.S. Dist. LEXIS 30210 (E.D. Tenn. July 12, 2004) ................................16

*In re Lason, Inc. Sec. Litig,*
143 F. Supp. 2d 855 (E.D. Mich. 2001) ..............................................................31

*Levine v. Metal Recovery Techs., Inc.,*
182 F.R.D. 102 (D. Del. 1998) ............................................................................29

*Litwin v. The Blackstone Grp., L.P.,*
634 F.3d 706 (2d Cir. 2011) .........................................................................16, 24

*Lloyd v. CVB Fin. Corp.,*
811 F.3d 1200 (9th Cir. 2016) .............................................................................39

*Mills v. United Producers, Inc.,*
2012 WL 1672948 (E.D. Mich. May 14, 2012) ..................................................40

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.,*
929 F. Supp. 2d 740 (M.D. Tenn. 2013) .......................................................35, 37

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.,*
541 F. Supp. 2d 986 (S.D. Ohio 2007) ................................................................27

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368, 382-383 (S.D.N.Y. 2015)..........................................29, 31

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ................................................... 16-17

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ...............................................................35

*SEC v. DCI Telecomms., Inc.*,
    122 F. Supp. 2d 495 (S.D.N.Y. 2000) ................................................19

*SEC v. DiMaria*,
    207 F. Supp. 3d 343 (S.D.N.Y. 2016) ................................................20

*SEC v. Escala Group, Inc.*,
    2009 WL 2365548 (S.D.N.Y. July 31, 2009)....................................20

*SEC v. Kovzan*,
    807 F. Supp. 2d 1024 (D. Kan. 2011)................................................32

*SEC v. Leslie*,
    2012 WL 116562 (N.D. Cal. Jan. 13, 2012)................................. 23-24

*SEC v. Monterosso*,
    768 F. Supp. 2d 1244 (S.D. Fla. 2011) ........................................ 18-19

*Sohol v. Yan*,
    2016 WL 1704290 (N.D. Ohio Apr. 27, 2016) ................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................25

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)...........................................................................16

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ...............................................31

*United States v. Cohen*,
    946 F.2d 430 (6th Cir. 1991) .............................................................40

*In re Unumprovident Corp. Sec. Litig.*,
   396 F. Supp. 2d 858 (E.D. Tenn. 2005)...............................................................32

*Winslow v. BancorpSouth, Inc.*,
   2011 WL 7090820 (M.D.Tenn. Apr. 26, 2011) ..................................................33

**Statutes**

15 U.S.C. § 78u-4(b)(2) ...................................................................... 24-25

**Other Authorities**

SEC Staff Accounting Bulletin No. 99,
   64 FR 45150-01 (Aug. 19, 1999)......................................................................24

## STATEMENT OF ISSUES PRESENTED

1.      Were Defendants' admittedly false statements concerning the "streak" so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance, where the Complaint alleges, inter alia, that (i) throughout the Class Period, Defendants publicly and repeatedly touted the streak, and made "a regular practice of underscoring [its] significance"; (ii) the streak was closely-followed and widely-reported on by market observers, who frequently cited it as concrete evidence that the Company had turned the corner and was flourishing; (iii) Defendants went to great lengths – including deliberately soliciting, encouraging, intimidating, and bribing dealers across the Company's U.S. business units to submit false sales – in order to maintain the illusion of the streak; and (iv) FCA's stock price declined on three separate occasions following disclosures that partially revealed the existence of Defendants' fraudulent scheme, and its corresponding impact on the streak?

2.      Do the allegations in the Complaint collectively give rise to a strong inference that Defendants knew or were reckless in not knowing that there was a nationwide scheme to book fraudulent NVDRs in order to prop up the "streak," where the Complaint alleges, inter alia, that (i) Defendant Bigland and his top lieutenants directed and spread the fake sales scheme from FCA Canada to the Company's U.S. business units; (ii) by mid-2015, dealer complaints about the

Company's fraudulent practices had grown so loud that it launched an internal investigation, which informed Defendants that thousands of fraudulent sales had been booked; (iii) in January 2016, when a lawsuit was filed by FCA's dealers alleging the nationwide scheme, Defendants admitted that they had been aware of allegations regarding the practices for some time; (iv) the fake sales scheme permeated FCA's entire U.S. (and Canadian) operations over the course of many years; indeed, the fraudulent practices were so ubiquitous at FCA US that the Company's executives even referring to them by a pet name – "unnatural acts"; (v) Defendants Marchionne, Palmer, and Bigland were the top executives at FCA's U.S. division, serving as Chairman, CFO, and Head of Sales, respectively, and controlled the contents of the Company's false statements; (vi) Defendants were motivated to commit the fraud in order to maintain the illusion of the streak, convince the market of the Company's strength and turnaround narrative, raise nearly $7 billion in capital through public offerings, attract a merger partner, and parlay their seeming success into promotions and industry accolades; (vii) the SEC, DOJ, and FBI have launched criminal and civil investigations into the false sales practices, and a federal grand jury has been empaneled; multiple sources have reported that the investigations are centered on Defendant Bigland; (viii) after the government investigations were announced, Defendants suddenly announced that they were restating five years of monthly sales figures, admitting that the streak

had ended three years earlier; (ix) the fraud concerns the Company's core operations – U.S. vehicle sales; (x) Defendants had access to numerous internal reporting systems that tracked NVDRs and "unwinds," and could run "NVDR Unwind Reports" from those systems to determine how many NVDRs had been "unwound"; and (xi) FCA Canada, where Defendant Bigland served as Chairman and CEO, was also forced to restate years' worth of false sales and "unwinds" as a result of the same practices?

## <u>STATEMENT OF CONTROLLING<br>OR MOST APPROPRIATE AUTHORITIES</u>

The controlling or most appropriate authorities for the relief that Plaintiffs seek include:

The statements alleged in the Complaint are materially false:

1.   *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)

2.   *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005)

3.   *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001)

4.   *SEC v. Leslie,* 2012 WL 116562 (N.D. Cal. Jan. 13, 2012)

The allegations in the Complaint collectively give rise to a strong inference of scienter:

5.   *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308 (2007)

6.   *Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011) ("*Dana II*")

7.   *Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008) ("*Dana I*")

8.   *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp*., 399 F.3d 651 (6th Cir. 2005)

9.   *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001)

10.   *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010)

11.   *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008)

<u>**MEMORANDUM OF LAW**</u>

## I.    <u>INTRODUCTION</u>

This lawsuit challenges the "streak."  During the Class Period, Defendants repeatedly bragged that FCA US had achieved year-over-year monthly sales growth. Defendants' streak purportedly reached *75 consecutive months* by July 2016 and was the longest reported in the automotive industry by leaps and bounds.[1]

Defendants bombarded the market with boasts about the streak, tallying and trumpeting the monthly total at every turn. Analysts and industry insiders highlighted the streak, expressing surprise at FCA's apparent ability to maintain it while competitors struggled. News outlets heaped praise on FCA executives for the streak and expressed amazement at the seeming financial success that it conveyed to investors. Indeed, at various times during the Class Period, the market called the streak "jaw-dropping," "whopping," "impressive," and "astonishing."

In reality, unbeknownst to Plaintiffs and the Class, Defendants utilized smoke and mirrors to keep the illusion of the streak intact. As set forth in great detail in the Complaint, Defendants artificially achieved the streak by, among other things, fabricating monthly sales. For example, senior FCA officials enticed FCA

---

[1] Unless otherwise noted: (i) capitalized terms and abbreviations shall have the meanings ascribed to them in the Consolidated Class Action Complaint ("CAC" or "Complaint") (DE 34); (ii) all references to "¶__" are to paragraphs in the CAC; (iii) all internal citations and quotation marks are omitted; (iv) all emphasis is added; and (v) Defendants' Motion to Dismiss (DE 38), and accompanying memorandum of law (DE 39), are indicated as the "Motion" or "DB."

dealerships to record false sales at month's end with phony "advertising" payments, "expense reimbursements," and other incentives. The fraudulent practices that Defendants used to keep the streak alive were so pervasive at the Company that FCA's executives even had a nickname for the fictitious department that oversaw them – the "unnatural acts department." Plaintiffs base their allegations on, among other things, details provided by former FCA employees, a lawsuit filed by FCA dealers, and belated admissions by Defendants.

Beginning in January 2016, the truth concerning the streak began to surface. A lawsuit brought by FCA franchise dealerships informed the market for the first time that FCA had been strong-arming its dealers into booking false monthly sales numbers, thus casting doubt upon FCA's streak. Even though Defendants denied any wrongdoing and continued to tout the streak, the market responded adversely.

Several months later, on July 18, 2016, the market learned that the SEC, DOJ, and FBI had launched investigations into FCA's sales reporting practices. Then, just days later, on July 26, 2016, Defendants shockingly reversed course. Retroactively applying what they characterized as a more "transparent" sales reporting methodology, Defendants admitted that the Company's streak actually ended in September 2013 – over one year prior to the start of the Class Period.

Not surprisingly, the market reacted with dismay, with one news agency commenting that the streak "has been bared as mythological." As questions

mounted concerning the streak and the veracity of FCA's executives, FCA's stock price languished, costing Plaintiffs and the Class hundreds of millions of dollars.

In their Motion, Defendants do not challenge the falsity of their statements concerning the streak. Nor do they challenge loss causation. Instead, Defendants boldly contend that their admitted misstatements, made each and every month of the Class Period, were immaterial as a matter of law. As purported support for their argument, Defendants offer several mathematical computations seeking to demonstrate that any fake sales reported by the Company comprised a "trifling" percentage of the Company's total consumer sales. Based upon their math, Defendants conclude that investors could not and would not have cared about the false sales because they did not significantly affect the Company's bottom line.

Defendants' attempt to disprove materiality through math fails for several reasons. To begin, all of Defendants' computations necessarily require the Court to accept FCA's restated sales results as truthful and accurate. At the pleading stage, however, courts do not weigh the merits of the case or engage in fact-finding.

Even if Defendants' restated results are accepted as true, however, it does not change the fact that the Company's reported fake sales (i) created the false perception in the market that the streak existed during the Class Period, even though it ended in 2013; and (ii) rendered each and every one of Defendants' statements concerning the streak false and misleading. Thus, the relevant analysis

for the Court is whether the Complaint adequately alleges that Defendants' misstatements concerning the streak were material to investors, not simply whether false sales were a material portion of total sales.

As the Sixth Circuit explained in *Helwig v. Vencor*, "[m]ateriality is about marketplace effects, not just mathematics." Materiality involves *both* qualitative and quantitative assessments, and cannot be determined solely by applying a bright-line numerical test as Defendants contend.  Here, Defendants altogether avoid any analysis of the qualitative materiality of their misstatements, ignoring the Complaint's wealth of allegations demonstrating that the streak was (i) a primary focus of Defendants' communications to the market in the U.S. and Canada; (ii) one of the most closely-watched metrics concerning the Company in the market; and (iii) so important to Defendants that they went to great (and fraudulent) lengths to maintain it. These allegations adequately plead materiality.

The Complaint also demonstrates that Defendants' streak-related false statements were quantitatively material. For example, Plaintiffs detail significant adverse price reactions by FCA common stock to revelations suggesting that the streak was fabricated. Further, even accepting Defendants' "actual" sales numbers as true, the streak was overstated during the Class Period at all relevant times by at least *40 months*. In other words, contrary to Defendants' characterization of the misstatements as "trifling," Defendants overstated the length of the sales streak by

greater than *100%* each and every month of the Class Period.

Thus, the Complaint alleges strong indicia of both quantitative and qualitative materiality. Nothing further is required at this stage.  Indeed, Courts rarely decide the issue of materiality at the motion to dismiss stage as it involves mixed questions of law and fact, and is thus generally left to the trier of fact.

Defendants also challenge the sufficiency of the Complaint's scienter allegations.  Again relying on their self-serving mathematical computations, Defendants argue that because the false sales had no effect on the Company's overall financial health, Defendants had no motive to misrepresent them.

To the contrary, the Complaint makes clear, and Defendants do not refute, that the Company's reporting of false sales kept the perception of the streak alive in the market. Because the streak was a major milestone in the automotive industry and viewed as an important barometer of the Company's success, Defendants were clearly motivated to keep the streak alive in the minds of the market. Further, Plaintiffs detail additional motives Defendants possessed for misrepresenting the streak, including (i) the ability to raise billions of dollars of capital; and (ii) to enhance their careers through promotions and increased compensation.

In addition to allegations of motive, the Complaint sets forth a myriad of facts demonstrating Defendants knew or recklessly disregarded that their statements concerning the streak were false. Among other things, the Complaint

alleges that Bigland directed FCA's fraudulent scheme, personally approving and directing so-called "advertising" and "marketing" payments to dealers to induce them to record false sales. In the month of June 2015 alone, Bigland blessed $2,000,000 of illicit payments.

The Complaint also alleges facts demonstrating that all Individual Defendants possessed actual knowledge of the false sales scheme by no later than mid-2015. There are no stronger indicia of scienter than actual knowledge.

Prior to mid-2015, the Complaint contains allegations demonstrating that, at a minimum, Defendants were reckless in failing to detect the scheme as the false sales involved the core business of the Company, and numerous internal reports and tracking systems contradicted Defendants' statements concerning the streak.

As detailed herein, viewed in their totality, Plaintiffs' allegations create a strong inference that Defendants acted with scienter. Nothing further is required.

## II.   **STATEMENT OF FACTS**

### A.   **Background**

FCA was formed by the October 2014 merger between Italian automaker Fiat and FCA US, formerly known as Chrysler. ¶21. FCA operates through six business segments. ¶22. The largest segment, NAFTA, is driven by the Company's U.S. auto sales and accounts for roughly 90% of the Company's earnings. ¶22.

FCA operates in the U.S. through its wholly owned subsidiary, FCA US.

6

¶21. The Company sells automobiles to a network of independent franchised dealers, who then resell the vehicles to the public. ¶59. Retail sales to consumers are viewed by investors as an important indicator of an automaker's financial health. ¶60. As *Bloomberg* explained during the Class Period, "Investors [] weigh monthly sales reports closely for signs of how auto companies are faring." ¶60.

Chrysler has long been known as one of the "big three" U.S. automakers. ¶30. Together with its larger siblings, Ford and G.M., the big three for years dominated the lucrative American auto market. ¶30. From 2006 to 2008, however, Chrysler lost $30 billion. ¶30. In early 2009, Chrysler filed for Chapter 11 bankruptcy so it could pursue a "lifesaving" alliance with Fiat. ¶34.

Marchionne, then Chairman and CEO of Fiat, took over Chrysler in June 2009. ¶36. Marchionne's first order of business was to institute a flat organizational structure with Marchionne at its "epicenter." ¶¶37-39. Then, in November 2009, Marchionne, Bigland, and other Chrysler executives laid out an ambitious five-year plan to turn Chrysler around (2009 Plan). ¶40.

By April 2014, the 2009 Plan seemed to have worked. FCA had reported four straight years of monthly year-over-year U.S. sales growth. ¶¶48-49. In May 2014, with FCA's October 2014 NYSE debut fast approaching, Marchionne announced that the Company had created a new five-year plan (2014 Plan). Analysts were initially skeptical of the 2014 Plan. ¶¶49, 51.

By September 2014, market sentiment had begun to turn – in large part because of the streak. *Bloomberg*, for instance, reported that Chrysler "is on an unprecedented winning streak that now stretches almost 4 ½ years." ¶54.

### B. The Class Period

By the beginning of the Class Period, the streak purportedly had reached 55 months. Defendants continued to aggressively tout FCA's monthly sales streak at every turn. For instance, the Company led off press releases for the first 17 months of the Class Period with a bullet point touting the streak.[2] Defendants tallied the streak and proclaimed the Company's success in monthly videos released to the market.[3] And Marchionne and Bigland personally boasted about the streak in discussing the Company's operations with the market.[4]

Market watchers continued to marvel at the streak, which the Company was somehow able to sustain even in the face of difficult comparisons and macroeconomic pressures. ¶¶176-312. At times, news outlets characterized the streak as "jaw-dropping" (¶183), "astonishing" (¶184), "improbable" (¶254), and "whopping" (¶280). *CNNMoney.com* even compared the Company's streak to the legendary 56-game hit streak of Joe DiMaggio. ¶190. Commentators marveled that the streak continued despite G.M. and Ford, two of the Company's top

---

[2] ¶¶174, 178, 185, 194, 202, 211, 218, 223, 229, 237, 247, 255, 264, 270, 276, 291, 300.

[3] ¶¶179, 187, 200, 208, 212, 219, 224, 238, 248, 256, 265, 271, 277, 292, 308.

[4] ¶¶90, 91, 95, 178, 194, 202, 207, 211, 218, 223, 229, 237, 247, 255, 264, 270, 287, 291, 300, 307.

competitors, suffering declines. ¶215. The streak was so prevalent in the market that media even tried to predict when the streak would end. ¶¶245-46. And even when the Company mysteriously stopped mentioning the streak, market commentators tallied and highlighted the streak independently based upon Defendants' reported U.S. sales gains. ¶¶316-18, 322-25, 329-31.

### C.    Defendants Resort to Fraudulent Practices in Order Maintain the Perception of the Streak

Unbeknownst to investors, Defendants utilized illicit sales practices to keep the streak alive.

As detailed in the Complaint, FCA deliberately solicited, encouraged, and outright bribed its dealers to record false sales during the last few days of each sales month. ¶¶99-142. Frequently, the bribes were disguised as "marketing" or "advertising" payments to avoid detection in case of an audit. ¶101. Dealers would then unwind fictitious sales during the first few days of the following month, before the vehicle warranty was triggered. ¶99.[5] This practice of inducing dealers to book false sales was directed by FCA's fictitious "unnatural acts department." ¶105. According to a September 2016 *Wall Street Journal* article, the "unnatural acts department" had been "used over several years . . . to convey the urgency of drumming up last-minute vehicle sales, particularly if the auto maker's results

---

[5] CW-1 explained that if the warranty had already begun to run, it would be more difficult for the dealer to actually sell the vehicle to a real customer. ¶100.

were coming short of monthly objectives." ¶105. CW-1 similarly confirmed that unnatural acts refer to "anything that is unethical, immoral or improper." ¶106.

The Company's "unnatural acts" were carried out across nearly all of its Business Centers.  For example:

**Denver Business Center:** According to CW-1, the Denver Business Center "absolutely" paid dealers to record fictitious sales at the direction of its Director, Steven Yandura. ¶¶108-119. For example, at a June 30, 2015 meeting attended by all Business Center Directors, Bigland and Kommor told Yandura that he was 500 vehicles short of his target, and authorized additional marketing funds to allow him to generate sales to meet the target. ¶111. Following the meeting, Bigland or Kommor sent an email to all nine Business Center Directors which broke out a total of $2,000,000 in additional marketing funds to the nine Business Centers. ¶¶114-16. CW-1 recalls receiving an extra $150,000 to $180,000 on June 30, 2015. ¶112. The impetus for the extra money was to maintain the streak. ¶112.  CW-1 explained that on June 30, 2015, the Denver Business Center paid its dealers $400,000 in "marketing" payments to input false sales to meet the sales target. ¶¶113, 116. According to CW-1, payments to dealers ranged from $2,000 to over $50,000. ¶115. Moreover, these payments worked: 300 or more false NVDRs came out of the Denver Business Center in June 2015 alone as a result. ¶116. Based on conversations with Area Sales Managers, CW-1 believes that in June 2015 most of

the nine Business Centers engaged in reporting fictitious sales. ¶114.

**Southwest Business Center**: According to CW-2, unnatural acts – including fake NVDRs – began occurring in the Southwest Business Center when Mike Dragojevic took over as Director in January 2015, and were still occurring when CW-2 left in November 2015. ¶120. CW-2 understood that 11-16 dealerships in the Southwest Business Center participated in the fake NVDR scheme. ¶126. Dragojevic told Area Sales managers that, when processing a "questionable" deal, Jeep Wranglers were the best way to go, and $50,000 was available to dealers who booked high numbers through the "Wrangler program." ¶¶124. CW-2 similarly learned from Dragojevic that Bigland and Kommor logged into Company systems on a daily basis to track internal sales results, including NVDRs. ¶122.

**FCA Canada and Great Lakes Business Center**: Prior to becoming the Southwest Business Center Director, Dragojevic served as head of FCA Canada's Eastern Business Center between July 2006 and January 2012, where he similarly promoted and engaged in unnatural acts, including fake sales. ¶128. At the time, Dragojevic worked under the direction of Bigland, who was CEO of FCA Canada. *Id.* Dragojevic was able to parlay his fraudulent tactics, and resulting success, into a promotion to Great Lake Business Center Director, a position he held from January 2012 to January 2015. ¶129. According to CW-1, Dragojevic employed similar "unnatural acts" in the Great Lakes Business Center. ¶129. At Great Lakes,

Dragojevic's "right hand man" was Yandura. ¶130.

**Midwest Business Center and Northeast Business Center**: According to the Dealer Lawsuit, FCA's Midwest Business Center, and its Director Phil Scroggin, were heavily embroiled in the fictitious sales scheme. ¶¶132-34.[6] For instance, in June 2015 (i) an FCA district manager offered $15,000 to a dealer to falsely report 23 sales; (ii) Scroggin and an FCA district manager asked a dealer to submit 40 false NVDRs for $20,000 in incentives; and (iii) FCA requested that another dealer submit 85 false NVDRs in exchange for incentives. ¶132.

**Mid-Atlantic Business Center and Southeast Business Center**: The Dealer Lawsuit similarly alleges unnatural acts at the Mid-Atlantic and Southeast Business Centers, including, for instance, around November 30, 2015 (i) an FCA sales manager asked a manager of multiple FCA dealerships in Florida, Georgia, and Pennsylvania to book false NVDRs in exchange for co-op money or an allocation of high-demand vehicles; and (ii) an FCA representative told another dealership that FCA was short on sales for the month and twice requested that the dealership report false sales and then unwind them in the following days. ¶135.

### D.    FCA's Own Investigation Reveals Thousands of Secret Fake Sales

By no later than mid-2015, dealer complaints about the Company's "unnatural acts" had reached Marchionne. ¶139. Similarly, at a new vehicle

---

[6] Scroggin previously served as Northwest Business Center Director, where he supervised Kommor, and engaged in unnatural acts. ¶¶133-34.

announcement in Las Vegas in August 2015, Bigland stated that he was aware that the unnatural acts had occurred, and that they had to stop. ¶141. As a result of these complaints, Defendants launched an internal investigation into the practice of submitting false NVDRs, which revealed thousands of FCA sales for which there were no buyers. ¶¶139-40. The practice nevertheless continued during the Class Period, and Defendants continued to tout the streak in, among other things, Press Releases which quoted Bigland and were signed by Palmer. ¶¶140-42.

### E.    Investors Finally Learn of Defendants' Fraud

On January 12, 2016, the Dealer Lawsuit was filed. ¶143. The suit – which has since been sustained, *Napleton's Arlington Heights Motors, Inc. v. FCA US LLC*, 214 F. Supp. 3d 675 (N.D. Ill. 2016) – alleges that FCA induced dealers to book fraudulent sales in return for lucrative payments or benefits in the form of advertising money and other competitive advantages. ¶143.

The Company responded to the Dealer Lawsuit on January 14, 2016, assuring investors that it had been aware of the allegations for some time, as it had "carried out an investigation of the facts, and [] determined that these allegations are baseless." ¶144. Similarly, in a February 16, 2016 article in the *Windsor Star*, Bigland called the lawsuit "false accusations" leveled by a "disgruntled dealer." ¶151. Despite the lawsuit, the Company continued to tout the streak in public statements, including monthly press releases signed by Palmer. ¶¶290-308.

Despite the Company's outward projections of confidence, by the time the Company reported its U.S. vehicle sales for April 2016, all overt references to the streak had been removed. ¶152.[7] Still, the Company continued to report its aggregate U.S. sales numbers – which included vehicle sales that the Company would later admit should have been reversed or did not qualify as sales – through June 2016. ¶152. Thus, investors and analysts continued to believe that the streak was still alive and well. ¶¶152-53.

Then, on July 18, 2016, news surfaced that the Company's sales practices had given rise to a criminal investigation by the DOJ and FBI and a civil investigation by the SEC. ¶¶344-51. The reports were later confirmed by the Company. ¶348.  Multiple news sources have since reported that the government investigations are centered directly on Bigland. ¶¶169-70.

Just eight days later, on July 26, 2016, FCA restated its monthly U.S. sales figures for 2011 through June of 2016 (Restatement). ¶163. The Restatement disclosed that the Company's sales streak had in fact ended in September 2013, at month 40. ¶163. The Restatement further admitted that its dealers could, in fact, book fake sales and then unwind them but that it did not subtract these unwound sales from its monthly reported U.S. sales (thereby inflating them). ¶¶164, 353. The Restatement further announced that, going forward, FCA would report its

---

[7] FCA Canada, which had engaged in similar "unnatural acts" to prop up its own streak, ¶¶389-91, stopped mentioning its streak in November 2015, ¶392.

sales under a new "transparent" methodology. ¶¶354-56. After the Company adopted its new methodology, it reported U.S. sales *declines* in six of the next seven months. ¶388.

## III.   <u>ARGUMENT</u>

The elements of a claim for violations of §10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011). In their Motion, Defendants concede that the Complaint sufficiently pleads falsity, reliance, loss causation, and damages.   Defendants' limited challenge to the Complaint focuses on Plaintiffs' allegations concerning materiality and scienter.   As set forth herein, Defendants' arguments fail.

### A.   **The Complaint Sufficiently Pleads Materiality**

#### 1.   **Materiality is Rarely Resolved on a Motion to Dismiss**

"Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005). That is, would the withheld information have "significantly altered the total mix of information made available?" *Id.* The general rule for securities fraud cases is that "[a]t [the motion to dismiss] stage in the proceedings, a complaint may not properly be dismissed on

15

the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Id.* at 681.

Whether materiality has been properly alleged is a fact-intensive question. *Id.* at 669. Both qualitative and quantitative factors must be considered in an integrative manner. *In re King Pharm., Inc., Sec. Litig.*, 2004 U.S. Dist. LEXIS 30210, at *18-19 (E.D. Tenn. July 12, 2004). Materiality is about marketplace effects, not just mathematics, *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001), and "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material." *Litwin v. The Blackstone Grp., L.P.*, 634 F.3d 706, 717-18 (2d Cir. 2011).

Materiality is a question of fact that should normally be left to a jury rather than resolved by the Court on a motion to dismiss. *Helwig*, 251 F.3d at 563 ("Courts generally reserve materiality questions for the trier of fact"); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (materiality "determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments *are peculiarly ones for the trier of fact*").[8]

---

[8] *Accord Beach v. Healthways, Inc.*, 2009 WL 650408, at *2-3 (M.D. Tenn. Mar. 9, 2009) (same); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1192 n.13 (10th Cir. 2003)

**B.    The Complaint Sets Forth Adequate Facts Supporting Materiality**

The Complaint details an abundance of facts demonstrating that, not only was the streak both quantitatively and qualitatively material to the market, it was one the most followed aspects of FCA's business during the Class Period.

Although retail sales did not fall to the Company's bottom line, the Complaint shows that the market paid great attention to automakers' retail sales. For example, *Bloomberg* explained, "Investors [] weigh monthly sales reports closely for signs of how auto companies are faring." ¶60. Erik Gordon, a professor at University of Michigan Ross School of Business stated, "[i]t would be very difficult to convince a jury that it's not reasonable to consider sales numbers material." ¶154. Likewise, Professor Pete Henning from Wayne State University Law School commented, "How do you measure how any auto company is doing? Sales." ¶162. Tellingly, even Defendants admitted that monthly retail sales information was coveted by the market:

> FCA US has seriously considered simply ceasing to report this sales data on a monthly basis . . . . We understand the sales data are used by some market followers, the automotive press in particular, to opine about the state of the industry and we accept that our decision to suspend monthly reporting would impact those constituencies and possibly may impair their perception, and in turn the public perception, of FCA US.

DB. Ex. 1 at 2.

---

(materiality is "a question of fact that cannot render the complaints inadequate, lest . . . pleading requirements . . . replace the function of a trial").

Moreover, Defendants' own behavior recognized the importance of retail sales and the streak to the market. The Company led off press releases (signed by Palmer) for the first 17 months of the Class Period with a bullet point touting the streak, and Defendants tallied the streak in monthly videos released to the market. *See supra* at II.B.  Bigland consistently played up the streak in released quotes and statements to analysts. For example, Bigland told the *Automotive News*, "Growth is nonnegotiable from my perspective. . . . That's just a fundamental expectation I have every single month – hence the streak." ¶58.

Marchionne also boasted specifically about the streak. ¶¶98, 207, 287, 299. For example, Marchionne tied the streak to FCA's quality products and health:

> Don't forget one thing.  Since 2009 . . . we've had an uninterrupted record of sales growth for 69 months . . . . That has happened not because of the fact that I've discounted vehicles. . . . It's happened because of the fact that there's brand equity and there's value in what we're selling to the customer base.

¶98. Indeed, at the end of the Class Period, both the *The Wall Street Journal* and *Forbes* observed that Marchionne made a regular practice of underscoring the significance of the streak to the market. ¶¶363, 365.

Defendants' repeated boasts and affirmative decisions to tout the streak in press releases, videos, and statements to the market constitute strong indicia of materiality. *See, e.g., SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1263-64 (S.D. Fla. 2011) ("Whether a company advertises record breaking revenues or  otherwise

aggressively promotes its revenue numbers in its press releases may be considered a factor in determining whether a given misstatement is material."); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165-66 (2d Cir. 2000) (finding a company's own press releases "implicitly acknowledge[d] the significance" of statements made); *SEC v. DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 499 (S.D.N.Y. 2000) (statements were material where company "advertised record breaking revenues" and hyped statements in "annual reports, press releases, and on its website").

Further, the Complaint describes the widespread coverage that the streak received in the market during every month of the Class Period. ¶¶176-312. News outlets characterized the streak as "jaw-dropping" (¶183), "astonishing" (¶184), "improbable" (¶254), and "whopping" (¶280). Commentators marveled that the streak continued despite G.M. and Ford, two of the Company's top competitors, suffering declines. ¶215. The streak was so prevalent in the market that news outlets and analysts even tried to predict when the streak would end. ¶¶245-46.

Even when the Company mysteriously stopped mentioning the streak directly, market commentators tallied and highlighted the streak independently based upon Defendants' reported U.S. sales. ¶¶316-18, 322-25, 329-31. Upon learning the streak was misrepresented, the market responded with shock and disappointment. ¶¶359-65. The pervasive news and analyst coverage of the streak set forth in the Complaint further supports a finding of materiality.

The Complaint also describes in great detail the scheme pursued by Defendants to prop up the perception of the streak to the market. *See supra* II.C. "Managing" earnings or sales to falsely meet targets is the type of illicit managerial conduct that courts have found qualifies as compelling evidence of materiality. *See SEC v. Escala Group, Inc.*, 2009 WL 2365548, *9-10 (S.D.N.Y. July 31, 2009) (evidence of materiality "particularly compelling where management has intentionally misstated items in the financial statements to manage reported earnings"); *SEC v. DiMaria*, 207 F. Supp. 3d 343, 353-354 (S.D.N.Y. 2016) (same).

Moreover, the Complaint alleges that, on two occasions, the market price of FCA dropped precipitously in response to adverse news and market commentary concerning the reliability of Company's U.S. sales data. First, on January 14, 2016, the price of FCA common stock fell over 4% in response to the revelation that FCA-affiliated dealerships had alleged that the Company induced them to book fraudulent sales. ¶¶143-147.  Likewise, on July 27, 2016, FCA common stock fell over 4% in response to the Company's disclosure that the streak had actually ended three years earlier, as well as widespread and negative market commentary concerning the "mythological" streak. ¶¶163-68.  *See, e.g., City of Pontiac Gen. Emps.' Ret. Sys., v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368-69 (S.D.N.Y. 2012) (stock price drop indicative of materiality). Notably, while

claiming that their misstatements were immaterial, Defendants *do not challenge* that they caused loss to Plaintiffs and the Class.[9]

Further, Defendants cannot dispute the quantitative materiality of their misstatements concerning the streak. During the Class Period, each and every time Defendants touted the streak, they overstated its length by at least 40 months. ¶163. Thus, they overstated the streak by greater than 100% in every press release, on every conference call, and in every statement made to analysts. Any contention that investors would not have cared about a sales streak that was overstated in length by greater than 100% is, simply put, not credible.[10]

Thus, Defendants fail to refute the Complaint's wealth of allegations that (i) investors closely monitored the metric of consumer sales; (ii) Defendants repeatedly touted the streak and its relationship to the Company's financial health[11]; (iii) the market covered the streak exhaustively; (iv) Defendants went to great (and fraudulent) lengths to maintain the streak; and (v) the market responded

---

[9] While Defendants do not challenge loss causation, they oddly claim that when the market learned the streak actually ended in September 2013, the Company's stock price increased on July 26, 2016. DB at 22-23. Of course, Defendants fatally ignore the Complaint's contradictory allegations about stock price movements on January 14, 2016, July 19, 2016, and July 27, 2016. ¶¶147, 160, 168.

[10] Defendants contend that the revised sales results demonstrate that the Company achieved year-over-year growth in 73 out of 75 months, not materially different than a 75-month growth streak presented to the market. Defendants' contention defies common sense and does not comport with the plain meaning of the word "streak." DB at 22-23.

[11] As the *New York Times* noted after the Restatement, FCA'S sales reporting was "typical of the non-GAAP reporting that companies embrace to show how well they are doing because it involves an easily grasped figure for the media to report and analysts to highlight. Everyone loves a winning streak, which means there is enormous pressure to keep it alive as long as possible, perhaps by tinkering with the numbers just enough to maintain the façade another month." ¶387.

negatively to partial revelations of the truth concerning the streak. Together, all of the Complaint's allegations constitute strong support for a finding of materiality.

### C.    Defendants' "Mathematical" Immateriality Arguments Fail

Ignoring virtually all of the Complaint's materiality allegations, Defendants attempt to disprove materiality through mathematical computations. For example, Defendants contend that any false sales during the Class Period comprised a "trifling" amount of the Company's total sales, specifically 0.04%. DB at 20-21. In other words, having spent the entire Class Period underscoring the significance of the streak to the market, Defendants now contend "no harm, no foul."

Defendants' arguments do not hold water. *First,* Defendants' computations presume that the Company's restated results, reported in July and October 2016, are true and accurate. At the pleading stage, Defendants are not entitled to that presumption. *See, e.g., Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985) ("The court's function is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.").

Indeed, FCA's Restatement should not be accepted as true. In particular, rather than reversing fake sales in the month that they were recorded, Defendants chose to reverse fake sales in the month that the "unwinds" occurred. ¶¶354, 357. Thus, for example, if Defendants fraudulently recorded 500 sales in Month A in order to report sales growth for that month, and reversed those sales the following

month, Defendants' "restated" sales numbers would still show sales growth in Month A. As a result, discovery is likely to reveal additional months during the Class Period where sales "growth" was falsely and improperly reported.

*Second,* Plaintiffs do not challenge Defendants' reported false sales in a vacuum. Rather, the Complaint alleges that false sales permitted Defendants to repeatedly boast about a sales streak that, in reality, did not exist. Even if Defendants' restated sales are accepted as true and accurate, Defendants admit that, had the Company properly reported its true level of sales, the sales streak would have ended in 2013, over a year before the Class Period began. Thus, Defendants effectively admit that their reporting of false sales, no matter how "trifling," (i) fabricated the existence of a streak; and (ii) rendered each and every statement they made about the streak false and misleading.[12]

In *SEC v. Leslie,* 2012 WL 116562 (N.D. Cal. Jan. 13, 2012), defendants made essentially the same quantitative arguments about materiality that Defendants raise here in a motion for summary judgment. In denying the defendants' motion, the Court observed:

> Even accepting for purposes of the present motion that the effect of the alleged manipulations was quantitatively small, the real thrust of the SEC's claims is that the manipulations were *qualitatively* material

---

[12] Even if the Court finds that false sales, standing alone, were immaterial, Defendants' failure to refute the materiality of the misstatements concerning the streak permits the case to proceed. *See Sohol v. Yan,* 2016 WL 1704290, at *9 (N.D. Ohio Apr. 27, 2016) ("If even one of [the plaintiff's] allegations [satisfies] the PSLRA's pleading standard, then the complaint must survive.").

because they altered indicators relied upon by analysts and the market in evaluating Veritas for investment.

*Id.* at *6-7. The same analysis applies here. Even if the Company's false sales were minimal vis-à-vis total sales, the false sales admittedly altered the existence of the streak, a metric followed closely by investors.

*Third*, in *Basic, Inc. v. Levinson*, the Supreme Court expressly rejected the bright-line numerical test for materiality advocated by Defendants here. 485 U.S. 224, 236 & 236 n.14 (1988); *see also* SEC Staff Accounting Bulletin No. 99, 64 FR 45150-01, 45152 (Aug. 19, 1999) ("[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."). Instead, materiality requires *both* qualitative and quantitative assessments. *See Ganino,* 228 F.3d at 162-63 ("[q]ualitative factors may cause misstatements of quantitatively small amounts to be material"); *Litwin*, 634 F.3d at 714 (quantitative analysis not dispositive of materiality).

In sum, the streak was qualitatively and quantitatively material. Viewed in light of the totality of the circumstances alleged in the Complaint, Plaintiffs have sufficiently alleged that Defendants' misstatements were material.

### D.    The Complaint Adequately Pleads Scienter

The Complaint meets the PSLRA's requirement to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2). In the Sixth Circuit, this can be established by showing that the defendant possessed actual knowledge or was at least reckless in issuing false or misleading information. *Bridgestone*, 399 F.3d at 683. "Recklessness is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) ("*Dana II*").

While an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," it "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324 (2007). "Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) ("*Dana I*").

Importantly, the scienter analysis requires the Court to review the Complaint's allegations holistically, "based on the collective view of the facts, not the facts individually." *Dana II*, 646 F.3d at 961.

Courts in the Sixth Circuit frequently look to nine non-exhaustive factors in determining whether a complaint pleads scienter:

(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Bridgestone*, 399 F.3d at 683-684 (citing *Helwig*, 251 F.3d at 552). These factors are "not exhaustive," but merely "'helpful' in determining whether the facts as pled are probative of scienter." *Id*.

Here, the Complaint sets forth a mountain of facts creating a strong inference of scienter. Plaintiffs have alleged in detail that (i) Defendants had actual knowledge of the misrepresentations; (ii) Defendants had a motive to make the misrepresentations; and (iii) Defendants were, at a minimum, reckless in making their misstatements.

### 1. The Complaint Pleads that Defendants Possessed Actual Knowledge of the Scheme, Including Dealer Bribes

As discussed above, to establish scienter, Plaintiffs need not plead, let alone prove, Defendants' actual knowledge.  *Dana II,* 646 F.3d at 959. Here, though, the Complaint pleads – and indeed Defendants admit – actual knowledge of the

fraudulent sales practices.

*First,* the Complaint details Bigland's direct role in the false sales scheme. For example, the Complaint details how the same web of individuals – including Bigland, and Kommor, Dragojevic, Yandura, and Scroggin (who each reported to Bigland) – worked to spread their false sales scheme from FCA Canada through nearly all of FCA's nine U.S. Business Centers. ¶¶108-36, 389-92. To this end, the Complaint alleges that: (i) Bigland and Dragojevic engaged in "unnatural acts" while heading FCA Canada from 2006 to 2012; (ii) Dragojevic brought these fraudulent practices to the Great Lakes Business Center in 2012, where his "right hand man" was Yandura; and (iii) Yandura in turn employed similar fraudulent tactics after his promotion to Director of the Denver Business Center in 2015; (iv) Midwest Business Center Director Scroggin, who was previously Kommor's direct supervisor as Director of the Northeast Business Center, employed the same fraudulent practices. ¶¶128-131. These allegations are corroborated by CWs in two different Business Centers (Denver and Southwest) whose direct supervisors (Yandura and Dragojevic) reported straight to Bigland and Kommor. ¶¶28-29.[13] Defendants make no attempt to dispute these allegations.

---

[13] Defendants' suggestion that the Complaint "references conduct and events occurring long *after* September 2013" (i.e., the month when the sales streak came to an end) is therefore wrong. DB at 29. In any case, "what matters for purposes of 10(b) liability" is what defendants are "alleged to have known of the fraudulent scheme by the time" misrepresentations were issued, not in 2013. *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1002 (S.D. Ohio 2007).

In order to perpetrate the fraud, Bigland, Kommor, Dragojevic, Yandura, Scroggin, and others deliberately solicited, encouraged, and outright bribed FCA dealers to submit fake NVDRs during the last few days of each sales month. Dealers would then unwind fictitious sales during the first few days of the following month before the warranty triggered. ¶99. To this end, the Complaint alleges, inter alia, that:

- On or around June 30, 2015, Bigland and Kommor authorized $2,000,000 in extra "marketing funds" for the nine Business Centers in order to generate false sales on the last day of the month and keep the streak intact (¶114)[14];

- On or around June 30, 2015, Yandura authorized an extra $400,000 in "marketing" payments to dealers in the Denver Business Center, to induce dealers covered by the Denver Business Center to book false sales in order to maintain the streak (¶¶112, 113);

- Unnatural acts began in the Southwest Business Center when Dragojevic became Director in January 2015 and continued through at least November 2015. Dragojevic instructed his Area Sales Managers on how best to commit unnatural acts and, during the Class Period 11-16 dealerships in the Southwest Business Center were engaged in the fraudulent practices. (¶¶120, 124-26). Prior to January 2015, Dragojevic employed the fraudulent tactics in the Great Lakes Business Center (where he had been Director since January 2012) (¶¶129-31); and

- During the Class Period, Scroggin and his direct reports solicited dealerships in the Midwest Business Center to report fake sales in exchange for substantial incentives payments. (¶132).

Allegations that a defendant was involved in the bribery scheme through,

---

[14] Defendants argue that these allegations are unpersuasive because June 2015 "is one of the months where FCA US would have reported greater sales under the new methodology." DB at 30. As discussed above, however, the new sales methodology did not reverse false sales in the month that they were improperly booked and, as a result, it does not provide an accurate basis to determine in which month sales were overstated.

among other things, authorizing specific payments, create a strong inference of scienter. *See In re Braskem S.A. Sec. Litig.,* 2017 WL 1216592, at *2 (S.D.N.Y. Mar. 30, 2017) (allegations that defendant was involved in bribery conduct creates strong inference of scienter); *Levine v. Metal Recovery Techs., Inc.,* 182 F.R.D. 102, 105 (D. Del. 1998) (allegation that defendant accepted bribes satisfies scienter); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382-383 (S.D.N.Y. 2015) (a culture of bribe-paying and kickbacks can be probative of scienter).

*Second*, the Complaint alleges that by no later than mid-2015, Defendants were made aware of franchise dealers' complaints concerning the false sales scheme. ¶¶139, 141. Defendants' own statements confirm the same. In fact, in responding to the Dealer Lawsuit, the Company issued a formal statement making clear that it had been aware of the allegations for some time. ¶144. In particular, Defendants confirmed that they had become aware of allegations, and had since ordered, carried out, and completed an internal investigation. ¶144. That mid-2015 internal investigation informed the Defendants of thousands of fraudulent vehicle sales for which *there were no buyers*. ¶140. Indeed, Bigland admitted in August 2015 that he was aware of the "unnatural acts" (and CW statements confirm that Bigland knew about the false sales even before his admission). ¶141.

Finally, by no later than January 12, 2016, each Defendant knew of the unnatural acts by virtue of the Dealer Lawsuit. ¶143. Despite this, Defendants continued to report the streak, and to issue fake sales numbers, for many months.

Thus, at various times throughout the Class Period, the Complaint details facts demonstrating that Defendants both directed and had actual knowledge of the false sales. Yet, Defendants continued to boast about the streak. These actual knowledge allegations are more than sufficient to plead Defendants' scienter.

### 2.    The Complaint Alleges Motive

Motive and opportunity can be catalysts to fraud and serve as external markers to the required state of mind. *Helwig*, 251 F.3d at 550. Here, according to Defendants, they could not possibly have been motivated to commit fraud because the false sales were so minimal that they did not improve the Company's financial condition.  Defendants are wrong.

As an initial matter, while Defendants attempt to rely on their own restated figures (which are not presumed accurate at the pleading stage)  to suggest that their scheme had nothing to do with their ability to report sales growth, they do not explain why, after they were forced to desist in their practices, they reported sales declines in six out of the next seven months.  ¶¶367-68.  Moreover, even if the Company's Restatement is accepted as accurate, keeping the streak alive was undoubtedly important to a heavily leveraged Company that had only recently

emerged from bankruptcy. In December 2014, for instance, Bigland boasted that "[b]ack in the summer of 2009, when we emerged from bankruptcy . . . a lot of people had Fiat Chrysler Completely written off." ¶183. But, he went on, "when you have gone almost five years, it silences a lot of people who have alleged you have easy comparisons." *Id*.

Indeed, the streak allowed Defendants to outwardly present FCA as financially stable and viable in order to raise capital (needed in part to pay off the Company's heavy debt) and to attempt to attract a merger partner. ¶¶394-98. And the Company did just that. *See In re Lason, Inc. Sec. Litig*, 143 F. Supp. 2d 855, 858-59, 861 (E.D. Mich. 2001) ("The plaintiffs' pleadings in this case state that the defendants went past simply having a motive and opportunity – the defendants proceeded to act on that opportunity."). On December 16, 2014, FCA completed a secondary public offering of securities for total net proceeds in excess of $3.8 billion. ¶396. And on April 14, 2015, FCA closed a $3 billion bond offer to unsuspecting investors. ¶397. Finally, during the Class Period, Marchionne openly campaigned for a merger partner. ¶398. *See e.g*., *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) ("to inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital" is a sufficient allegation of motive); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004) (motivation to complete merger "probative of scienter").

Moreover, Bigland was able to parlay his purported success as head of U.S. Sales and CEO of FCA Canada into larger and more lucrative positions: (i) on October 5, 2015, as Head of NAFTA Fleet; and (ii) less than a year later, on May 24, 2016, CEO of FCA's Alfa Romeo and Maserati brands. ¶393. *See Helwig*, 251 F.3d at 552 (courts should consider defendants' self-interested motivations about their salaries or jobs); *SEC v. Kovzan*, 807 F. Supp. 2d 1024, 1039 (D. Kan. 2011) (evidence of CFO's promotion contributed to scienter).

Faced with Plaintiffs' strong *prima facie* case, Defendants offer red herrings. For example, they claim that the old system could not have reflected an improper intent because it was unsustainable, and the Court should infer that the Defendants would not have engaged in an unsustainable manipulation of their sales figures. DB at 25-26. But "the mere hindsight observation that a particular course of action makes no economical sense should not preclude the filing of a securities fraud action. Otherwise, hardly any securities fraud allegation could ever survive a motion to dismiss." *See, e.g., In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 894–95 (E.D. Tenn. 2005). Regardless, the far more plausible inference is that the scheme's unsustainability was a factor that caused Defendants to walk away from it, with their Motion to Dismiss an effort to sweep it under the rug.

### 3.    The Complaint Pleads Recklessness Under *Helwig*

Plaintiffs' allegations also create an inference of scienter under at least four

additional *Helwig* factors.

**Closeness in time of fraudulent statement and later disclosure of inconsistent information:** Here, the last false statement alleged in the Complaint was made on July 1, 2016. Just 10 days later, on July 11, 2016, prominent media outlets reported that the DOJ, FBI, and SEC had launched criminal and civil investigations into FCA "over complaints that the Company had fudged quarterly sales tallies" and reported "false sales numbers," ¶383. Then, approximately two weeks later, on July 26, 2016, FCA issued the Restatement admitting that its sales streak had in fact ended more than three years prior. The close proximity in time between each of these events supports an inference of scienter. *Bridgestone*, 399 F.3d at 684 (one week between false statement and tire recall probative of scienter); *Winslow v. BancorpSouth, Inc.,* 2011 WL 7090820, at *22 (M.D.Tenn. Apr. 26, 2011) (two week proximity probative of scienter).

**Existence of an ancillary lawsuit and government investigations:** The existence of ancillary lawsuits regarding the same subject matter serves to put defendants on notice of the alleged fraud and contributes to a strong inference of scienter. *Bridgestone*, 399 F.3d at 685. Here, the Dealer Lawsuit – which was largely sustained – contains allegations by the Company's own dealerships that both corroborate and overlap with the Complaint. *See, e.g.,* ¶¶132-136.

In addition to the Dealer Lawsuit, the SEC, DOJ, and FBI have each

launched their own criminal and civil investigations into the very same fraudulent practices alleged in the Complaint—with multiple sources identifying Defendant Bigland as their focus—and a federal grand jury has been empaneled. ¶¶344-351. This too supports a strong inference of scienter. *See Dana II*, 646 F.3d at 961 (SEC investigation into defendants' accounting practices contributed to scienter); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 714 (E.D. Mich. 2010) ("[I]f this entire matter could have been settled with reference to [Defendants' non-culpable explanations], the FBI and DOJ would not be conducting nationwide investigations" into defendants' conduct.).

**Divergence between internal reports and external statements**: Here, Plaintiffs allege that Defendants had access to at least four sources that contained detailed information directly contradicting Defendants' public statements regarding the streak. *Helwig,* 251 F.3d at 552. These included:

a) HPIMS, which tracked sales volume and vehicle reversals and, according to CW-2, could generate reports listing the vehicles unwound in a given period;

b) Field Connect, which provided comprehensive and detailed information on sales volume, and according to CW-2, reflected NVDRs for the month and the day, including sales unwound for all Dealers;

c) Dealer Connect, which, like Field Connect, provided detailed information regarding sales volume; and

d) Penta SAP, which recorded all payment activity – including purported "incentive payments" received for hitting sales targets – between a Business Center and a dealership.

¶¶377, 64-67. CW-1 explained that all of these systems allowed Defendants to run

34

"NVDR Unwind Report[s]" to determine how many NVDRs had been "unwound" in a given period. ¶66. And CW-2 confirmed that Bigland and Kommor were hands-on managers who tracked NVDRs on a daily basis. ¶¶65, 67.[15]  Access to this information suggests that Defendants were, at the very least, reckless in not knowing that FCA had falsified thousands of sales in order to artificially maintain the streak. *See Dana II*, 646 F.3d at 959-61 (scienter adequately alleged where defendants had been alerted to contrary facts by internal reports).

Moreover, any inference that Defendants did not access the internal reports, DB at 36-37, "is directly contradicted by the fact that [Marchionne and Bigland] specifically addressed [the streak] in [their] statements." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (defendant "bridge[d] the [scienter] gap herself by referencing the data directly"); *Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *56-57 (M.D. Tenn. Mar. 31, 2011) (inferring knowledge of fraud based on detailed public statements concerning relevant issues).[16] Simply put, by speaking directly on the streak, Defendants were required to have a reasonable basis to do so, including informing themselves of contradictory information that was at their fingertips.

---

[15]  *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015), is distinguishable. In *Bondali*, plaintiffs failed "to include facts sufficiently tying the individual defendants" to the contrary reports. *Id.* at 492.

[16]  *See also N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 785 (M.D. Tenn. 2013) (finding scienter where defendants did not make "any effort to verify" their public assurances regarding accounting controls).

**Disregard of the most current factual information**:  Here, as discussed above, the Complaint alleges that all Defendants had actual knowledge of the false sales by no later mid-2015. Nevertheless, Defendants continued to tout the existence of the streak through the remainder of the Class Period. Indeed, even after the Dealer Lawsuit was filed, Defendants continued to issue press releases touting the streak, which quoted Bigland and were signed by Palmer.

Defendants argue that the Complaint "[a]t most . . . suggest[s] that Messrs. Marchionne and Bigland were aware of some episodic instances of false sales reporting by dealers at one point in time." DB at 30. To the contrary, the Complaint alleges that the directive for false sales reporting came from Bigland and Kommor and that Bigland and his lieutenants both directed and spread the scheme across nearly all of FCA US's Business Centers. ¶¶112-13. Nor do Defendants explain how an internal investigation that uncovered thousands of fake sales qualifies as an "episodic instance[]."  Thus, the Complaint does not merely allege "[a]necdotal evidence of particular problems at particular [dealerships]," DB at 31 (citing *In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 564 (E.D. Mich. 2001)), but rather a Company-wide course of conduct. In fact, the practices were so ubiquitous that they had a widely-used moniker: unnatural acts.

### 4.    The Complaint Pleads Additional Facts Demonstrating Recklessness

The factors set forth in *Helwig* are not exhaustive.  The Complaint contains

additional factual allegations that further support a finding of scienter:

**Restatement**: Courts in the Sixth Circuit have found that the existence of a restatement contributes to a strong inference of scienter. *See, e.g., Fushi Copperweld*, 929 F. Supp. 2d at 786; *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *51 (M.D. Tenn. Mar. 31, 2009). Here, as discussed in detail above, Defendants restated more than five years of retail sales.

**Core Operations**: Courts also routinely find that "the more central a fact is to a company's core operations the more likely its executive acted with scienter." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008); *see also Garden City*, 2011 WL 1335803, at *57 (same). In this case, Defendants' public statements went to one of the most closely watched metrics (the streak) concerning its most profitable business segment (U.S. sales). ¶370.

**Defendants' high level positions within the Company**: As detailed herein, the Company's fraudulent practices were not limited to a small subset of employees, but rather permeated its critical U.S. business unit, with the same fraudulent practices occurring across most, if not all, of its nine U.S. Business Centers. As the top executives of the U.S. division, Defendants Marchionne, Palmer, and Bigland – the Chairman, CFO, and Head of Sales for FCA US, respectively – controlled the Company's day-to-day operations and were informed of and responsible for monitoring FCA's U.S. retail vehicle sales and the

37

Company's oft-referenced streak, ¶¶371-75. This further supports scienter. *See, e.g., In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006). Moreover, FCA Canada, where Defendant Bigland served as Chairman and CEO, was also forced to restate years' worth of false sales and "unwinds" as a result of the same practices. ¶¶389-92.

Together, and viewed in their totality, the Complaint's allegations undoubtedly create a strong inference of scienter.

### E.    Plaintiffs' CW Allegations Support an Inference of Scienter

In a desperate attempt to discredit the Complaint's litany of particularized allegations raising a strong inference of scienter, Defendants argue that Plaintiffs' CW testimony should be disregarded as unreliable. Contrary to Defendants' assertion, DB at 31-34, however, the Complaint here "give[s] sufficient detail about [the] CWs' position in the company such that the Court can discern the probable basis of a witness' belief." *Chamberlain*, 757 F. Supp. 2d at 703 (citing *Ley v. Visteon Corp.,* 543 F.3d 801, 811 (6th Cir. 2008)). In particular, the Complaint explains why each CW was in a position to know about the Company's fraudulent sales practices, alleging: (i) job titles (¶¶28-29); (ii) employment dates/timeframe (*id.*); (iii) job responsibilities (*id.*); (iv) specific reports drafted and/or received or meetings attended (¶¶63-67); and (v) direct interaction with high level employees (¶¶108-34). These allegations are more than sufficient for the

Court to discern the probable cause of each CW's belief. The CW allegations also corroborate each other.

Defendants also contend that no credence should be given to CW-sourced allegations if the CW has no personal interaction with the Individual Defendants. Courts disagree. *See, e.g., Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *16 (S.D. Ohio Mar. 29, 2010) (strong inference of scienter supported by, among other things, CWs who did not interact directly with defendants); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (district court improperly discounted CW allegation based on hearsay). Here, both CWs' managers interacted directly with Bigland and Kommor and conveyed the substance of those conversations to the CWs. ¶¶111-14, 122-23. That is more than sufficient.

Defendants also argue that the Complaint does not allege "who at the Company knew about the[] alleged . . . improprieties and what, when, where and how they knew." DB at 33. Yet, as Defendants go on to recognize, the Complaint alleges that Defendants were aware by at least August 2015 of internal complaints regarding the Company's fraudulent sales practices. ¶¶139-41. Moreover, as explained above, both CWs tie the allegations directly to their managers, who in turn reported to Bigland and Kommor.

Last, the CW allegations are corroborated by, among other things, (i) the criminal and civil investigations by the DOJ, SEC, and FBI; (ii) the Dealer

39

Lawsuit[17]; (iii) Defendants' own admissions in the Restatement that false sales artificially maintained the streak; and (iv) numerous reports from prominent and respected media outlets.

### F. The Complaint Pleads Corporate Scienter

As set forth *infra*, Plaintiffs have stated strong allegations of scienter as to Marchionne, Palmer, and Bigland. These allegations should be imputed to FCA, and Defendants' sole argument that the Complaint fails to plead corporate scienter, DB at 39, must be rejected. *Dana II*, 646 F.3d at 963.[18]

## IV. CONCLUSION

For all of these reasons, the Court should deny Defendants' Motion.[19]

Dated: June 30, 2017                    Respectfully submitted,

                                        */s/ E. Powell Miller*
                                        E. Powell Miller (P39487)
                                        Sharon S. Almonrode (P33938)
                                        **THE MILLER LAW FIRM, P.C.**
                                        950 West University Drive, Suite 300
                                        Rochester, MI 48307
                                        Telephone: (248) 841-2200
                                        Facsimile: (248) 652-2852
                                        epm@millerlawpc.com
                                        ssa@millerlawpc.com

---

[17] Defendants' suggestion that "allegations taken from other complaints should be disregarded," DB at 33-34, is contrary to Sixth Circuit law. *See Mills v. United Producers, Inc.*, 2012 WL 1672948, at *2 (E.D. Mich. May 14, 2012) (refusing to strike consent judgment from pleading under *United States v. Cohen,* 946 F.2d 430 (6th Cir. 1991).

[18] Plaintiffs have adequately pled a primary violation of Section 10(b); therefore, Defendants' sole argument against Section 20(a), DB at 40, liability fails.

[19] To the extent the Court perceives any deficiencies in the CAC, Plaintiffs should be granted leave to re-plead under Fed. R. Civ. P. 15.

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Gregory M. Castaldo
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com

-and-

Stacey M. Kaplan
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
skaplan@ktmc.com

*Attorneys for Lead Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2017, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/ E. Powell Miller*        
E. Powell Miller
