UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL PALAZZOLO and
ALBERT FERRANDI, Individually
and On Behalf of All Others Similarly Situated,

                Plaintiffs,                Civil Case No. 16-12803
                                                  Honorable Linda V. Parker

v.

FIAT CHRYSLER AUTOMOBILES N.V.,
SERGIO MARCHIONNE, RICHARD K. PALMER,
and REID BIGLAND,

                Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

This is a putative class action securities fraud case, in which investors in Fiat Chrysler Automobiles N.V. ("FCA") common stock are suing FCA and the following FCA executives: Chief Executive Officer Sergio Marchionne ("Marchionne"), Chief Financial Officer Richard K. Palmer ("Palmer"), and Head of U.S. Sales Reid Bigland ("Bigland"). Court-appointed Lead Plaintiffs Carl Palazzolo and Albert Ferrandi filed a Consolidated Class Action Complaint ("Complaint") on March 17, 2017. In the Complaint, Lead Plaintiffs allege that Defendants made materially false and misleading statements and/or omissions concerning a streak of increased monthly year-over-year United States retail sales

by FCA during the Class Period (i.e., November 3, 2014 and July 26, 2016, inclusive), which Lead Plaintiffs claim was based on "fake" sales. Lead Plaintiffs further allege that Defendants' statements or omissions resulted in the artificial inflation of the price of FCA common stock, which declined when the truth about FCA's U.S. sales emerged. The matter presently is before the Court on Defendants' motion to dismiss, filed pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. The parties have fully briefed the motion. Finding the facts and legal arguments adequately presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f). For the following reasons, the Court is denying the motion.

## I. Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . . ."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d

86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Thus in a securities fraud case, the court may consider the full text of filings with the United States Securities and Exchange Commission ("SEC") when deciding a Rule 12(b)(6) motion, even if they are not attached to the complaint. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001). Nevertheless, "[i]t would be improper for the [c]ourt to rely upon these documents to determine disputed factual issues" or to "make any determination as to the truth of any of the facts alleged or otherwise asserted in the documents themselves." *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875-76 (E.D. Tenn. 2005). "Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 893 (M.D.

Tenn. 2005) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)).

Where fraud is alleged, Rule 9(b)'s pleading requirements also must be satisfied. Fed. R. Civ. P. 9(b). Under Rule 9(b), "the circumstances constituting fraud or mistake" must be "state[d] with particularity[.]" Fed. R. Civ. P. 9(b). In the Sixth Circuit, this means the plaintiff must, "at a minimum, … allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex LP*, 2 F.3d 157, 161-162 (6th Cir. 1993) (internal quotation marks and citation omitted).

Additional heightened pleading requirements apply to claims arising under the PSLRA. *See* 15 U.S.C. § 78u–4(b)(1), (2). The Court discusses those heightened requirements in detail in Sections III and IV.

## II. Factual and Procedural Background

FCA is a worldwide automotive designer, manufacturer, and retailer. (Compl. ¶ 1.) FCA operates in the United States through its wholly-owned subsidiary FCA US LLC ("FCA US), which was formerly known as Chrysler Group LLC ("Chrysler"). (*Id.*) FCA operates through six business segments, with its North America segment comprising about 90% of FCA's earnings. (*Id.* ¶ 22.) Chrysler and Fiat S.p.A ("Fiat") consolidated after Chrysler experienced extensive

financial difficulties, reorganized, and emerged from bankruptcy in 2009. (*Id*. ¶ 2.) Marchionne, Chairman and Chief Executive Officer ("CEO") of Fiat, began overseeing the consolidated entity in June 2009. (*Id*.)

During the Class Period, Marchionne was responsible for the day-to-day management of FCA and controlled and directed its business and activities. (*Id*. ¶ 24.) When he began overseeing FCA, Marchionne instituted, what has been referred to as, "a flat organization with him at the top" in that "all key nerve systems run[] directly to [him]." (*Id*. ¶ 37.) In a July 2, 2015 article, *The Detroit News* described Marchionne as being at the "epicenter" of FCA's management matrix: "everyone is directly or indirectly connected to Marchionne, who has 38 executives reporting directly to him as CEO and chief operating officer of North America …." (*Id*. ¶ 38.) Marchionne supervises each of these executives individually. (*Id*. ¶ 39.)

During the Class Period, Marchionne certified the periodic financial reports FCA filed with the SEC and spoke regularly with investors and securities analysts regarding the company. (*Id.* 24.) He also has led FCA's Group Executive Council, its highest management body. (*Id*. ¶ 24.)

In November 2009, soon after Marchionne began overseeing FCA, he and other company executives announced a five-year plan to increase the company's U.S. retail sales by greater than 50% and its U.S. market share from less than 9%

in 2009 to greater than 13% by 2014.  (*Id*. ¶ 3.)  In February 2010, Chrysler

reported its first positive monthly U.S. sales results in 26 months.  (*Id*. ¶ 4.) When

Chrysler became a wholly-owned subsidiary of FCA in October 2014, Chrysler

had reported year-over-year monthly U.S. sales growth for fifty-four months.  (*Id*.)

FCA common stock began trading on the New York Stock Exchange on

October 13, 2014.  (*Id*. ¶ 5.)  Thereafter, starting on November 3, 2014, FCA

issued a monthly press release, which was filed with the SEC on Form 6-K,

announcing its U.S. retail sales for the preceding month.  (*See, e.g., id*. ¶¶ 174, 194,

202, 211, 218, 223, 270, 276, 291.)  From November 3, 2014 through June 1, 2016,

these press releases claimed an increase in FCA's U.S. sales compared to the same

month the year earlier and an extension of FCA US' consecutive sales streak of

year-over-year sales.  (*Id.*)  The press releases routinely included quotes from

Bigland about the increased sales and/or the sales streak.  (*Id*.)  Palmer signed all

but one of the press releases.  (*Id*.; *see also id*. ¶ 25.)

Bigland is and, throughout the Class Period, was FCA's Head of U.S. Sales,

a position he has held since June 2011.  (*Id*. ¶ 26.)  In that position, Bigland has

full responsibility for sales strategy, dealer relations and operations, order

facilitation, incentives and field operations.  (*Id.*) He reports directly to

Marchionne.  (*Id*.)  Bigland became a member of FCA's Group Executive Council

in September 2011  (*Id*.)  During the Class Period, Bigland regularly spoke with investors and securities analysts regarding FCA.  (*Id*. ¶ 26.)

Palmer, FCA's Chief Financial Officer ("CFO") since September 2011, also spoke regularly with investors and securities analysts regarding the company during the Class Period.  (*Id*. ¶ 25.)  In September 2011, Palmer also became a member of FCA's Group Executive Council.  (*Id*.)  He also has served as CFO of FCA US since June 2009.  (*Id.*)  In that capacity, he is responsible for all FCA US finance activities.  (*Id*.)  Palmer also sits on the Board of Directors of FCA US. During the Class Period, Palmer certified FCA's periodic financial reports filed with the SEC.  (*Id*.)

In its April 1, 2016 press release, announcing U.S. retail sales for March 2016, FCA claimed that increased sales for the month extended its year-over-year monthly sales gains to six full years.  (*Id*. ¶ 306.)  In the next two months' press releases, FCA did not mention the sales streak but claimed continued increased year-over-year sales. (*Id*. ¶¶ 313, 319.) The streak apparently reached 75 months by July 2016.  (*Id*. ¶ 6.)

FCA recognizes revenue when it ships vehicles to dealerships, not when the dealerships in turn sell vehicles to retail customers.  (*Id*. ¶ 59.)  Nevertheless, Defendants frequently referred to FCA's U.S. retail sales streak in public statements as evidence of the company's growth and success.  (*See, e.g., id*. ¶¶ 95,

98, 149, 174, 194, 200, 202, 207, 211, 218, 223, 224, 270, 276, 291.) Media outlets regularly reported on FCA's consecutive streak of increased year-over-year monthly U.S. sales, noting at times that FCA continued to report growth even when its competitors experienced declining sales and analysts predicted losses. (*See, e.g., id.* ¶¶ 49, 54, 79, 81-86, 92, 96, 153.) Lead Plaintiffs allege in the Complaint that retail sales "provide the investing public, creditors, and partners in potential acquisitions with an important indicator of the underlying health of FCA's business." (*Id.* ¶ 60.) A series of revelations starting in January 2016, however, began to uncover that FCA's increased year-over-year sales streak actually ended in September 2013, and that FCA's claimed increased sales were made possible by "fake" sales reported by franchised dealerships allegedly at the encouragement of executives at FCA headquarters. (*See, e.g., id.* ¶ 173.)

More specifically, Lead Plaintiffs allege in their Complaint that FCA officials encouraged and even bribed dealers with factory cash bonuses, expense reimbursements, and other incentives to carry out sales for which there was no actual buyer—typically at the end of the month to meet the month's sales volume objective. (*See, e.g., id.* ¶¶ 10, 105.) FCA collected retail sales data from dealers through New Vehicle Delivery Reports ("NVDRs"). (*Id.* ¶ 63.) A dealer who submitted an NVDR for a new sale also could cancel the transaction and return the vehicle to the dealer's unsold inventory. (*Id.*) Dealerships would "unwind" the

sales before the vehicle warranty went into effect.  (*Id*. ¶¶ 99, 113, 333.)  While "unwound" sales would be reflected in NVDRs (*see id*. ¶¶ 65, 66.), FCA did not subtract these unwound sales from its monthly reported U.S. sales.  (*Id*. ¶¶ 66, 164, 175(d).)  Lead Plaintiffs set forth information from two confidential witnesses detailing this scheme.

"CW-1" worked for FCA and its predecessors in various managerial positions from over ten years prior to the Class Period to late 2016.  (*Id*. ¶ 28.) During the Class Period, CW-1 was a managerial-level employee with accounting and finance responsibilities in FCA's Denver Business Center.  (*Id*.)  CW-1 reported to that center's director, Steven Yandura, who reported directly to Bigland and FCA's Vice President of U.S. Sales Operations, Jeffrey Kommor.  (*Id*.)  One of CW-1's responsibilities was to process and maintain records of all payment activity to dealers operating within the Denver Business Center's jurisdiction, including marketing related expenses.  (*Id*.)

According to CW-1, the Denver Business Center "absolutely" paid dealers to record fictitious sales at Yandura's direction and, based on her[1] observations, the directive was initiated at headquarters.  (*Id*. ¶ 108.)  CW-1 relates that the practice proliferated in the Denver Business Center after a June 30, 2015 meeting between

---

[1] Lead Plaintiffs use feminine pronouns to refer to the confidential witnesses to preserve their anonymity.  (Compl. ¶ 28 n.2, ECF No. 34 at Pg ID 661.)

Bigland, Kommor and the directors of FCA's nine business centers.  At that meeting, in response to Yandura's projected sales volume for the Denver Business Center, Bigland and Kommor instructed Yandura to generate additional sales and authorized the release of substantial additional marketing funds to allow him to do so.  (*Id*. ¶ 111.)  During a subsequent meeting with 30-40 Denver Business Center employees, which included CW-1, Yandura relayed his conversation with Bigland and Kommor.  (*Id*.)

On June 30, 2015, the Denver Business Center received an extra $150,000 to $180,000 from headquarters, which CW-1 understood was to be used by the center to pay dealers as an incentive to input false sales to maintain the sales streak.  (*Id*. ¶¶ 112-113.)  CW-1 provides that everyone in the Denver Business Center was expected to participate in the false sales reporting and CW-1 believed the directive came from FCA headquarters based on Yandura's comments.  (*Id*. ¶ 113.)

According to CW-1, the June 30, 2015 email approving additional funds for the Denver Business Center came from Bigland or Kommor, was sent to the directors of all nine business centers, and distributed a total of $2 million in additional marketing funds to the nine business centers. (*Id*. ¶ 114.)  Based on CW-1's conversations with area sales managers, she believed most of the nine business centers engaged in reporting fictitious sales in June 2015.  (*Id*.)

CW-2, an area sales manager in FCA's Southwest Business Center during the Class Period, relates that dealers in her jurisdiction also engaged in reporting fictitious sales. (*Id.* ¶¶ 29, 106.) According to CW-2, she started to hear area sales managers use the term "unnatural acts" beginning in 2014 or 2015 to describe "things like reporting vehicles sold that weren't, and then being paid to do it through advertising money." (*Id.*) According to CW-2, area sales managers were "under a lot of pressure" to meet sales goals and to beat the prior year sales numbers in order to keep the sales streak alive. (*Id.* ¶ 121.)

The director of the Southwest Business Center told CW-2 that Bigland and Kommor were "hands on" concerning vehicle sales and that they, along with other headquarters personnel, entered into the FCA in-house system on a daily basis— sometimes several times a day—to track NVDRs. (*Id.* ¶ 122.) CW-2 was aware of at least eleven to sixteen dealerships under the jurisdiction of the Southwest Business Center that participated in the scheme to submit false NVDRs. (*Id.* ¶ 126.) CW-2 provides that fake sales were still occurring when she left the Southwest Business Center in November 2015. (*Id.* ¶ 120.)

Information concerning these fraudulent sales first became public on January 12, 2016, when a group of seven automotive dealers under the common control of Edward F. Napleton filed a lawsuit against FCA US and FCA Realty, LLC in the United States District Court for the Northern District of Illinois ("Napleton

Lawsuit").[2]  (*Id.* ¶ 143); *see also Napleton's Arlington Heights Motors, Inc. v. FCA USA LLC*, No. 16-cv-403 (N.D. Ill. filed Jan. 12, 2016). These dealerships were within the jurisdiction of FCA US's Southeast Business Center or its Mid-Atlantic Business Center.  (Compl. ¶ 135, ECF No. 34 at Pg ID 699.)

The plaintiffs in the Napleton Lawsuit allege that FCA US solicited fraudulent sales reports from certain dealers nationwide to create the appearance of a continual increase in sales volume growth.  Mem. Op. & Order, *Napleton's Arlington Heights Motors, Inc.*, No. 16-cv-403 (N.D. Ill. Oct. 4, 2016), ECF No. 62 at 2.  According to the plaintiffs' amended complaint, FCA US and its agents devised and executed a scheme to post fraudulently inflated sales numbers through the creation of false NVDRs.  *See, e.g.*, Am. Compl., *id.* (filed Mar. 4, 2016), ECF No. 21 ¶ 35.  The defendants, the amended complaint alleges, rewarded dealerships with monies and other benefits when they achieved sales targets FCA US set in its sole discretion and granted priority access to high demand vehicle models to dealers who sold more of those models over other competitors.  *Id.* ¶¶ 3-4, 36.

FCA issued two separate press releases the day after the Napleton Lawsuit was filed in which it denied the allegations in the complaint.  (Compl. ¶ 335, ECF No. 34 at Pg ID 766.)  In one of those press releases, FCA stated that it had been

---

[2] The dealerships involved in the Napleton lawsuit are located in four different states: Illinois, Florida, Missouri, and Pennsylvania.

aware of the allegations made by the plaintiffs in the Napleton Lawsuit for some

time and had conducted an investigation which revealed that the allegations were

"baseless[.]"  (*Id.* ¶ 336.) Top FCA executives had ordered an internal review in

mid-2015, but the investigation in fact uncovered thousands of reported retail

vehicle sales for which there had been no buyers (i.e. fake or fraudulent sales).  (*Id.*

¶ 378.)

In response to the information revealed in the Napleton Lawsuit, FCA's

share price fell 4.2% from a closing price of $7.86 on January 13, 2016 to a closing

price of $7.53 on January 14, 2016.  (*Id.* ¶ 147.)

On July 18, 2016, news surfaced that the SEC and the United States

Department of Justice were investigating FCA's policies for reporting new vehicle

sales and had raided FCA's regional business centers and headquarters a week

earlier.  (Id. ¶ 156.)  FCA issued a press release denying the allegations and

accusations against it.  (*Id.*)  In response to the news of the federal investigation,

FCA's share price fell 2.53% from a closing price of $6.73 on July 18, 2016 to

$6.56 on July 19, 2016.  (*Id.* ¶ 160.)

On July 26, 2016, FCA restated its monthly U.S. sales figures for 2011

through June 2016.  (*Id.* ¶ 163.)  According to these restated figures, FCA's streak

of increasing consecutive monthly year-over-year U.S. sales actually ended in

September 2013, at month 40.  (*Id.*)  FCA acknowledged as part of its restatement

that dealerships could, in fact, book fake sales and then unwind them in order to meet a volume objective and that FCA previously did not subtract these unwound sales from its monthly reported U.S. retail sales. (*Id.* ¶ 164.) In response to this news, FCA's share price fell 4.29% from a closing price of $7.00 on July 26, 2016 to a closing price of $6.70 on July 27, 2016. (*Id*. ¶ 168.)

Investors of FCA common stock thereafter initiated this lawsuit on July 29, 2016, claiming that Defendants' repeated public assertions of an ongoing streak of year-over-year monthly sales increases artificially inflated the value of the stock, which fell when the truth about those sales was revealed, causing them loss.[3] The Court appointed Lead Plaintiffs and Lead Counsel on January 18, 2017. (ECF No. 31.) Lead Plaintiffs filed their Consolidated Class Action Complaint on March 17, 2017, in which they assert the following two counts: (I) a violation by all Defendants of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder; and (II) a violation by the individual Defendants (Marchionne, Bigland, and Palmer) of Section 20(a) of the Securities Exchange Act.

---

[3] Investors actually initiated two separate lawsuits, which this Court consolidated on November 3, 2016. (*See* ECF No. 18.)

# III. Elements of the Claims

To state a claim under Section 10(b) or Rule 10b-5, a plaintiff must allege the following: "(1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by [the] plaintiffs; and (5) proximately causing them injury." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (citations omitted). Under the PSLRA's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must also:

> "(1) … specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed [and]
>
> (2) ... state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."

*Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (emphasis in original) (quoting 15 U.S.C. § 78u–4(b)(1), (2)). Stated differently, the PSLRA "requires [the] plaintiff to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194

and n.12 (1976)).  In seeking to dismiss Lead Plaintiffs' Complaint, Defendants

argue that their allegations do not sufficiently establish the materiality of the

alleged false statements and scienter.

"A misrepresentation or an omission is material only if there is a substantial

likelihood that a reasonable investor would have viewed the misrepresentation or

omission as having significantly altered the total mix of information made

available."  *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th

Cir. 2004) (internal quotation marks and citations omitted).  The Sixth Circuit has

advised that a complaint may be dismissed for failure to demonstrate materiality,

"only if '[the misrepresentations or omissions] are so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their

unimportance.'"  *Id*. (quoting *Helwig*, 251 F.3d at 563).  Ordinarily, materiality is a

question of fact for the jury.  *Helwig*, 251 F.3d at 563 (citing cases).

Nevertheless, courts have found slight financial inaccuracies (for example, a

2% overstatement of the company's net sales) to be immaterial as a matter of law.

*See USM Holdings, Inc. v. Simon*, No. 15-14251, 2016 WL 4396061, at *5 (E.D.

Mich. Aug. 18, 2016) (unpublished opinion); *Parnes v. Gateway 2000, Inc.*, 122

F.3d 539, 546 (8th Cir. 1997) (recognizing that in some cases the false information

is so insignificant, in relation to the total mix of data available, that it would not

have mattered to a reasonable investor).  Nevertheless, as the district court

17

recognized in *USM Holdings*, "even relatively small financial errors *can* be material." 2016 WL 4396061, at *5 (emphasis in original) (citing SEC Staff Accounting Bulletin No. 99 (Aug. 12, 19999) (recognizing a 5% rule of thumb for assessing the materiality of accounting discrepancies, but also explaining that qualitative factors may make discrepancies of less than 5% material). "Qualitative factors may cause misstatements of quantitatively small amounts to be material." *Litwin v. The Blackstone Grp., L.P.*, 634 F.3d 706, 717-18 (2d Cir. 2011). As the Sixth Circuit has stated: "Materiality is about marketplace effects, not just mathematics." *Helwig*, 251 F.3d at 563.

The Sixth Circuit defines the scienter requirement for proving securities fraud as "knowing and deliberate intent to manipulate, deceive, or defraud and recklessness[.]" *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) (internal quotation marks and citation omitted). "Recklessness" is defined as "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be obvious that any reasonable man would have known it.'" *Id*. at n.3 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). The Supreme Court advised in *Tellabs, Inc.*, "[t]o qualify as 'strong' …, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 314. The *Tellabs* Court

emphasized that courts should take a holistic approach when evaluating the plaintiff's complaint, focusing on "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 326; *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007) ("We … employ a 'totality of circumstances' test in assessing whether a plaintiff has adequately alleged scienter.").

## IV.  Defendants' Arguments and Analysis

### A.  Materiality

Contending that "Plaintiffs' claims are premised on FCA US LLC's … publication of a new methodology for compiling and reporting monthly vehicle sales to end users[]" and that the newly calculated U.S. sales represent a "tiny adjustment[]" from the originally stated figures (0.2% over a period of five and a half years and 0.04% during the 21-month putative class period), Defendants argue that the alleged false statements are not material as a matter of law.  (Defs.' Mot. at 2, ECF No. 38 at Pg ID 823.)  Defendants contend that FCA's restatement of its sales figures "had little impact on FCA's stock price, which actually *increased* by 1.16% on July 26, 2016, from $6.92 to $7.00."[4]  (Defs.' Br. in Supp. of Mot. at 2,

---

[4] Defendants cite two cases after noting the increase in FCA's stock price the day it restated its sales figures: *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) and *Amgen* (cont'd …)

ECF No. 39 at Pg ID 840.)  Only by misconstruing the gist of Lead Plaintiffs' claims, however, can Defendants realistically challenge Lead Plaintiffs' ability to satisfy the materiality requirement.

Lead Plaintiffs do not premise their claims simply on FCA's stated U.S. sales figures.  Rather, Lead Plaintiffs base their claims on Defendants' repeated assertions of a continued sales streak throughout the putative class period when the streak in fact ended in September 2013.  The purported length of the streak, Lead Plaintiffs maintain, misled investors (among others) about the company's financial strength and success.  As such, if it enabled FCA to claim a continuation of increased year-over-year monthly sales, even a slight overstatement regarding the level of U.S. sales was material.

---

*Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013).  (Defs.' Br. in Supp. of Mot. at 23, ECF No. 39 at Pg ID 861.)  Both cases discuss market efficiency and the presumption that a public, material misrepresentation will be reflected in the security's price in an efficient market.  *Oran*, 226 F.3d at 282; *Amgen Inc.*, 133 S. Ct. at 1192.  As the court stated in *Oran*, in an efficient market, materiality can be judged by looking at the movement of the stock "in the period *immediately* following disclosure."  226 F.3d at 282 (emphasis added).  The *Oran* court did not define "immediately," although in a subsequent decision the Second Circuit indicated that "[t]his does not mean instantaneously, of course[.]"  *In re Merck & Co., Inc. Sec. Litigation*, 432 F.3d 261, 269 (2d Cir. 2005).  This Court does not believe the "period immediately following the disclosure at issue" is necessarily even limited to the day the disclosure is made.  According to Lead Plaintiffs' Complaint, the stock price fell 4.29% the day after FCA restated its sales figures, from a closing price of $7.00 on July 26 to $6.70 on July 27.  (Compl. ¶ 366, ECF No. 34 at Pg ID 778.)

As an initial matter, in deciding Defendants' motion to dismiss, this Court

may not consider the mathematical computations Defendants introduce in their

motion to evaluate the plausibility of the factual allegations in the Complaint.

Rather, the Court must consider only the facts alleged in Lead Plaintiffs'

Complaint, which must be accepted as true. This includes Lead Plaintiffs'

assertion that FCA previously did not subtract unwound sales from its monthly

reported U.S. sales.[5] Moreover, even if Defendants' computations are correct and

a restatement of FCA US's sales resulted in a "miniscule effect on the number of

reported sales" (Defs.' Br. in Supp. of Mot. at 26, ECF No. 39 at Pg ID 864), this

does not undermine Lead Plaintiffs' claim that including false sales in its retail

_____

[5] In support of their argument that the fraudulent scheme alleged by Lead Plaintiffs
"defies common sense and basic math", Defendants contend that the net number of
reported sales over a given period would not be impacted by unwound sales.
(Defs.' Br. in Supp. of Mot. at 25-26, ECF NO. 39 at Pg ID 863-64.) According to
Defendants, "[i]nducing a dealer to submit and then unwind fake NVDRs in one
month would simply decrease sales in the month in which the unwound vehicles
were sold[.]" (_Id._) Lead Plaintiffs assert, however, that FCA was not subtracting
the unwound sales from its monthly reported U.S. sales under the alleged
fraudulent scheme. Moreover, what is significant for purposes of Lead Plaintiffs'
claims is not the impact of the unwound sales on the number of net sales, but rather
the purported streak. As Lead Plaintiffs point out, even in FCA's restated figures,
it may have chosen the month to subtract an unwound sale (that is, between the
month the "fake" sale was recorded, the month it was rewound, and the month the
vehicle was resold) to maintain the appearance of growth. As Lead Plaintiffs
additionally argue, FCA's restated sales figures should not be accepted as true at
this stage of the proceedings.

sales figures enabled FCA to present to the public the image that it was experiencing a six-year consecutive streak in year-over-year sales growth.

Lead Plaintiffs demonstrate in their Complaint that Defendants frequently touted the consecutive monthly year-over-year U.S. sales increases in public statements as evidence of FCA's growth. For example, as Lead Plaintiffs cite, "Bigland maintained that the sheer length of the streak proved that it was not simply the result of 'easy comparisons': 'when you have gone almost five years, it silences a lot of people who have alleged you have easy comparisons.'" (Compl. ¶ 82, ECF No. 34 at Pg ID 680.) With regard to the streak, Marchionne commented: "'we've had almost six years of uninterrupted growth in the United States. … That's not an inconsequential feat.'" (*Id*. ¶ 7, at Pg ID 653.) According to the Complaint, "Marchionne added that the Company's streak was proof that FCA was doing something right." (*Id*.) All of FCA's monthly press releases from November 2014 until April 2016 headlined the sales streak.

Media outlets focused on the streak repeatedly when reporting on FCA's viability, and it was the extensive length of the streak that reporters found "virtually unheard of for American auto manufacturers," "jaw-dropping[,]" and "astonishing[.]" (*Id*. ¶¶ 81, 82, 84 ECF No. 34 at Pg ID 680, 681.) As Lead Plaintiffs set forth in the Complaint, media outlets and financial analysts frequently cited the "streak as concrete evidence that [FCA] had turned the corner and was

flourishing." (*Id.* ¶ 80, ECF No. 34 at Pg ID 680.)  One financial news outlet explained: "'Investors weigh monthly sales reports closely for signs of how auto companies are faring.'" (*Id.* ¶ 60, at Pg ID 672.)

The restatement of FCA US's sales may have been quantitatively insignificant.  Nevertheless, the previously stated sales figures enabled FCA to maintain the perception of a consecutive streak of year-over-year sales growth for over six years.  Lead Plaintiffs' Complaint reflects that this streak was qualitatively material to investors.  In other words, the public, media, and investors were not focused on the specifics of FCA US' monthly sales figures, but rather on the fact (or purported fact) that those figures led to a continuation of FCA's growth streak.

For these reasons, the Court cannot find that Defendants' purported false statements or omissions were immaterial as a matter of law.

### B.  Scienter

Defendants argue that Lead Plaintiffs do not plead facts giving rise to the required "strong inference" that they acted with scienter.  According to Defendants, because FCA US would have reported more sales from January 2011 through June 2016 under its new methodology, its growth was real and thus there could have been no scheme to "create the perception of growth."  Defendants also maintain that Lead Plaintiffs' allegations of scienter are insufficient because they are "based almost exclusively on conclusory and unsubstantiated assertions from

23

two confidential witnesses, media reports and unproven allegations lifted from a single unverified complaint in a separate action filed by two FCA US dealerships." (Defs.' Mot. at 3, ECF No. 38 at Pg ID at Pg ID 824.)

Again, Lead Plaintiffs do not base their claims on FCA US's sales figures. Instead, they premise their claims on Defendants' alleged creation of the perception of a streak of consecutive sales growth through, in part, fraudulent sales. Lead Plaintiffs plead sufficient facts that, when viewed collectively, suggest Defendants were aware of—and in Bigland's case, perhaps directed—the conduct leading to the false sales figures used to continue this streak. At the very least, Lead Plaintiffs allege several red flags and suspicious facts that should have caused Defendants to become aware of the alleged fraudulent scheme.

For example, in mid-2015, business center employees and dealerships began complaining to corporate headquarters about directives to submit false sales to meet sales volume quotas. (Compl. ¶¶ 138, 139, ECF No. 34 at Pg ID 701.) Defendants confirmed that they were made aware of the allegations and ordered an internal investigation. (*See, e.g.*, Compl. ¶ 144, ECF No. 34 at Pg ID 703.) That investigation revealed thousands of fraudulent vehicle sales for which there were no buyers. (*Id.* ¶ 140.) Nevertheless, for approximately another year, Defendants continued to claim sales growth based on figures that included fraudulent sales and to tout the streak in increased sales.

Defendants also continued to make those claims after the Napleton Lawsuit was filed, where it again was asserted that FCA was pressing dealerships to report fraudulent sales to maintain the streak.[6]  Defendants' public statement that the allegations in the lawsuit were baseless, where a previous internal investigation revealed at least some of them to be true, supports a finding of scienter.  At the very least, the Napleton Lawsuit put Defendants on notice of the alleged fraud.

The information provided by two confidential witnesses who worked at different FCA business centers further supports an inference of scienter.  These witnesses indicate that FCA US headquarters imposed minimum monthly sales targets for its franchise dealers and solicited, encouraged, and bribed dealers through its business centers to submit fake NVDRs during the last few days of each sales month to meet or exceed those sales goals.  The confidential witnesses' statements reflect that this occurred in most, if not all, of FCA's nine business centers.  As such, unlike a case cited by Defendants, these witnesses do not "describe the anomalies of a rogue fiefdom," but rather "company-wide practices that rise to the level of a core operation[,]" contributing to a strong inference that

---

[6] It does not matter for purposes of deciding Defendants' motion to dismiss whether the allegations in the Napleton Lawsuit are true.  The Court need decide only whether the allegations in Lead Plaintiffs' Complaint, viewed through the prisms of Rules 9(b) and 12(b)(6) and the PSLRA, state a claim for relief.  According to Lead Plaintiffs, the filing of the Napleton Lawsuit, regardless of whether it has merit, should have been a red flag to Defendants concerning the fake sales used to increase FCA US sales.

the individual Defendants were aware of the fraud. *See In re Waschovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011).

Contrary to Defendants' assertions, the allegations in Lead Plaintiffs' Complaint are sufficient in terms of detail to give weight to these witnesses' statements. The statements are not "vague and conclusory" and provide sufficient particularity as to "what, when, where, and how [these complaining witnesses] knew" the alleged facts. *Ley v. Visteon*, 543 F.3d 801, 811 (6th Cir. 2008). Lead Plaintiffs' further allegations concerning the structure of FCA and Marchionne's, Bigland's, and Palmer's central roles within the corporate structure and involvement in day-to-day operations add to the totality of circumstances suggesting that they would have been aware of—if not played a role in—the alleged fraudulent scheme.

For these reasons, Lead Plaintiffs allege sufficient facts in their Complaint to give rise to a strong inference that Defendants acted with the required state of mind.

## V. Conclusion

In summary, the Court holds that Lead Plaintiffs allege sufficient facts to satisfy the pleading requirements in Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss the Consolidated

Class Action Complaint (ECF Nos. 38, 39) is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 14, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, December 14, 2017, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager
